# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| BROADWAY GATE MASTER FUND, LTD., PENNANT MASTER FUND LP, and PENNANT WINDWARD MASTER FUND, LP, | ) ) ) ) ) | CIVIL ACTION NO. |
| Plaintiffs, | ) ) ) | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES** |
| v. | ) | **LAWS AND THE COMMON LAW** |
| OCWEN FINANCIAL CORPORATION, WILLIAM ERBEY, RONALD FARIS, MICHAEL BOURQUE, and JOHN BRITTI, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

Plaintiffs Broadway Gate Master Fund, Ltd., ("Broadway"), Pennant Master Fund LP, ("Pennant Master"), and Pennant Windward Master Fund, LP ("Pennant Windward" and, collectively with Broadway and Pennant Master, "Plaintiffs") are investment funds that purchased the common stock of Defendant Ocwen Financial Corporation ("Ocwen" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, sue Ocwen and certain of its former and present officers, Defendants William Erbey ("Erbey"), Ronald Faris ("Faris"), Michael Bourque ("Bourque"), and John Britti ("Britti" and, collectively with Erbey, Faris and Bourque, the "Individual Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of: Ocwen's filings with the U.S. Securities and Exchange Commission ("SEC"); an October 5, 2015 SEC order instituting

a settled administrative proceeding against Ocwen's affiliate, Home Loan Servicing Solutions Ltd.; various letters sent by the Superintendent of the New York State Department of Financial Services to Ocwen; a December 22, 2014 consent order between Ocwen, Ocwen Loan Servicing LLC, and the New York State Department of Financial Services; a consent judgment filed in the matter *Consumer Financial Protection Agency, et al. v. Ocwen Financial Corporation, et al.*, 13-cv-2025 (D.D.C. Feb. 26, 2014); several reports issued by Joseph A. Smith, Jr. concerning Ocwen's compliance with the National Mortgage Settlement; pleadings, motion papers, and exhibits to declarations filed in the matter *In re Ocwen Financial Corporation Securities Litigation*, 14-cv-81057-WPD (S.D.Fl.); and public documents and media reports concerning Ocwen and its affiliates.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       Plaintiffs bring this action under the federal securities laws and under the common law to recover the investment losses they suffered as a result of numerous false and misleading statements that Ocwen and its executives made to induce Plaintiffs to purchase the common stock of Ocwen.  Defendants' misrepresentations to Plaintiffs caused Plaintiffs to suffer significant investment losses when the truth was gradually revealed and the price of Ocwen's common stock plummeted as a result.

2.       Ocwen is a mortgage servicing company based in Florida that was founded and – until very recently – led by Defendant Erbey.  Erbey has since been forced to resign his position. Defendants' right-hand man in running Ocwen was his long time compatriot, Defendant Faris.

3.       Plaintiffs are investment funds managed by a common advisor based in New Jersey.

4.      In 2013, Defendants sought to induce Plaintiffs to invest in Ocwen.  Rather than providing accurate information about the company, however, Defendants made numerous misrepresentations to Plaintiffs' investment advisor to induce Plaintiffs to purchase Ocwen stock. Defendants made these misrepresentations not only in public documents and statements on which Plaintiffs' investment advisor relied, but also directly to Plaintiffs' investment advisor during an in-person meeting.  Defendant Erbey personally met with Plaintiffs in September 2014 to encourage them to continue purchasing the stock of Ocwen despite concerns raised by a New York regulatory investigation of Ocwen.

5.      Over the course of 2013 and 2014, Defendants induced Plaintiffs to purchase hundreds of millions of dollars of Ocwen stock by making false and materially misleading statements to Plaintiffs' investment advisor and in Ocwen's public filings.

6.      For example, Defendants Ocwen, Erbey, Faris and Britti made false and misleading statements concerning Erbey's recusal from the approval of related-party transactions.  Between 2009 and 2012, Erbey spun off four of Ocwen's businesses into separate public companies that served as customers of and service providers to Ocwen.  Erbey was Chairman of Ocwen and all of the related companies, and a large shareholder of Ocwen and most of the related companies.  To avoid potential conflicts of interest, Defendants represented that Erbey recused himself from the negotiation and approval of all transactions between Ocwen and the related companies.  As it turns out, however, Erbey was involved in the approval of multiple transactions with the related companies.  In December 2014, Ocwen entered into a government consent order pursuant to which it admitted Erbey's improper involvement in related-party transactions, and Erbey agreed to resign from his position with Ocwen and all of the related companies.

7.      Defendants Ocwen, Erbey, Faris and Britti also misrepresented that Ocwen's financial statements were prepared in accordance with generally accepted accounting principles, and that Ocwen had implemented effective controls over financial reporting required to ensure that its financial statements were correctly prepared.  In August 2014, however, Ocwen disclosed that in 2013 and the first quarter of 2014, it had improperly accounted for the sale of mortgage servicing rights to one of its related companies.  Ocwen also admitted that – contrary to its prior representations – its internal controls over financial reporting contained a material weakness.  As a result of the admittedly improper accounting, Ocwen materially overstated its income for the first quarter of 2014, and was forced to restate its financial statements for the relevant periods.

8.      Defendants Ocwen and Erbey also made false statements about Ocwen's compliance with the National Mortgage Settlement and Ocwen's disclosure procedures.  Under the National Mortgage Settlement, Ocwen was required to establish an independent and properly functioning internal review group to monitor Ocwen's compliance with mandatory mortgage servicing standards set forth in the settlement.  Defendant Erbey represented that Ocwen was in compliance with the National Mortgage Settlement, and Defendant Faris certified that Ocwen had effective disclosure controls and procedures so that any material failure to comply with the National Mortgage Settlement would be promptly discovered and publicly disclosed.  In December 2014, however, the court-appointed monitor for the National Mortgage Settlement issued a report revealing that Ocwen's internal review group lacked independence from its servicing business and did not have the resources, knowledge or authority to properly perform its mandate.  Moreover, Ocwen's failure to establish a properly functioning internal review group was not disclosed to the public because the group did not have proper management reporting lines in place.  Thus, Ocwen

was not in compliance with the National Mortgage Settlement and did not have effective disclosure controls and procedures.

9.  Defendants Ocwen, Erbey, Faris and Britti misled Plaintiffs about Ocwen's servicing technology.  Ocwen consistently represented that its servicing technology allowed it to increase the rate of borrower loan modifications it performed, which had the effect of increasing Ocwen's profits.  However, in October 2014, it was publicly revealed that a defect in Ocwen's servicing technology had been causing Ocwen to backdate hundreds of thousands of loan modification letters for years, depriving borrowers of the opportunity to modify the terms of their mortgage loans, and violating the requirements of the National Mortgage Settlement.  Ocwen's senior management had known about the issue since November 2013, but had failed to disclose it while continuing to falsely tout the effectiveness of Ocwen's servicing technology.  Ocwen's representation that its technology allowed it to complete more loan modifications was materially misleading because it omitted information about the backdating issue, which Ocwen had a duty to disclose to Plaintiffs once it made affirmative representations about its technology's impact on loan modifications.

10.  Finally, Defendants Ocwen, Britti and Bourque made material misrepresentations concerning the regulatory investigations to which Ocwen was subject.  Specifically, in its quarterly reports filed with the SEC for the first, second and third quarters of 2014, Ocwen disclosed that it was subject to several regulatory investigations, but failed to disclose to investors that: (a) a California regulatory agency had commenced a regulatory examination of Ocwen in January 2013; (b) in June 2014, California issued an order against Ocwen requiring Ocwen to comply with California's requests for production of documents and records, which Ocwen had previously failed to do; and (c) in October 2014, California instituted an administrative action against Ocwen,

seeking to suspend Ocwen's license to service mortgages in California.  California is Ocwen's largest market, with over $112 billion of mortgage loans serviced by Ocwen in California as of December 31, 2013.  Accordingly, Ocwen's failure to disclose the existence of the California regulatory investigation, which could have led to a significant loss of business for Ocwen, rendered its statements regarding the regulatory investigations to which it was subject materially incomplete and misleading.  In January 2015, several media outlets disclosed the existence of the California investigation and the potential suspension of Ocwen's license, causing the price of Ocwen's common stock to plummet.

11.     Plaintiffs purchased their Ocwen common stock between October 2013 and November 2014 in reliance on Defendants' misrepresentations.  In making their decisions to invest in Ocwen common stock, Plaintiffs' investment advisor read, reviewed, listened to, and relied on Defendants' materially misleading statements.  Plaintiffs' investment adviser also relied on the integrity of the market price of Ocwen's common stock.  Plaintiffs and their investment advisor were unaware of the falsity of Defendants' statements when Plaintiffs purchased Ocwen stock.

12.     Defendants' misrepresentations caused Plaintiffs to purchase Ocwen common stock at artificially-inflated prices.  Had it not been for these repeated material misrepresentations – communicated and conveyed to Plaintiffs both in person and through public filings – Plaintiffs either would not have purchased their Ocwen shares or would not have paid the prices they paid.

13.     As the truth about Ocwen and Erbey was gradually disclosed and processed by the market, Plaintiffs suffered significant investment losses.

14.     Plaintiffs therefore bring this action to recover the damages suffered as a result of the wrongs committed by Defendants.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

16.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

18.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## PARTIES

### A.    Plaintiffs

19.    Plaintiff Broadway is a Cayman Islands corporation located at One DeForest Avenue, Suite 200, Summit, NJ 07901.  The dates on which Broadway purchased Ocwen common stock during the relevant period are attached hereto as Exhibit A.

20.    Plaintiff Pennant Master is a Cayman Islands partnership located at One DeForest Avenue, Suite 200, Summit, NJ 07901.  The dates on which Pennant Master purchased Ocwen common stock during the relevant period are attached hereto as Exhibit B.

21.     Plaintiff Pennant Windward is a Cayman Islands partnership located at One DeForest Avenue, Suite 200, Summit, NJ 07901.  The dates on which Pennant Windward purchased Ocwen common stock during the relevant period are attached hereto as Exhibit C.

**B.     Defendants**

22.     Defendant Ocwen is a Florida corporation with its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409.  At all relevant times, Ocwen was a publicly-traded company.

23.     Defendant Erbey is the founder and former Chairman of Ocwen.  Upon information and belief, Erbey resides in Saint Croix, U.S. Virgin Islands.

24.     Defendant Faris is the Chief Executive Officer of Ocwen.  Upon information and belief, Faris resides at 11970 Torreyanna Circle, West Palm Beach, FL 33412.

25.     Defendant Bourque is the Chief Financial Officer of Ocwen.  Upon information and belief, Bourque resides in Saint Croix, U.S. Virgin Islands.

26.     Defendant Britti is the former CFO of Ocwen.  Upon information and belief, Britti resides at 2640 Peachtree Road NW, Unit 3, Atlanta GA 30305.

## FACTUAL ALLEGATIONS

**I.     Events Prior to Plaintiffs' Investment in Ocwen**

**A.     The Mortgage Servicing Industry**

27.     Ocwen's primary line of business is residential mortgage loan servicing.  Ocwen is one of the largest mortgage servicers in the United States.  Unlike traditional mortgage loan servicers, Ocwen is not a bank regulated by the Federal Deposit Insurance Corporation or the Office of the Comptroller of the Currency, but rather a financial services company.

28.     Mortgage loan servicers play an important role in the mortgage industry.  The servicers are the entities responsible for (i) collecting and remitting the monthly payments of

principal and interest made by the homeowner to repay the mortgage loan, (ii) administering the escrow accounts from which the borrower's property taxes and homeowners' insurance are paid, and (iii) managing loans when the borrower has become delinquent in making payments (including negotiating loan modifications with the borrower or instituting foreclosure proceedings against the mortgaged property).  It is the servicer, and not the lender, that the homeowner communicates with about their mortgage loan.

29.     Servicers are also the parties responsible for obtaining homeowner's insurance when a homeowner has let his insurance coverage lapse.  The insurance procured by the servicer in such circumstances is called "force-placed" insurance.

30.     In today's capital markets, mortgage loans are frequently pooled together into securitized trusts in which interests, or "residential mortgage backed securities," are sold to investors.  Companies that service loans owned by such securitized trusts are obligated to make servicing advances to the trusts; that is, the servicer is required to pay the trust for missed payments that the servicer expects the borrower will ultimately pay.  Although servicers are entitled to be reimbursed for any servicing advances they make, the existence of such a requirement requires the servicer to maintain a financing facility.

31.     A servicer's primary form of remuneration is its mortgage servicing fee, which is a percentage of the unpaid principal balance, or "UPB," of the mortgage loans being serviced. Servicers may also earn ancillary fees such as retaining the interest that accrues on loan payments between the time they are paid by the borrower and remitted to the lender or the trust, and in some circumstances collecting late fees from homeowners during a period of delinquency.

32.     The party that owns the right to service a mortgage loan is said to hold the mortgage servicing rights, or "MSRs."  Sometimes, the holder of MSRs will hire a subservicer or a special servicer to service a particular mortgage loan.

**B.     Erbey, Ocwen and the Related Companies**

33.     Ocwen was founded in 1988 by Erbey and his business partner, Barry Wish, following the dissolution of Wish and Erbey's existing venture, The Oxford Financial Group.

34.     During its early years, Wish and Erbey focused Ocwen's growth on the acquisition of non-performing loans.

35.     Initially, Wish was Ocwen's Chairman and Erbey was its CEO.  However, Erbey replaced Wish as Chairman in 1996.  Erbey served as Ocwen's Chairman and CEO until 2010, when he appointed Faris as CEO.  Faris had served Erbey in various roles at Ocwen since 1991, working his way up the corporate ladder to become Erbey's right-hand man.  Erbey remained as Chairman of Ocwen after he appointed Faris CEO.

36.     In 1999, frustrated with the increasing regulatory scrutiny that Ocwen was receiving from the Office of Thrift Supervision, Erbey commenced a "de-banking" process for Ocwen, turning Ocwen from a thrift bank into a financial services company.  The de-banking process was completed in 2004.

37.     Part of Erbey's subsequent plan for Ocwen was to "spin off" certain of Ocwen's business segments into related, but purportedly independent, public companies.  Erbey became Chairman of all of these new companies, while continuing in his position as Chairman of Ocwen. He also received large equity positions in most of the new companies.

38.     In 2009, Erbey spun off Ocwen Solutions into a company called Altisource Portfolio Solutions S.A. ("Altisource Solutions").  Ocwen Solutions had performed a number of services for Ocwen, one of which was developing the technology that Ocwen used to service

mortgage loans.  Following the spin-off, Ocwen entered into a long-term licensing agreement to use Altisource Solutions' electronic servicing platform, REALServicing.  Ocwen is by far Altisource Solution's largest customer.

39.     Altisource Solutions created an insurance agency subsidiary called Beltline Road Insurance Agency ("Beltline").  In August 2013, Ocwen appointed Beltline as its exclusive insurance representative.

40.     In 2011, Erbey created a new business entity called Home Loan Servicing Solutions, Ltd. ("HLSS").  The purpose of HLSS was to allow Ocwen to pursue an "asset-lite" strategy.  Ocwen sold many of its MSRs to HLSS, meaning that HLSS received the servicing fees and made the servicing advances on those loans, while Ocwen retained the right to subservice those loans and keep the ancillary fees.  Erbey became Chairman of HLSS and received stock in HLSS.

41.     In 2012, Erbey spun off two more public companies:  Altisource Residential Corporation ("Altisource Residential") and Altisource Asset Management Corporation ("Altisource Asset Management").  The purpose of Altisource Residential is to acquire non-performing loans from Ocwen, and then convert foreclosed properties into rental units.  The income from those rental properties are passed through to Altisource Residential's investors.  Erbey became Chairman of Altisource Residential and received a substantial ownership percentage of Altisource Residential.

42.     Altisource Asset Management is the asset manager for Altisource Residential under a fifteen-year asset management agreement between the two entities.  As of December 31, 2013, Altisource Asset Management had only seven employees, and shared the same executive officers

as Altisource Residential.  Erbey became Chairman of Altisource Asset Management and received a substantial beneficial ownership percentage of Altisource Asset Management.

43.     Throughout this Complaint, Altisource Solutions, HLSS, Altisource Residential, and Altisource Asset Management will be referred to collectively as the "Related Companies."

### C.     Ocwen's Growth

44.      As is well known, the collapse of the U.S. housing market and the resulting subprime mortgage crisis in 2007 led to a global financial crisis in 2008.

45.     During the global financial crisis, Ocwen took advantage of the resulting increase in mortgage loan delinquencies.  Among other things, Ocwen's reduced labor costs, which it achieved by outsourcing customer service positions to India, allowed it to acquire and service large volumes of subprime loans.

46.     In response to the global financial crisis, governments around the globe passed sweeping reforms concerning the regulation and supervision of banks.  For example, in July 2010, Congress enacted the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank").  In December 2010, the Basel Committee on Banking Supervision presented "Basel III: A global regulatory framework for more resilient banks and banking systems,"

47.     This heightened regulatory environment allowed Ocwen to further benefit from the financial crisis because it was no longer a bank.  As a result of the reforms and increased compliance framework, several large banks exited the mortgage servicing business and sold their MSRs to non-banks.

48.     Ocwen purchased many of the divesting banks' servicing businesses and MSRs. For example, in 2011, Ocwen acquired Goldman Sach's mortgage servicing arm, Litton Loan Servicing.  Similarly, in 2012 Morgan Stanley exited the mortgage servicing industry by selling its servicing unit, Saxon, to Ocwen.

49.     Thus, from 2010 through 2013, Ocwen grew rapidly via portfolio and business acquisitions.  In 2010, Ocwen serviced approximately $74 billion UPB of mortgage loans.  By 2013, that number had risen to approximately $500 billion.

### D.     National Mortgage Servicing Standards

50.     Despite its non-bank status, Ocwen was not free from the increased regulatory oversight imposed in the wake of the financial crisis.

51.     In February 2012, the Consumer Financial Protection Bureau (a new federal agency created under Dodd-Frank), forty-nine states, and the District of Columbia announced a global settlement of federal and state investigations against the country's five-largest mortgage servicers (at that time, Bank of America Corporation, JP Morgan Chase & Co., Wells Fargo & Company, Citigroup Inc. and Ally Financial Inc.) for improper mortgage practices (the "National Mortgage Settlement").

52.     Among other things, the National Mortgage Settlement reformed servicing standards.  The new servicing standards required servicers to: (a) fix common flaws in foreclosure and bankruptcy procedures (including ensuring that the servicer has the right to foreclose before instituting foreclosure proceedings, and verifying that factual assertions made in court documents are accurate); (b) adopt policies and processes to oversee and manage third-party providers retained by the servicer; (c) adopt loss mitigation procedures to reduce foreclosures (including a prohibition on instituting foreclosure proceedings against a borrower with a pending loan modification application); (d) establish a single point of contact for each borrower; (e) implement standard loan modification timelines (including providing the borrower with thirty days to appeal the denial of a loan modification request); (f) implement special procedures to protect active military personnel from foreclosure; (g) not charge unreasonable fees to the borrower; and (h) not unnecessarily impose force-placed insurance on a borrower.

53.     Moreover, servicers subject to the National Mortgage Settlement are required to set up an "Internal Review Group," establish adequate staffing levels and improve training of mortgage professionals.

54.     Although Ocwen initially was not a party to the National Mortgage Settlement, MSRs that it acquired from servicers that were parties to that settlement were required to be serviced in accordance with the settlement.

55.     In March 2013, Ocwen announced that it had established a Compliance Committee to provide assistance to Ocwen's Board of Directors with (i) establishment and oversight of Ocwen's compliance function, including its compliance management system, and (ii) oversight of Ocwen's compliance with applicable laws, rules and regulations.  Defendant Faris was a member of the Compliance Committee because, according to Ocwen, "the Compliance Committee benefits from his deep knowledge of industry regulation and compliance practices as well as his many years of experience working with industry regulators."

56.     In December 2013, Ocwen reached a separate agreement with several governmental authorities to comply with the National Mortgage Settlement.  Among other things, Ocwen agreed to (i) service loans in accordance with the National Mortgage Settlement and (ii) be subject to oversight for three years by the independent monitor (the "NMS Monitor") administering the requirements of the National Mortgage Settlement.

### III.     Defendants' Representations to Induce Plaintiffs to Invest in Ocwen

57.     To induce Plaintiffs to purchase Ocwen's common stock, Defendants made numerous representations about Ocwen's business.  These representations included assurances about the safeguards Ocwen had implemented to protect against potential conflicts of interest, the accuracy of Ocwen's financial statements, Ocwen's compliance with the National Mortgage

Settlement, the advantage that Ocwen's technology provided in achieving borrower loan modifications, and the disclosure of regulatory investigations to which Ocwen was subject.

### A.   Representations Concerning Erbey's Recusal from Transactions with the Related Companies

58.    Erbey's control over both Ocwen and the Related Companies created concerns for Plaintiffs and the investment community about the existence of potential conflicts of interests in transactions between Ocwen and one of more of the Related Companies.  Specifically, Plaintiffs and other investors were concerned about the possibility that, based on his leadership position at the Related Companies, Erbey could cause Ocwen to enter into business deals with the Related Companies that were less favorable than Ocwen would otherwise achieve in an arm's-length transaction with nonaffiliated third parties.

59.    Plaintiffs therefore sought assurances that Erbey would not be dictating or influencing the terms of the business deals between Ocwen, on the one hand, and the Related Companies, on the other.

60.    In response to such concerns, Defendants repeatedly represented that Ocwen had sufficient safeguards in place to prevent Erbey's interference in such deals.

61.    In Ocwen's annual report for 2012, issued on March 1, 2013, Ocwen,  Erbey, Faris and Britti represented:  "We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource [Solutions], including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions."

62.    Similarly, the following year, in Ocwen's annual report for 2013, issued on February 28, 2014, Ocwen, Erbey, Faris and Britti substantially repeated this representation about Erbey's recusal from related party transactions:  "We have adopted policies, procedures and

practices to avoid potential conflicts with respect to our dealings with Altisource [Solutions], HLSS, Altisource Assent Management and [Altisource] Residential, including our Executive Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities."

63.     Ocwen again repeated this representation verbatim in its amended annual report for 2013, issued on August 18, 2014, which was signed by Defendants Erbey, Faris and Bourque.

64.     Ocwen made similar statements in its proxy statements for its annual meeting of shareholders issued on April 3, 2013 ("Due to the nature of Mr. Erbey's obligations to each of [Ocwen, HLSS, Altisource Solutions, Altisource Residential and Altisource Asset Management], he recuses himself from decisions pertaining to any related transactions."), and on April 22, 2014 ("Due to the nature of Mr. Erbey's obligations to each of [Ocwen, HLSS, Altisource Solutions, Altisource Residential and Altisource Asset Management], he recuses himself from decisions pertaining to any transactions between them.")

65.     Erbey made such representations himself during telephone conference calls with investors, including Plaintiffs' investment advisor.  On a December 3, 2013 conference call, Erbey told investors:  "I'd like to stress, first of all, that [the Related Companies] are not affiliates, that they are independent companies.  They have independent boards, and they have management teams."  A few minutes later, Erbey stated emphatically:  "[W]e have [a] robust related party transaction approval process.  Any related party transaction between the [Related Companies and Ocwen], I actually recuse myself from . . . ."

66.     On a February 26, 2014 call with investors, including Plaintiffs' investment advisor, Erbey stated that there had been "full disclosure" of all potential conflicts of interest arising from Erbey's affiliation and involvement with Ocwen and the Related Companies, and that

the boards of each of the Related Companies was completely "independent," despite Erbey's presence as Chairman of those boards.

67.     On September 16, 2014, Erbey met personally with Plaintiffs' investment advisor in New York to discuss Ocwen.  Erbey assured Plaintiffs' investment advisor that Ocwen had implemented proper procedures to safeguard against potential conflicts of interest.

**B.     Representations Concerning Ocwen's Financial Statements and the Effectiveness of Its Internal Controls over Financial Reporting**

68.     As a public company, Ocwen is required to report its financial results in accordance with United States Generally Accepted Accounting Principles ("GAAP").  GAAP is a set of accounting standards, the application of which by Ocwen allows Plaintiffs to compare the financial health of Ocwen to other companies.

69.     Ocwen's 2013 annual report contained audited financial statements purportedly prepared in accordance with GAAP.  Indeed, Faris and Britti each certified that "the financial statements, and the other financial information included in [Ocwen's 2013 annual report], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

70.     Ocwen reported that its income before taxes for the year ended December 31, 2013 was $335,223,000.

71.     Ocwen's quarterly report for the first quarter of 2014, which was issued on May 2, 2014, and was signed by Britti, also contained financial statements purportedly prepared in accordance with GAAP.  Faris and Britti again provided certifications about the accuracy of the financial information in the quarterly report.

72.     Ocwen reported that its income before taxes for the quarter ended March 31, 2014 was $88,960,000.

73.     As a further safeguard to prevent issuers from reporting materially inaccurate financial information, the SEC requires public companies to implement and design proper internal controls over financial reporting and to report as to the effectiveness of those controls.  The existence of effective internal controls over financial reporting at Ocwen was important to Plaintiffs because it provided some assurance that the financial information provided by Ocwen was accurate and prepared in accordance with GAAP.

74.     In Ocwen's 2013 annual report, which was signed by Erbey, Faris and Britti, Ocwen reported that its management had conducted an evaluation and concluded that as of December 31, 2013, Ocwen's internal controls over financial reporting were effective.  In their accompanying certifications, Faris and Britti both assured investors that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

75.     In its first quarter report for 2014, Ocwen stated that there had been no change in its internal controls over financial reporting during the first quarter "that ha[d] materially affected, or [wa]s reasonably likely to materially affect, our internal control over financial reporting."  Faris's and Britti's certifications to the first quarter report again provided that they had designed internal controls to reasonably assure that Ocwen's financial statements were reported in accordance with GAAP and evaluated the effectiveness of those internal controls.

C.     **Representations Concerning Compliance with National Mortgage Settlement and Effectiveness of Disclosure Controls and Procedures**

76.     In December 2013, Ocwen reached an agreement with governmental authorities to comply with the requirements of the National Mortgage Settlement, which agreement was formalized in a Consent Judgment entered by a federal court on February 26, 2014.

77.     Among other things, Ocwen was required to comply with the servicing standards of the National Mortgage Settlement and to establish an "Internal Review Group" ("IRG").  The purpose of the IRG was to establish an internal watchdog, independent from Ocwen's servicing business, to perform quarterly reviews of Ocwen's compliance with the National Mortgage Settlement.  In addition to being independent from Ocwen's servicing business, the IRG was required to be staffed with skilled personnel who had the ability to analyze problems and who had access to the appropriate members of management or the board responsible for publicly reporting violations of the National Mortgage Settlement.

78.     Ocwen's compliance with the National Mortgage Settlement was important to Plaintiffs.  Ocwen's failure to comply with the requirements of the National Mortgage Settlement could result in the imposition of substantial penalties that would adversely affect Ocwen's business operations and results.

79.     Even before the Consent Judgment was entered, Ocwen represented that it was in compliance with the requirements of the National Mortgage Settlement.  In its presentation for its December 2013 investor day, Ocwen stated that although it was not yet a party to the National Mortgage Settlement, "it services or subservices loans for parties which are subject to these settlements and therefore ***services in compliance with those standards*** as applicable."  (Emphasis added).

80.     In its press release announcing its operating results for the first quarter of 2014, issued on May 1, 2014, Ocwen touted its compliance with the National Mortgage Settlement. Specifically, Erbey stated:

> Going forward, we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business. **We consider our** solid balance sheet, **National Mortgage Settlement compliance** and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages. (Emphasis added).

81.     In addition, Ocwen was required to implement safeguards so that any material developments at the company, including Ocwen's failure to comply with the National Mortgage Settlement, would be disclosed to investors.  Accordingly, Ocwen reported that it had effective disclosure procedures and controls to ensure that material information was publicly disclosed.  For example, in its first quarter report for 2014, Ocwen stated that its

> Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2014, [Ocwen's] disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to [Ocwen's] Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

82.     Faris's certification submitted with the first quarter report further stated that he had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to

the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

83.    Faris provided identical certifications with Ocwen's quarterly reports for the second and third quarters of 2014, filed on August 18, 2014, and October 30, 2014, respectively.

### D.    Representations Concerning Technology to Increase Loan Modifications

84.    Ocwen frequently told investors that its strong servicing platform gave it a competitive advantage in connection with loan modifications.

85.    Loan modifications – the process pursuant to which the terms of a distressed borrower's loan are modified so that the borrower is able to repay the loan – are important to mortgage servicers because, in Ocwen's own words, "[s]ervicers generally earn more profit as their portfolios become more current."

86.    Ocwen's use of technology to service mortgage loans was an important factor to Plaintiffs because it could reduce servicing costs and increase efficiency.

87.    In its annual reports for 2012 and 2013, Ocwen represented that it was "able to increase borrower acceptance rates of loan modifications" because of the technology it leased from Altisource Solutions.

88.    Ocwen also highlighted its use of technology to increase loan modifications in its investor presentations.  For example, in his portion of the Investor/Analyst Day Presentation for December 2013, Britti told investors that Ocwen's "[l]ow-cost, [s]calable [s]ervicing [p]latform and [t]echnology . . . [h]elps [k]eep [b]orrowers in their [h]omes."

### E.    Representations Concerning Regulatory Investigations

89.    In each of its periodic filings with the SEC, Ocwen included a disclosure in the notes to its financial statements about "Regulatory Contingences."

90.     In these disclosures, Ocwen stated generally that it was "subject to a number of pending federal and state regulatory investigations, examinations, inquiries, requests for information and/or other actions," and then purported to individually describe each of the material investigations impacting Ocwen.

91.     In its periodic reports during the relevant time period, Ocwen identified the following material regulatory contingencies:

- "In July 2010, [Ocwen Loan Servicing, LLC ("OLS")] received two subpoenas from the Federal Housing Finance Agency as conservator for Freddie Mac and Fannie Mae in connection with ten private label mortgage securitization transactions where Freddie Mac and Fannie Mae have invested.  The transactions include mortgage loans serviced but not originated by OLS or its affiliates."

- "On November 24, 2010, OLS received a Civil Investigative Demand (CID) from the FTC requesting documents and information regarding various servicing activities.  On June 6, 2012, the FTC notified OLS that it had referred this CID to the CFPB."

- "On November 7, 2011, OLS received a CID from the Attorney General's Office of the Commonwealth of Massachusetts requesting documents and information regarding certain foreclosures executed in Massachusetts."

- "On January 18, 2012, OLS received a subpoena from the New York Department of Financial Services (NY DFS) requesting documents regarding OLS' policies, procedures and practices regarding lender-placed or "force-placed" insurance which is required to be provided for borrowers who allow their hazard insurance policies to lapse.  Separately, on December 5, 2012, we entered into a Consent Order with the NY DFS in which we agreed to the appointment of an independent Monitor to oversee our compliance with the Agreement on Servicing Practices. NY DFS selected the firms that will act as the Monitor, and their formal engagement commenced effective July 1, 2013.  The engagement will last until July 1, 2015, and we intend to continue to cooperate with the NY DFS and the Monitor."

- "On February 9, 2012, HUD, attorneys general representing 49 states and the District of Columbia and other agencies

announced a $25 billion settlement (the National Mortgage Settlement) with the five largest mortgage servicers – Bank of America Corporation, JP Morgan Chase & Co., Wells Fargo & Company, Citigroup Inc. and Ally Financial Inc. (formerly GMAC) – regarding servicing and foreclosure issues. In addition to assessing monetary penalties which are required to be used to provide financial relief to borrowers (including refinancing and principal write-downs), the National Mortgage Settlement requires that these servicers implement changes in how they service mortgage loans, handle foreclosures and provide information to bankruptcy courts. As part of the ResCap Acquisition, OLS is required to service the ResCap loans in accordance with the requirements of the National Mortgage Settlement, although OLS is not responsible for any payment, penalty or financial obligation, including but not limited to providing Ally's share of financial relief to borrowers under that settlement.

On December 19, 2013, we reached an agreement, which was subject to court approval, involving the CFPB and various state attorneys general and other state agencies that regulate the mortgage servicing industry (Regulators). On February 26, 2014, the United States District Court for the District of Columbia entered a consent judgment approving the agreement."

- "In early February 2014, the NY DFS requested that Ocwen put an indefinite hold on an acquisition from Wells Fargo Bank, N.A. (Wells Fargo) of MSRs and related servicing advances relating to a portfolio of approximately 184,000 loans with a UPB of approximately $39.0 billion. The NY DFS expressed an interest in evaluating further our ability to handle more servicing. We have agreed to place the transaction on indefinite hold. We are cooperating with the NY DFS on this matter. We cannot currently estimate the outcome of the NY DFS evaluation. Actions by the NY DFS, if any, could have a material impact on Ocwen's ongoing business and financial condition."

- "On April 28, 2014, we received a letter from the staff of the New York Regional Office of the SEC (the "Staff") informing us that it was conducting an investigation relating to Ocwen and making a request for voluntary production of documents and information relating to the April 22, 2014 surrender of certain options to purchase our common stock by Mr. Erbey, our Executive Chairman, including the 2007 Equity Incentive Plan and the related option grant and surrender documents. We intend to cooperate with the Staff in this matter."

- "On June 12, 2014, we received a subpoena from the SEC requesting production of various documents relating to our business dealings with Altisource, HLSS, AAMC and Residential and the interests of our directors and executive officers in these companies. Following the above-described announcement on August 12, 2014 that we intend to amend our Annual Report on Form 10-K for the fiscal year ended December 31, 2013 and our Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, the Staff informed us that it plans to serve us with an additional subpoena in relation to such amendments. We are cooperating with the Staff on these matters."

92.     By specifically identifying the above events, Ocwen represented to investors that these were the only material regulatory contingencies to which Ocwen was subject.

## IV.     Plaintiffs Purchase Ocwen Common Stock in Reliance on Defendants' Representations

93.     Plaintiffs are investment funds managed by Pennant Capital Management, LLC ("Pennant").  Pennant is an investment advisor based in Summit, New Jersey.

94.     Plaintiffs, through Pennant, specifically relied on the representations set forth above prior to purchasing Ocwen stock, as well as on the integrity of the market price of Ocwen common stock.

95.     Pennant began building a "long position" – that is, buying stock based on a belief that the stock's price would increase over time – for Plaintiffs in Ocwen in October 2013.

96.     Prior to purchasing Ocwen stock for Plaintiffs, Pennant reviewed Ocwen's public disclosures, investor presentations and financial statements, and even spoke with Britti, who at that time was Ocwen's CFO.

97.     As Plaintiffs continued to purchase Ocwen stock throughout 2013 and 2014, Pennant kept abreast of publicly-disclosed developments concerning Ocwen by, among other things, reviewing Ocwen's SEC filings, listening to Ocwen's quarterly earnings calls, and talking with the CFO.   During the relevant time period, Ocwen's CFO – which in 2013 was Britti but

then in mid-2014 became Bourque – spoke directly with representatives of Pennant on multiple occasions.

98.    Because Pennant is the investment adviser to funds that collectively held a large amount of Ocwen's stock, Ocwen was eager to meet with Pennant to encourage it to continue purchasing Ocwen stock.  Indeed, during the relevant period, Erbey and Faris beneficially owned large amounts of Ocwen stock.  According to Ocwen's 2014 proxy statement, dated April 22, 2014, Erbey owned 17.8 million shares of Ocwen common stock plus options to acquire an additional 2.8 million shares, and Faris owned 374,105 shares of Ocwen common stock plus options to acquire an additional 1.35 million shares.  Their ownership of millions of shares and options meant that Erbey and Faris were incentivized to induce large investors, such as Plaintiffs, to purchase Ocwen stock in order to keep the company's stock price high.

99.    On September 16, 2014, Erbey himself met with representatives of Pennant.  Erbey discussed with Pennant the opportunities for future acquisitions of MSRs, potential cost-saving opportunities, and the issues raised in publicly-released letters that the NYDFS has sent to Ocwen.  In response to questions from Pennant about whether he was involved in transactions with the Related Companies, Erbey assured Pennant that Ocwen had in place procedures to prevent conflicts of interest.

100.    Ocwen viewed Pennant as an important business partner whose purchase of Ocwen stock was necessary to the company's success and to drive the stock price higher.  Defendants Erbey and Faris had a significant economic interest in inducing Pennant to purchase Ocwen stock.

101.    When purchasing Ocwen stock on behalf of Plaintiffs, Pennant actually read (or heard) and relied on each of the statements described above.

102.    Each of the representations made by Defendants was material to Plaintiffs.

103.    The statements concerning Erbey's recusal from transactions with the Related Companies were material to Plaintiffs because Erbey's position as Chairman of the Related Companies created the potential that Erbey would act against Ocwen's interests in transactions between Ocwen and the Related Companies.

104.    The statements concerning the accuracy of Ocwen's reported financial information and preparation of Ocwen's financial statements in accordance with GAAP, and the statements about the effectiveness of Ocwen's internal controls over financial reporting, were material to Plaintiffs because they assured Plaintiffs that Ocwen's reported financial statements accurately reflected Ocwen's financial condition.

105.    The statements concerning Ocwen's compliance with the National Mortgage Settlement, and the statements concerning the effectiveness of Ocwen's disclosure controls and procedures, were material to Plaintiffs because Ocwen's failure to comply with the National Mortgage Settlement could result in the imposition of significant penalties against Ocwen, but effective disclosure controls and procedures would ensure that such violations would be publicly disclosed by Ocwen.

106.    The statements concerning Ocwen's use of technology to increase loan modifications were material to Plaintiffs because servicers generally earn more profit as their portfolios become more current, and effective technology reduces servicing costs as long as modifications are achieved in a manner that complies with applicable regulatory requirements.

107.    The statements concerning the regulatory investigations to which Ocwen was subject were material to Plaintiffs because they revealed potential penalties to which Ocwen could be subject that could interfere with Ocwen's ability to service mortgage loans and could detrimentally impact Ocwen's bottom line.

108.    Had Pennant known the truth (as described below), it would not have purchased Ocwen common stock on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

## V.    Defendants' Representations to Plaintiffs Were Materially False and Misleading

109.    Unbeknownst to Pennant and Plaintiffs at the time, the material representations that Defendants made concerning Erbey's recusal from related-party transactions, Ocwen's reporting of financial information in accordance with GAAP, the existence of effective internal controls over financial reporting at Ocwen, Ocwen's compliance with the National Mortgage Settlement, the existence of effective disclosure controls and procedures at Ocwen, Ocwen's technological capabilities for increasing loan modifications, and the regulatory investigations to which Ocwen was subject, were either false or omitted truthful information that rendered the representations materially misleading.

### A.    Erbey Failed to Recuse Himself from Approving Transactions with the Related Companies

110.    Contrary to Defendants' representations set forth above, Ocwen did not have effective policies in place to prevent potential conflicts of interest, and Erbey did not recuse himself from the approval of related-party transactions.

111.    On December 19, 2014, Ocwen entered into a Consent Order with the New York Department of Financial Services (the "NYDFS Consent Order"). The NYDFS Consent Order disclosed that Ocwen had widespread conflicts of interest with related parties. Specifically, contrary to its representations in its 2013 and 2014 annual reports, Ocwen stipulated and agreed in the NYDFS Consent Order that it did "not have a written policy that explicitly require[d] potentially conflicted employees, officers, or directors to recuse themselves from involvement from transactions with [the Related Companies]."

112.     Moreover, Erbey did not recuse himself "from approvals of several transactions" with the Related Companies.

113.     Details of some of the transactions from which Erbey failed to recuse himself were fleshed out in an October 2015 Consent Order between HLSS and the SEC (the "HLSS Consent Order").  The HLSS Consent Order describes how Erbey, in fact, "approved many transactions between HLSS and Ocwen in both his HLSS- and Ocwen-related capacities."

114.     As noted above, HLSS was founded to make Ocwen "asset-lite" by transferring certain Ocwen owned MSRs to HLSS and requiring HLSS to make the servicing advances on those MSRs.

115.     Between 2012 and 2013, HLSS and Ocwen entered into nine transactions in which Ocwen transferred MSRs to HLSS.

116.     For each of those transactions, Ocwen and HLSS had to negotiate the servicing fee that HLSS would collect for each MSR.

117.     The transactions had to be approved by Ocwen's Credit Committee or Executive Committee, and by HLSS's Credit Committee.  Erbey was a member of all three of these committees.  Faris also sat on Ocwen's Executive Committee.

118.     In 2012, Ocwen entered into five of these transactions with HLSS, which totaled approximately $67.5 billion in UPB.  In 2013, Ocwen entered into another four transactions with HLSS, totaling approximately $120 billion in UPB.

119.     Erbey personally approved at least six of these nine transactions between Ocwen and HLSS, both in his capacity as Chairman of Ocwen and Chairman of HLSS.

120.     Furthermore, in 2014, Erbey failed to recuse himself from a transaction between Ocwen and HLSS concerning HLSS's purchase of $672 million of loans previously purchased by

Ocwen.  According to the HLSS Consent Order, "[i]n a February 2014 email addressed to members of both HLSS and Ocwen senior management, [Erbey] approved this purchase on the condition that it did not trigger losses for HLSS."

121.    Thus, rather than recusing himself from the approval of a related-party transaction – as he represented to Plaintiffs that he always did – Erbey inserted himself into the transaction and added terms that favored HLSS over Ocwen.

122.    This illustrates the conflict of interest that Erbey had as both Chairman of Ocwen and Chairman of the Related Companies, as Erbey favored the interest of HLSS at the expense of Ocwen.

123.    Another related-party transaction that Erbey approved was disclosed by the New York Department of Financial Services ("NYDFS") in a letter that it sent to Ocwen on August 4, 2014.  In that letter, the NYDFS revealed that Ocwen had entered into a transaction with an agent of Altisource Solutions to procure force-placed insurance for Ocwen, and that Erbey had expressly approved the transaction.

124.    Specifically, in January 2014, Altisource provided a memo to Ocwen's Credit Committee recommending that Ocwen retain Southwest Business Corporation ("SWBC") as Ocwen's force-placed insurance agent.  Erbey approved the transaction as a member of Ocwen's Credit Committee.

125.    As part of the deal, SWBC was required to pay Altisource Solutions' subsidiary, Beltline, a portion of the commissions it received from insurers because Altisource Solutions had recommended SWBC to Ocwen.  These fees amounted to about $60 million per year being paid to Altisource Solutions for performing essentially no work.

126.    Ocwen also agreed to pay SWBC a monitoring fee for monitoring whether its borrowers' homeowner's insurance coverage had lapsed.  Altisource Solutions provided SWBC with access to Ocwen's loan files and, in return, SWBC was required to remit to Altisource Solutions 75% of the monitoring fee paid by Ocwen, even though Altisource Solutions' existing contracts with Ocwen already required it to provide businesses designated by Ocwen with access to Ocwen's loan files.  Moreover, Ocwen agreed to pay SWBC **double** what it paid its previous force-placed insurance agent for providing monitoring services.  Thus, under the deal, Ocwen was indirectly paying Altisource Solutions approximately $5 million per year to provide a service it was already contractually obligated to provide, all pursuant to a deal approved by Erbey.

127.    This again illustrates the conflict of interest that Erbey had as both Chairman of Ocwen and Chairman of the Related Companies, as Erbey favored the interest of Altisource Solutions at the expense of Ocwen.

### B.    Ocwen Violated GAAP and Misstated the Effectiveness of Its Internal Controls over Financial Reporting

128.    Contrary to its representations to Plaintiffs, Ocwen did not prepare its financial statements in accordance with GAAP, and did not have effective internal controls over financial reporting.

129.    On August 12, 2014, Ocwen issued a press release stating that its year-end financial statements for 2013 and its quarterly financial statements for the first quarter of 2014 could no longer be relied upon as being in compliance with GAAP because it had not been correctly reporting the value of the MSRs sold to HLSS.

130.    Ocwen is required to account for the MSRs it sells to HLSS as a financing, rather than as a sale, because Ocwen retains title to the MSRs.  As such, Ocwen is required to report the future cash flows that HLSS is expected to receive from those MSRs as a liability on Ocwen's

balance sheet.  Under GAAP, Ocwen must record the value of the future cash flows at "fair value."  FASB Financial Accounting Standards Codification Topic 820 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

131.    At the time of each transaction, Ocwen based the fair value of the future cash flows owed to HLSS on the price at which the MSRs were sold to HLSS.  However, each quarter thereafter, Ocwen retained a third-party valuation firm to value those rights.

132.    Rather than report the third parties' valuation of the MSRs in its financial statements, Ocwen adopted a valuation methodology that violated GAAP.  If the valuation firm's valuation was within 5% of the carrying value of the MSRs, Ocwen did not adjust the value recorded in its financial statements.  This meant that the third party might be valuing the MSRs at a price that was tens of millions of dollars off from what Ocwen was reporting as "fair value."

133.    Indeed, the valuation of the MSRs provided by the third party fluctuated each quarter, but Ocwen did not change the reported value of the MSRs.

134.    Erbey knew that this valuation method was improper before it was ever implemented.

135.    According to the HLSS Consent Order, Erbey concluded that "'the math would never work' and expressed his concerns to a member of HLSS senior management."  Erbey later commented on the issue:  "when you launch a ship . . . , the ship is going to hit the water, [so] don't expect the hull not to get wet."  (Alterations in original).

136.    In its August 12, 2014 press release, Ocwen announced that as a result of the improper accounting method, its pre-tax income for the first quarter of 2014 had been overstated, and its pre-tax income for year ended December 31, 2013 had been understated, by approximately

$17 million.  The overstatement for the first quarter represented approximately 19% of Ocwen's previously-reported income before taxes for that period.

137.    Ocwen also announced in its August 12, 2014 press release that it "anticipates [that] it will determine that a material weakness existed in the relevant time periods in the adequacy of [its] controls relating to how [it] monitor[s] and implement[s] the impact of applicable accounting conventions."

138.    Ocwen confirmed the overstatement of pre-tax income for the first quarter of 2014 and the understatement of pre-tax income for the year-ended December 31, 2013, when, on August 18, 2014, it restated its financials for 2013 and the first quarter of 2014.  The restated financials showed that understatement/overstatement of income before taxes was $17,256,000.

139.    In addition, Ocwen admitted in the restated financials that its internal controls over financial reporting for 2013 and the first quarter of 2014 were ineffective. Specifically, Ocwen admitted that there was a material weakness during those periods in its financial controls because "the use of an accounting convention in its application of the interest method to financing liabilities related to Rights to MSRs sold to HLSS were not properly designed to calculate the appropriate allocation of cash payments between principal and interest in connection with the financing liability."

### C.    Ocwen Failed to Comply with the National Mortgage Settlement's Requirements, and Also Did Not Have Effective Disclosure Controls and Procedures

140.    Despite its representations to the contrary, Ocwen failed to properly implement its compliance obligations under the National Mortgage Settlement.

141.    First, Ocwen failed to comply with the servicing standards imposed by the National Mortgage Settlement.  As further explained below, Ocwen did not provide borrowers with the requisite thirty days to appeal the denial of a loan modification application because it improperly

backdated letters advising borrowers of their right to appeal.  Furthermore, in the NYDFS Consent Order, Ocwen stipulated and agreed that Ocwen had:  (1) "fail[ed] to confirm that it had the right to foreclose before initiating foreclosure proceedings"; (2) fail[ed] to ensure that its statements to the court in foreclosure proceedings were correct"; (3) pursu[ed] foreclosure even while modification applications were pending"; (4) fail[ed] to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty"; and (5) fail[ed] to assign a designated customer care representative."

142.    Ocwen also violated the National Mortgage Settlement by failing to establish an independent, properly trained IRG with the ability to discover and report Ocwen's digressions from the parameters of the National Mortgage Settlement to appropriate personnel.

143.    In May 2014, the NMS Monitor was notified of an email from a current employee of Ocwen's IRG, who stated that (i) Ocwen was not complying with the National Mortgage Settlement and (ii) Ocwen's IRG's processes and procedures were severely flawed.  The NMS Monitor's representatives subsequently interviewed the whistleblower, who made a number of assertions about the insufficiency of the IRG and provided 200 pages of documents to support those assertions.

144.    After conducting an investigation of Ocwen's IRG, the NMS Monitor determined that the IRG was "understaffed" and operated in a "dysfunctional and chaotic working environment" that "led to serious problems and flaws in the processes and procedures by which the IRG tested loans" for compliance with the National Mortgage Settlement during the first quarter of 2014.

145.    In December 2014, the NMS Monitor concluded that, at least with respect to the first quarter of 2014, Ocwen's IRG violated the requirements of the National Mortgage Settlement:

"IRG's processes and procedures . . . lacked the critical keys to integrity . . . , namely, 'an internal quality control group that is independent from the line of business whose performance is being measured,' and an internal quality control group with 'the appropriate authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessments contemplated'" by the National Mortgage Settlement.  (Footnotes omitted).

146.     The NMS Monitor also found that the IRG's single reporting line to Ocwen's Chief Risk Officer was inadequate because that the Chief Risk Officer reported to Ocwen's Board of Directors, which was controlled by Erbey.  The IRG should have reported to Ocwen's Compliance Committee, which was comprised of two independent directors and the CEO.  By having the IRG report to him through the Chief Risk Officer, Erbey was able to prevent the disclosure of Ocwen's violations of the National Mortgage Settlement.

147.     Thus, Ocwen lacked the necessary disclosure controls and procedures to reasonably assure that material information, such as Ocwen's violations of the National Mortgage Settlement, would be publically reported as required by the SEC.  Had Faris actually conducted an evaluation of the effectiveness of Ocwen's disclosure controls and procedures – as he repeatedly certified that he had done – he would have known that the IRG's reporting line was inadequate.

148.     To bring Ocwen's IRG into compliance with the requirements of the National Mortgage Settlement, the NMS Monitor required Ocwen to: (1) adopt corporate governance principles concerning the IRG's independence and ability to perform its required function; (2) appoint a new leader for the IRG; (3) provide the NMS Monitor with advanced access to IRG reporting; and (4) establish a hotline between the NMS Monitor and the IRG that IRG employees could use to contact the Monitor anonymously.

149.     Additionally, Ocwen set up new line of reporting for the IRG as of December 2014. Instead of simply reporting to the Chief Risk Officer, the IRG reported directly to Ocwen's Compliance Committee, which was made up of a majority of independent directors and on which Erbey did not sit.  This change was made so that Ocwen would have disclosure controls and procedures to ensure that material information was properly publicly disclosed by Ocwen.

### D.     Ocwen's Servicing Platform Caused the Improper Back-Dating of Letters to Prevent Mortgage Modifications

150.     Ocwen's representation that its technology allowed it to complete more loan modifications was materially misleading because it omitted information that Ocwen had a duty to disclose once it made affirmative representations on the issue.  Defendants failed to disclose that the servicing platform that Ocwen leased from Altisource Solutions actually impeded mortgage loan modifications because of technology errors.

151.     On October 21, 2014, the NYDFS sent a letter notifying Ocwen that it had "uncovered serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers, likely causing them significant harm."

152.     When Ocwen denied a loan modification request from a borrower, it sent the borrower a denial letter.  The denial letter stated that the borrower had thirty days to appeal the denial of the modification request.  Due to a problem with Ocwen's servicing platform, however, Ocwen dated the denial letters prior to the date that they were actually sent to the borrower.  Thus, by the time the borrower received the letter, her thirty days to appeal often had already lapsed.

153.     Although one of its employees discovered this backdating issue in November 2013 and reported the problem to Ocwen's Vice President of Compliance, Ocwen failed to investigate or disclose the problem.  In April 2014, the same employee raised the issue again.  However,

Ocwen again failed to disclose the problem.  In December 2014, Ocwen consented to the appointment of an operations monitor by the NYDFS to finally address the problem.

### E.     Ocwen Failed to Disclose the Existence of an Investigation of and Accusation against Ocwen by the California Department of Business Oversight

154.     Ocwen's disclosure of a handful of regulatory investigations was materially incomplete and misleading because it omitted information about the most significant investigation to which Ocwen was subject:  an investigation of Ocwen by the California Department of Business Oversight (the "California DBO").

155.     California is by far Ocwen's largest servicing market.  As of December 31, 2013, Ocwen serviced more than 435,000 mortgage loans in California, with UPB of over $112 billion.  These California loans accounted for almost 25% of the UPB of loans serviced by Ocwen.

156.     In order to service mortgage loans in California, Ocwen was required to be licensed by the California DBO.

157.     In January 2013, the California DBO commenced a regulatory examination of Ocwen to ensure Ocwen's compliance with the California Residential Mortgage Lending Act and the California Homeowner Bill of Rights.

158.     As part of that investigation, the California DBO made several requests to Ocwen for the production of information and documents, including issuing an administrative subpoena to Ocwen.  These requests included a demand that Ocwen produce loan files.  In October 2013, the California DBO requested ten loan files from Ocwen.  When Ocwen failed to properly respond to the California DBO's request, the California DBO issued a subpoena duces tecum on Ocwen in March 2014.  In July 2014, the California DBO requested 1200 loan files from Ocwen.  In August 2014, the California DBO requested 120 loan files from Ocwen.

159.    On June 16, 2014, the California DBO issued an "Order to Discontinue Violations" against Ocwen as a result of Ocwen's failure to produce requested information and documents.

160.    On October 3, 2014, the California DBO issued an Order of Forfeiture against Ocwen, requiring Ocwen to forfeit $1000 (the maximum penalty permitted by law) as a result of Ocwen's failure to produce the requested documents and information.  On November 26, 2014, the California DBO issued another Order of Forfeiture against Ocwen, again as a result of Ocwen's failure to produce requested documents and information, and again imposing the maximum fine allowed by law.  A third Order of Forfeiture for $1000 was issued against Ocwen on January 2, 2015.

161.    On October 3, 2014, the California DBO initiated an administrative action – or "accusation" – against Ocwen to suspend Ocwen's mortgage loan servicing license in California based on Ocwen's failure to comply with the regulatory investigation.  On November 14, 2014, a California administrative law judge ordered Ocwen to produce all information and documents requested by the California DBO by December 1, 2014.  Ocwen failed to comply with this order.

162.    On the evening of January 12, 2015, the *Los Angeles Times* released an article with the headline, "California seeking to suspend Ocwen Financial's mortgage license," publicly disclosing for the first time the existence of the California DBO's investigation of and accusation against Ocwen.

163.    On January 23, 2015, Ocwen entered into a Consent Order with the California DBO pursuant to which:  (a) Ocwen agreed to cease acquiring any additional mortgage servicing rights in California until the California DBO is satisfied that Ocwen has responded to its requests for documents and information; (b) Ocwen agreed to the appointment of an independent third-party

auditor to conduct a comprehensive review of Ocwen's servicing policies and procedures; and (c)

Ocwen agreed to pay a penalty of $2,500,000 to the California DBO.

**VI.  The Truth About Defendants' Misrepresentations to Plaintiffs Is Gradually Revealed, Causing the Price of Ocwen's Stock to Plummet and Causing Plaintiffs to Suffer Significant Damages**

164.    Between February 2014 and January 2015, a series of partial corrective disclosures

with respect to the above-described misrepresentations were released to the market, causing the

price of Ocwen common stock to significantly decline and Plaintiffs to suffer significant losses on

their purchases of Ocwen stock.

165.    On February 26, 2014, the NYDFS sent a letter to Ocwen stating that it had

"uncovered a number of potential conflicts of interest between Ocwen and other public companies

with which Ocwen is closely affiliated."   The letter identified those companies as HLSS,

Altisource Solutions, Altisource Residential and Altisource Asset Management.   The NYDFS

continued:  "Indeed, the facts our review has uncovered to date cast serious doubts on recent public

statements made by the company that Ocwen has a 'strictly arms-length business relationship'

with those companies."

166.    Upon the release of this letter, which indicated that Ocwen's representations

concerning Erbey's recusal from transactions between Ocwen and the Related Companies were

false, the price of Ocwen common stock dropped almost 7%, from a close on February 25, 2014

of $39.52 per share to a close of $36.76 per share on February 26, 2014.

167.    However, Defendants continued to deny the existence of any conflicts of interest.

Specifically, as noted above, Ocwen made false statements about Erbey's recusal from related-

party transactions in its 2013 annual report (issued just two days after the NYDFS letter), its 2013

amended annual report, and its 2014 proxy statement.

168.    On August 4, 2014, the NYDFS sent another letter to Ocwen, this time disclosing how Erbey had approved Ocwen's retention of SWBC as Ocwen's force-placed insurance agent, pursuant to which Altisource Solutions was to receive tens of millions of dollars of fees per year passed through SWBC.  Upon the release of this news, Ocwen's share price dropped 2.5%, from a close on August 1, 2014 of $27.68 per share to a close on August 4, 2014 of $26.98 per share.

169.    However, Defendants still continued to conceal the truth.  In fact, Erbey himself represented to Plaintiffs during an in-person meeting with Pennant in September 2014 that Ocwen had procedures in place to prevent conflicts of interest.

170.    On December 22, 2014, the NYDFS Consent Order was made public.  The NYDFS Consent Order revealed that, despite Defendants' representations to the contrary – including Erbey's in-person representation to Pennant – Ocwen did not have effective policies in place to prevent potential conflicts of interest, and Erbey did not recuse himself from related party transactions.  Indeed, as part of the NYDFS Consent Order, Ocwen agreed that: (a) it would no longer share any common officers or employees with any related party; (b) it would not share risk, internal audit, or vendor-oversight functions with any related party; (c) it would appoint two additional board members who would not own any equity in any related party; and (d) Erbey would resign from his positions as Chairman of Ocwen, Altisource Solutions, Altisource Residential, Altisource Asset Management, and HLSS.  Upon the release of this news, the market price of Ocwen common stock plummeted almost 27%, from a close of $21.90 per share on December 19, 2014, to a close of $16.01 on December 22, 2014.

171.    The truth about Ocwen's accounting misrepresentations and its lack of effective internal controls with respect to the recording of the sale of MSRs to HLSS was revealed on August 12, 2014, when Ocwen issued a press release stating, among other things, that: (a) its financial

statements for 2013 and the first quarter of 2014 could no longer be relied upon; (b) it had been using an improper valuation method in violation of GAAP to value the MSRs sold to HLSS; (c) it had overstated its pre-tax income for the first quarter of 2014 by almost 20%; and (d) its internal controls over financial reporting suffered from a material weakness.  On this news, Ocwen stock dropped 4.5%, from a close of $26.34 per share on August 11, 2014, to close at $25.16 per share on August 12, 2014.

172.    The truth about Ocwen's failure to comply with the National Mortgage Settlement and the lack of adequate disclosure controls and procedures was partially revealed on October 21, 2014, when the NYDFS issued an open letter to Ocwen recounting the letter-backdating issue.  As further explained below, the price of Ocwen common stock lost almost 30% of its value on October 21-22, 2014, dropping from $26.26 per share to $19.04 per share.  However, this news did not reveal the full extent of Ocwen's blatant lack of compliance with the National Mortgage Settlement.

173.    On December 16, 2014, the NMS Monitor released his interim report on Ocwen's compliance (or lack thereof) for the first and second quarters of 2014.  That report revealed for the first time that Ocwen had failed to establish a properly functioning and independent IRG.  It also revealed that Ocwen did not have the disclosure controls and procedures in place to ensure the disclosure of its material non-compliance with the National Mortgage Settlement.  After the report was released, Ocwen's common stock fell almost 6%, closing on December 16, 2014, at a price of $20.93 per share, down from $22.25 per share on the prior close.

174.    The NYDFS Consent Order also revealed that Ocwen had failed to comply with the servicing standards of the National Mortgage Settlement.  Specifically, Ocwen stipulated and agreed that Ocwen had:  (a) "fail[ed] to confirm that it had the right to foreclose before initiating

foreclosure proceedings"; (b) fail[ed] to ensure that its statements to the court in foreclosure proceedings were correct"; (c) pursu[ed] foreclosure even while modification applications were pending"; (d) fail[ed] to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty"; and (e) fail[ed] to assign a designated customer care representative." As noted above, the price of Ocwen common stock plummeted almost 27%, from a close of $21.90 per share on December 19, 2014, to a close of $16.01 on December 22, 2014, following the release of the NYDFS Consent Order.

175. The truth about Ocwen's technology impeding its modification of mortgage loans began to emerge on October 21, 2014, when the NYDFS issued an open letter to Ocwen recounting the letter-backdating issue. This news also revealed that Ocwen was violating the terms of the National Mortgage Settlement by not affording borrowers thirty days to appeal the denial of a mortgage loan modification request. However, in response to the NYDFS letter, and before markets closed, Ocwen issued a response admitting the backdating of letters "due to software errors in our correspondence systems," and suggesting that only 283 borrowers in New York received backdated letters. As a result of the information released on October 21, 2014, Ocwen's stock price fell dramatically by over 18%, to close at $21.48 per share on October 21, 2014, down from a previous close on October 20, 2014, of $26.26 per share.

176. After the markets closed on October 21, 2014, Ocwen issued another press release, stating that it wished "to correct its statement in a press release earlier . . . that 283 borrowers in New York received letters with incorrect dates" because it was "aware of additional borrowers in New York who received letters with incorrect dates" but did "not yet know how many such letters there were." The next day, October 22, 2014, the price of Ocwen common stock dropped more than 11%, closing at $19.04 per share.

177.    The truth concerning the California DBO's investigation of Ocwen was partially revealed after the markets closed on January 12, 2015, when the *Los Angeles Times* reported that California was seeking to suspend Ocwen's mortgage license in California.  The article revealed that the California DBO was examining whether Ocwen had violated the California Homeowner's Bill of Rights and the California Residential Mortgage Lending Act, and had filed an accusation against Ocwen in October 2014 because Ocwen had failed to comply with the DBO's request for information.  On this news, the price of Ocwen common stock plummeted by more than 36%, closing on January 13, 2015 at a price of $7.78 per share, down from a close of $12.19 per share on January 12, 2015.

178.    After the markets closed on January 13, 2015, Ocwen issued a press denying that it had failed to provide the California DBO with the requested information, stating that it anticipated a resolution of the matter through cooperation with the prescribed administrative proceeding, and insisting that it had effective controls in place to ensure compliance with California regulations. However, before the markets opened on January 14, 2015, the *New York Post* issued an article in which a spokesman for the DBO refuted Faris's statement:   "'You know those movies about lawsuits where the defense responds to discovery requests by burying the plaintiffs in a blizzard of documents?' Tom Dresslar, a spokesman for the regulator told The Post.  'Ocwen's approach has been sort of the opposite.' . . . making it nearly impossible for the agency to do its job."  On this news, the price of Ocwen's common stock declined more than 10%, closing on January 14, 2015, at a price of $7.00 per share.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

**I.     Misrepresentations Concerning Erbey's Recusal from Transactions with the Related Companies**

179.    Ocwen's annual report for 2012, filed with the SEC on Form 10-K on March 1, 2013, misrepresented to investors that:  "We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource [Solutions], including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions."  The 2012 annual report was signed by Defendants Erbey, Faris and Britti.

180.    Ocwen's annual proxy statement for 2013, filed with the SEC on Schedule 14A on April 3, 2013, misrepresented to investors that:  "Due to the nature of Mr. Erbey's obligations to each of [Ocwen, HLSS, Altisource Solutions, Altisource Residential and Altisource Asset Management], he recuses himself from decisions pertaining to any related transactions."  The proxy statement was signed by Defendant Erbey.

181.    In a December 3, 2013 conference call, Defendant Erbey misrepresented to investors that:  "I'd like to stress, first of all, that [the Related Companies] are not affiliates, that they are independent companies.  They have independent boards, and they have management teams. . . .   [W]e have [a] robust related party transaction approval process.  Any related party transaction between the [Related Companies and Ocwen], I actually recuse myself from . . . ."

182.    On a February 26, 2014 conference call, Defendant Erbey misrepresented that there had been "full disclosure" of all potential conflicts of interest arising from his affiliation and involvement with Ocwen and the Related Companies, and that the boards of each of the Related Companies was completely "independent," despite his presence as Chairman of those boards.

183.    Ocwen's annual report for 2013, filed with the SEC on Form 10-K on February 28, 2014, misrepresented to investors that:  "We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource [Solutions], HLSS,

[Altisource Asset Management] and [Altisource] Residential, including our Executive Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities." The 2013 annual report was signed by Defendants Erbey, Faris and Britti.

184.    Ocwen again repeated this representation verbatim in its amended annual report for 2013, filed with the SEC on Form 10K/A on August 18, 2014, which was signed by Defendants Erbey, Faris and Bourque.

185.    Ocwen's annual proxy statement for 2013, filed with the SEC on Schedule 14A on April 22, 2014, misrepresented to investors that: "Due to the nature of Mr. Erbey's obligations to each of [Ocwen, HLSS, Altisource Solutions, Altisource Residential and Altisource Asset Management], he recuses himself from decisions pertaining to any transactions between them." The proxy statement was signed by Defendant Erbey.

186.    During a September 16, 2014 in-person meeting with Plaintiffs' investment advisor in New York, Defendant Erbey misrepresented that Ocwen had implemented proper procedures to safeguard against potential conflicts of interest.

187.    The statements set forth above in paragraphs 179 through 186 were materially false and misleading because Ocwen did not have effective policies in place to prevent potential conflicts of interest, and Erbey did not recuse himself from the approval of related-party transactions.

188.    Specifically, as stipulated to and agreed by Ocwen in the NYDFS Consent Order, "Ocwen d[id] not have a written policy that explicitly require[d] potentially conflicted employees, officers, or directors to recuse themselves from involvement from transactions with [the Related Companies]".

189.     Moreover, as stipulated to and agreed by Ocwen in the NYDFS Consent Order, Erbey did not recuse himself "from approvals of several transactions" with the Related Companies.

190.     According to the HLSS Consent Order, Erbey "approved many transactions between HLSS and Ocwen in both his HLSS- and Ocwen-related capacities."  Erbey personally approved at least six of nine transactions entered into between HLSS and Ocwen in 2012 and 2013. Furthermore, in 2014, Erbey approved a purchase of $672 million of loans by HLSS from Ocwen "on the condition that it did not trigger losses for HLSS."

191.     Additionally, according to an August 4, 2014 open letter from the NYDFS to Ocwen, in January 2014 Erbey approved Ocwen's retention of SWBC as Ocwen's force-placed insurance agent, even though SWBC kicked back tens of millions of dollars of fees to Altisource Solutions in return for its appointment by Ocwen.

II.     **Misrepresentations Concerning Ocwen's Financial Statements and the Effectiveness of Its Internal Controls over Financial Reporting**

A.     **Misrepresentations Concerning Ocwen's Income Before Taxes**

192.     Ocwen's annual report for 2013, filed with the SEC on Form 10-K on February 28, 2014, misrepresented to investors that Ocwen's income before taxes for the year ended December 31, 2013 was $335,223,000.  The 2013 annual report was signed by Defendants Erbey, Faris and Britti.

193.     This statement was materially false and misleading because, as set forth in Ocwen's amended annual report for 2013, filed with the SEC on Form 10-K/A on August 18, 2014, Ocwen's income before taxes for the year ended December 31, 2013, was understated by $17,256,000.

194.     Ocwen's quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q on May 2, 2014, misrepresented to investors that Ocwen's income before taxes for the quarter

ended March 31, 2014 was $88,960,000.  The 2014 first quarter report was signed by Defendant Britti.

195.    This statement was materially false and misleading because, as set forth in Ocwen's amended quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q/A on August 18, 2014, Ocwen's income before taxes for the quarter ended March 31, 2014, was overstated by $17,256,000.

**B.**     **Misrepresentations Concerning Accuracy of Financial Statements**

196.    Defendant Faris and Britti each misrepresented in certifications, dated February 28, 2014, appended to Ocwen's 2013 annual report that "the financial statements, and the other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

197.    These certifications were materially false and misleading because, as set forth in Ocwen's amended annual report for 2013, filed with the SEC on Form 10-K/A on August 18, 2014, Ocwen's income before taxes for the year ended December 31, 2013, was understated by $17,256,000.

198.    Defendant Faris and Britti each misrepresented in certifications, dated May 2, 2014, appended to Ocwen's quarterly report for the first quarter of 2014 that "the financial statements, and the other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

199.    These certifications were materially false and misleading because, as set forth in Ocwen's amended quarterly report for the first quarter of 2014, filed with the SEC on Form 10-

Q/A on August 18, 2014, Ocwen's income before taxes for the quarter ended March 31, 2014, was overstated by $17,256,000.

### C. Misrepresentations Concerning Effectiveness of Internal Controls over Financial Reporting

200.    In Ocwen's 2013 annual report, filed with the SEC on Form 10-K on February 28, 2014, Ocwen misrepresented that "[u]nder the supervision of and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have conducted an evaluation of our internal control over financial reporting as of December 31, 2013, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (1992).   Based on that evaluation, our management concluded that, as of December 31, 2013, internal control over financial reporting is effective based on criteria established in Internal Control – Integrated Framework issued by the COSO." The 2013 annual report was signed by Defendants Erbey, Faris and Britti.

201.    In their accompanying certifications, dated February 28, 2014, Defendants Faris and Britti both misrepresented that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

202.    These statements were materially false and misleading because, as set forth in Ocwen's amended annual report for 2013, filed with the SEC on Form 10-K/A on August 18, 2014, there was "a material weakness in internal control over financial reporting as of December 31, 2013. The Company's controls related to the use of an accounting convention in its application

of the interest method to financing liabilities related to Rights to MSRs sold to HLSS were not properly designed to calculate the appropriate allocation of cash payments between principal and interest in connection with the financing liability."

203.    In Ocwen's quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q on May 2, 2014, Ocwen misrepresented that "[n]o change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting." The 2014 first quarter report was signed by Defendant Britti.

204.    In their accompanying certifications, dated May 2, 2014, Defendants Faris and Britti both misrepresented that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

205.    These statements were materially false and misleading because, as set forth in Ocwen's amended quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q/A on August 18, 2014, there was:

> a material weakness in internal control over financial reporting as of December 31, 2013. The Company's controls related to the use of an accounting convention in its application of the interest method to financing liabilities related to Rights to MSRs sold to HLSS were not properly designed to calculate the appropriate allocation of cash payments between principal and interest in connection with the financing liability.

> We have corrected our application of the interest method used to calculate the appropriate allocation between principal and interest in connection with accounting for a financing liability related to Rights

to MSRs sold to HLSS. We are also in the process of implementing new controls related to the monitoring and oversight of valuations of Level 3 assets and liabilities and the level and timing of critical assumptions used in third-party valuations we use in our accounting processes and reporting. Management believes these initiatives will remediate the material weakness in internal control over financial reporting described above. The Company will test the ongoing operating effectiveness of the new controls in future periods. The material weakness cannot be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

III.   **Misrepresentations Concerning Ocwen's Compliance with the National Mortgage Settlement and Effectiveness of Disclosure Controls and Procedures**

A.   **Misrepresentations Concerning Ocwen's Compliance with the National Mortgage Settlement**

206.   In its presentation for current and potential investors, filed with the SEC as an exhibit to a December 3, 2013 Form 8-K, Ocwen misrepresented that although it was not yet a party to the National Mortgage Settlement, "it services or subservices loans for parties which are subject to these settlements and therefore services in compliance with those standards as applicable."

207.   This statement was materially false and misleading.  As Ocwen subsequently stipulated and agreed in the NYDFS Consent Order, Ocwen, in violation of the servicing standards of the National Mortgage Settlement, (a) "fail[ed] to confirm that it had the right to foreclose before initiating foreclosure proceedings"; (b) fail[ed] to ensure that its statements to the court in foreclosure proceedings were correct"; (c) pursu[ed] foreclosure even while modification applications were pending"; (d) fail[ed] to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty"; and (e) fail[ed] to assign a designated customer care representative."  Moreover, as set forth in the NYDFS October 21, 2014 letter to Ocwen, Ocwen did not provide borrowers with the required thirty days to appeal the denial of a loan

modification application, which was a requirement of the National Mortgage Settlement, because it improperly backdated letters advising borrowers of their right to appeal.

208.    In its press release announcing its operating results for the first quarter of 2014, attached as an exhibit to a Form 8-K filed with the SEC on May 1, 2014, Ocwen misrepresented, in a quote attributed to Defendant Erbey, that:

> Going forward, we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business. **We consider our** solid balance sheet, **National Mortgage Settlement compliance** and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages. (Emphasis added).

209.    In addition to the reasons set forth above in paragraph 207, this statement was materially false and misleading because, as disclosed in the NMS Monitor's December 16, 2014 report, Ocwen's IRG violated the requirements of the National Mortgage Settlement because its "processes and procedures . . . lacked the critical keys to integrity . . . , namely, 'an internal quality control group that is independent from the line of business whose performance is being measured,' and an internal quality control group with 'the appropriate authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessments contemplated'" by the National Mortgage Settlement.

**B.**    **Misrepresentations Concerning the Effectiveness of Ocwen's Disclosure Controls and Procedures**

210.    In Ocwen's quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q on May 2, 2014, Ocwen misrepresented that:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 31, 2014.  Based on this evaluation, our Chief Executive Officer and Chief Financial Officer

concluded that, as of March 31, 2014, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

The 2014 first quarter report was signed by Defendant Britti.

211.    In his accompanying certification, dated May 2, 2014, Defendant Faris misrepresented that he had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

212.    Defendant Faris repeated that statement verbatim in his accompanying certification to the Ocwen quarterly report for the second quarter of 2014, dated August 18, 2014, and in his accompanying certification to the Ocwen quarterly report for the third quarter of 2014, dated October 30, 2014

213.    These statements were materially false and misleading because, as found by the NMS Monitor, the IRG's single reporting line to Ocwen's Chief Risk Officer was inadequate because the Chief Risk Officer reported to Ocwen's Board of Directors, which was controlled by Erbey.  In order to have effective disclosure controls and procedures, the Chief Risk Officer needed to report to Ocwen's Compliance Committee, which was comprised of two independent directors

and the CEO.  A direct line of reporting to the Compliance Committee would have assured that material developments inside Ocwen were publicly disclosed.  Thus, Ocwen lacked the necessary disclosure controls and procedures to reasonably assure that material information, such as Ocwen's violations of the National Mortgage Settlement, would be reported as required by the SEC.  Had Faris actually conducted an evaluation of the effectiveness of Ocwen's disclosure controls and procedures – as he repeatedly certified that he had done – he would have known that the IRG's reporting line was inadequate.

**IV.**　**Misrepresentations Concerning Backdating of Loan Modification Letters**

214.　In its annual report for 2012, filed with the SEC on Form 10-K on March 1, 2013, Ocwen misrepresented to investors that it was "able to increase borrower acceptance rates of loan modifications" because of the technology it leased from Altisource Solutions.  The 2012 annual report was signed by Defendants Erbey, Faris and Britti.

215.　Ocwen repeated this statement verbatim in its annual report for 2013, filed with the SEC on Form 10-K on February 28, 2014.  The 2013 annual report was signed by Defendants Erbey, Faris and Britti.

216.　In its presentation for current and potential investors, filed with the SEC as an exhibit to a December 3, 2013 Form 8-K, Ocwen misrepresented that Ocwen's "[l]ow-cost, [s]calable [s]ervicing [p]latform and [t]echnology . . . [h]elps [k]eep [b]orrowers in their [h]omes."

217.　These statements were materially false and misleading because they omitted information that Ocwen had a duty to disclose once it made affirmative representations on the issue.  Defendants failed to disclose that the servicing platform that Ocwen leased from Altisource Solutions actually impeded modifications because of technology errors.  As set forth in the NYDFS letter to Ocwen dated October 21, 2014, Ocwen's servicing platform caused Ocwen to backdate

letters to borrowers, thus depriving thousands of borrowers of their right to appeal the denial of a loan modification request.

## V.      Misrepresentations Concerning Regulatory Investigations

218.    In its quarterly report for the first quarter of 2014, filed with the SEC on Form 10-Q on May 2, 2014, Ocwen misrepresented the material regulatory investigations to which it was subject.  Ocwen disclosed that it was subject to:  (a) a December 2012 consent order with the NYDFS; (b) an indefinite hold requested by the NYDFS of Ocwen's acquisition of a pool of MSRs from Wells Fargo; (c) the National Mortgage Settlement; and (d) a voluntary request for the production of documents from the SEC.  Defendant Britti signed the first quarter report.

219.    This statement was materially incomplete and misleading because it failed to disclose that the California DBO had instituted a regulatory examination of Ocwen in 2013, that Ocwen had not been responding properly to the California DBO's requests for documents and information, and that in March 2014 the California DBO had issued a subpoena duces tecum to Ocwen.

220.    In its quarterly report for the second quarter of 2014, filed with the SEC on Form 10-Q on August 18, 2014, Ocwen misrepresented the material regulatory investigations to which it was subject.  Ocwen disclosed that it was subject to:  (a) a December 2012 consent order with the NYDFS; (b) an indefinite hold requested by the NYDFS of Ocwen's acquisition of a pool of MSRs from Wells Fargo; (c) the National Mortgage Settlement; and (d) a June 12, 2014 subpoena from the SEC concerning the production of documents.  Defendant Bourque signed the second quarter report.

221.    This statement was materially incomplete and misleading because it failed to disclose that the California DBO had instituted a regulatory examination of Ocwen in 2013, that

Ocwen had not been responding properly to the California DBO's requests for documents and information, that in March 2014 the California DBO had issued a subpoena duces tecum to Ocwen, and that on June 16, 2014, the California DBO issued an Order to Discontinue Violations against Ocwen as a result of Ocwen's failure to produce requested information and documents.

222.    In its quarterly report for the third quarter of 2014, filed with the SEC on Form 10-Q on October 30, 2014, Ocwen misrepresented the material regulatory investigations to which it was subject.  Ocwen disclosed that it was subject to:  (a) a December 2012 consent order with the NYDFS; (b) an indefinite hold requested by the NYDFS of Ocwen's acquisition of a pool of MSRs from Wells Fargo; (c) an inquiry from the NYDFS "about certain other aspects of [Ocwen's] business, including certain aspects of our business dealings with Altisource [Solutions], HLSS, [Altisource Asset Management] and [Altisource] Residential, the interests of [Ocwen's] directors and executive officers in these companies, an online auction business owned by Altisource [Solutions], the role of Altisource [Solutions] in certain lender-placed insurance arrangements, the provisions contained in releases we use in connection with litigation settlements and certain erroneously dated borrower correspondence that we sent"; (d) the National Mortgage Settlement; (e) a June 12, 2014 subpoena from the SEC concerning the production of documents; and (f) an additional subpoena received from the SEC in response to Ocwen's restatements of its financials. Defendant Bourque signed the third quarter report.

223.    This statement was materially incomplete and misleading because it failed to disclose that the California DBO had instituted a regulatory examination of Ocwen in 2013, that Ocwen had not been responding properly to the California DBO's requests for documents and information, that in March 2014 the California DBO had issued a subpoena duces tecum to Ocwen, that on June 16, 2014, the California DBO issued an Order to Discontinue Violations against

Ocwen as a result of Ocwen's failure to produce requested information and documents, and that on October 3, 2014, the California DBO initiated an accusation against Ocwen to suspend Ocwen's mortgage loan servicing license in California based on Ocwen's failure to provide requested documents and information.

## SUMMARY OF ERBEY'S AND FARIS'S SCIENTER

224.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

225.    Defendants Erbey and Faris acted with scienter with respect to the materially false and misleading statements discussed above.

226.    Defendant Erbey knew that he did not recuse himself from approving transactions between Ocwen and the Related Companies.  Indeed, as the Court has already found in *In re Ocwen Securities Litigation*, "Erbey would have knowledge of his approval of related party transactions if he personally approved them."

227.    Defendant Faris, as a member of the Executive Committee that approved such transactions, also knew that Erbey did not recuse himself from the approval of transactions between Ocwen and the Related Companies.    Faris, as a member of Ocwen's Compliance Committee, knew that Ocwen had not adopted policies, procedures and practices to avoid potential conflicts in transactions between Ocwen and the Related Companies.

228.    As senior executives of Ocwen, Erbey's and Faris's knowledge of Erbey's involvement in the related party transactions is imputable to Defendant Ocwen.

229.    With respect to misrepresentations in Ocwen's financial statements, as detailed in the HLSS Consent Order, Defendant Erbey knew that the valuation methodology Ocwen used to account for the sale of MSRs to HLSS was improper, and in fact expressly questioned its use.

230.    Moreover, Faris certified that, as CEO of Ocwen, he personally conducted an evaluation of the effectiveness of Ocwen's internal controls over financial reporting.  He therefore was aware of the improper valuation methodology being employed by Ocwen and the resulting failure in the effectiveness of Ocwen's internal controls over financial reporting.

231.    As senior executives of Ocwen, Erbey's and Faris's knowledge is imputable to Defendant Ocwen.

232.    Defendant Faris knew that Ocwen was not in compliance with the National Mortgage Settlement because he sat on Ocwen's Compliance Committee, which was responsible for ensuring Ocwen's compliance with all applicable laws and regulations.  As an executive of Ocwen, Faris's knowledge is imputable to Defendant Ocwen.

233.    Moreover, Faris certified that he conducted an evaluation of the effectiveness of Ocwen's disclosure controls and procedures.  He therefore knew that the IRG's reporting line was inadequate and that Ocwen lacked effective disclosure controls and procedures.

234.    As a senior executive of Ocwen, Faris's knowledge is imputable to Defendant Ocwen.

235.    Defendant Ocwen knew that its servicing technology was improperly backdating loan modification denial letters.  An Ocwen employee brought the issue to the attention of Ocwen's Vice President of Compliance in November 2013.  As a senior executive of Ocwen, the Vice President of Compliance's knowledge is imputable to Defendant Ocwen

236.    Finally, Defendant Faris has conceded that he was aware of the California DBO investigation of Ocwen at least since October 3, 2014.  In Ocwen's January 13, 2015 press release, Faris stated that: "Since this notification [of an administrative action dated October 3, 2014], we have dedicated substantial resources towards satisfying the DBO's requests.  We believe we have

provided the requested information in the format requested." As a senior executive of Ocwen, Faris's knowledge is imputable to Defendant Ocwen.

237. Moreover, the magnitude of the potential fallout from the California DBO investigation suggests that Ocwen, Erbey and Faris were aware of the investigation. As noted above, California accounted for almost 25% of Ocwen's servicing business. Because the California DBO investigation created a risk of Ocwen's California mortgage servicing license being suspended, Defendants Ocwen, Erbey and Faris knew about the investigation but elected not to disclose it to investors because of the impact such disclosure would have on Ocwen's stock price.

## SUMMARY OF BRITTI'S AND BOURQUE'S NEGLIGENCE

238. Plaintiffs do not allege that Defendants Britti and Bourque acted with scienter.

239. Instead, Britti was negligent in making statements in the 2012 annual report and the 2013 annual report concerning Erbey's recusal from transactions with the Related Companies, in the 2013 annual report concerning the accuracy of Ocwen's financial statements and the effectiveness of Ocwen's controls over financial reporting, in the 2012 annual report and the 2013 annual report concerning Ocwen's technology, and in the 2014 first quarterly financial statement concerning the regulatory investigations to which Ocwen was subject.

240. Bourque was negligent in making statements in the 2014 second and third quarterly financial statements concerning the regulatory investigations to which Ocwen was subject.

241. Had Britti acted with the standard of care required of a CFO of a public company, he would have been aware that Erbey was not recusing himself from the approval of transactions between Ocwen and the Related Companies, he would have been aware that Ocwen was improperly valuing the sale of MRSs to HLSS and did not have effective controls over financial

reporting, he would have been aware that Ocwen's servicing platform was causing Ocwen to improperly backdate letters denying requests for mortgage loan modifications, and he would have been aware that Ocwen was under investigation by the California DBO and was putting its California business in jeopardy by failing to comply with the California DBO's requests for information.

242.    Had Bourque acted with the standard of care required of a CFO of a public company, he would have been aware that Ocwen was under investigation by the California DBO and was putting its California business in jeopardy by failing to comply with the California DBO's requests for information.

## PLAINTIFFS' ACTUAL RELIANCE

243.    Plaintiffs, through Pennant, actually, read (or heard), reviewed, and relied upon Defendants' misrepresentations prior to purchasing Ocwen stock.

244.    Pennant began purchasing Ocwen common stock for Plaintiffs in October 2013.

245.    Prior to purchasing Ocwen stock for Plaintiffs, one or more employees of Pennant actually read, reviewed and relied upon Ocwen's public disclosures, investor presentations and financial statements, including the 2012 annual report and the 2013 annual proxy statement.

246.    As Plaintiffs continued to purchase Ocwen stock throughout 2013 and 2014, Pennant kept abreast of publicly-disclosed developments concerning Ocwen, and prior to purchasing stock, as applicable, actually read (or heard), reviewed, and relied upon the December 3, 2014 conference call, the December 3, 2013 investor presentation, the February 26, 2013 conference call, the 2013 annual report and the certifications thereto, the 2014 first quarter report and the certifications thereto, the May 1, 2014 press release, the 2014 annual proxy statement, the

2014 second quarter report and the certifications thereto, and the 2014 third quarter report and the certifications thereto.

247.     On September 16, 2014, Erbey himself met with representatives of Pennant.  Erbey discussed with Pennant the opportunities for future acquisitions of MSRs, potential cost-saving opportunities, and the issues raised in publicly-released letters that the NYDFS has sent to Ocwen. In response to questions from Pennant about whether he was involved in transactions with the Related Companies, Erbey assured Pennant that Ocwen had procedures in place to prevent conflicts of interest.  Pennant listened to and actually relied upon these statements by Erbey in purchasing additional Ocwen stock for Plaintiffs.

248.     When purchasing Ocwen stock on behalf of Plaintiffs, Pennant actually read (or heard) and relied on each of the statements described above.

249.     Had Pennant known the truth, it would not have purchased Ocwen common stock on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

## **PRESUMPTION OF RELIANCE**

250.     In addition to Plaintiffs' actual reliance, Plaintiffs intend in the alternative to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:  (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Ocwen common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Ocwen common stock; and (e) Plaintiffs purchased Ocwen common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

251.    The market for Ocwen common stock was open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements and failures to disclose, Ocwen common stock traded at artificially inflated prices during the relevant period.  The artificial inflation continued until the time the market came to realize the truth about Ocwen and Erbey.

252.    At all relevant times, the market for Ocwen common stock was efficient for the following reasons, among others:  (a) Ocwen filed periodic reports with the SEC; (b) the stock was listed and actively traded on the NYSE; (c) numerous analysts, including analysts from BofA Merrill Lynch, Citigroup and Barclays, followed Ocwen; and (d) Ocwen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

253.    Plaintiffs purchased Ocwen common stock in reliance on the market price of Ocwen common stock, which reflected all the information in the market, including the misstatements by Defendants.

## LOSS CAUSATION

254.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Ocwen common stock, set forth in Exhibits A through C, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  As a series of partial but inadequate disclosures was issued, as detailed above in paragraphs 165 through 178, the price of those securities dropped, and Plaintiffs were damaged.

255.    Ocwen sought to reassure investors of the ability of its servicing technology to increase loan modifications.  In doing so, Ocwen concealed the foreseeable risk that problems in its servicing platform actually caused Ocwen to improperly backdate letters to borrowers, thus depriving borrowers of their opportunity to appeal the denial of a request for a mortgage loan modification.  Beginning with the October 21, 2014 letter from the NYDFS to Ocwen disclosing the backdating issue, that foreseeable risk gradually materialized, thus causing the price of Ocwen common stock to decline as detailed above.

256.    Ocwen also sought to reassure investors that its regulatory liability was limited to a handful of regulatory investigations.  In doing so, Ocwen concealed the foreseeable risk that a California DBO investigation of Ocwen, and Ocwen's failure to comply with that investigation, could result in steep fines imposed on Ocwen and a disruption to Ocwen's servicing business in California.  Beginning with the January 12, 2015 *Los Angeles Times* article disclosing the California DBO investigation, that foreseeable risk gradually materialized, thus causing the price of Ocwen common stock to decline as detailed above.

## **NO SAFE HARBOR**

257.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ocwen who knew that those statements were false when made.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Ocwen, Erbey and Faris

258.    Plaintiff repeat and reallege paragraphs 19-24, 27-237, 243-57 as if set forth herein.

259.    This Cause of Action is asserted against Defendants Ocwen, Erbey, and Faris, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

260.    Defendants Ocwen, Erbey, and Faris, both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Ocwen common stock; and (iii) cause Plaintiffs to purchase Ocwen common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Ocwen, Erbey, and Faris took the actions set forth above.

261.    Defendants Ocwen, Erbey, and Faris both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Ocwen common stock in an effort to artificially inflate and maintain the market prices for Ocwen common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

262.    By virtue of their high-level positions at the Company, Erbey and Faris were authorized to make public statements, and made public statements on Ocwen's behalf.  These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

263.    In addition, Ocwen, Erbey, and Faris had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to Ocwen's servicing technology and regulatory investigations of Ocwen, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

264.    Defendants Ocwen, Erbey, and Faris acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants Ocwen's, Erbey's, and Faris's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Ocwen's operations, business, performance and prospects from the investing public, including misstating the effectiveness of the Company's internal controls, the accuracy of Ocwen's financial statements, Erbey's recusal from the negotiation and approval of transactions with the Related Companies, Ocwen's compliance with the National Mortgage Settlement, the effectiveness of Ocwen's technology to increase loan modifications, and regulatory investigations of Ocwen.  By concealing these material facts from investors, Ocwen, Erbey and Faris supported the artificially inflated price of Ocwen's securities.

265.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Ocwen's securities.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Ocwen, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Ocwen, Erbey, and Faris, but not disclosed in public statements by Ocwen, Erbey, and Faris, Plaintiffs purchased Ocwen common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Ocwen's securities substantially declined.

266.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Ocwen, which was concealed by Ocwen, Erbey, and Faris, Plaintiffs would not have purchased Ocwen common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

267.    By virtue of the foregoing, Defendants Ocwen, Erbey, and Faris have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

268.    As a direct and proximate result of Defendants Ocwen's, Erbey's, and Faris's, wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

269.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen, Erbey, and Faris in the matter *In re Ocwen Financial Corporation Securities Litigation*, 14-cv-81057-WPD (S.D.Fl.), as well as a tolling

agreement between Plaintiffs and Defendants Ocwen, Erbey and Faris, Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

**SECOND CAUSE OF ACTION**
**Violations of Section 18 of the Exchange Act**
**Against Defendants Ocwen, Britti, and Bourque**

270.    Plaintiffs repeat and reallege paragraphs 19-22, 25-63, 68-76, 84-87, 89-97, 101-04, 106-39, 150-71, 175-79, 183-84, 187-97, 200-02, 214-15, 218-23, 238-46, 248-49, 254-257 as if set forth herein.

271.    As alleged herein, Defendant Britti negligently caused statements to be made in the Company's 2012 and 2013 annual report (filed with the SEC pursuant to the rules or regulations of the Exchange Act), Defendant Britti negligently caused statements to be made in the Company's financial statements for the first quarter of 2014 (filed with the SEC pursuant to the rules or regulations of the Exchange Act), and Defendant Bourque negligently caused statements to be made in the Company's financial statements for the second and third quarters of 2014 (filed with the SEC pursuant to the rules or regulations of the Exchange Act), which statements were, at the time and in light of the circumstances under which made, false or misleading with respect to material facts.

272.    In purchasing Ocwen stock, Plaintiffs' investment team actually read, and had direct eyeball reliance on, the statements in the 2012 and the 2013 annual reports, and on the statements in the first, second and third quarterly reports of 2014.

273.    Specifically, one or more employees of Pennant actually read and relied upon the following statements:

- "We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related

parties such as Altisource [Solutions], including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions." - 2012 annual report.

- Ocwen is "able to increase borrower acceptance rates of loan modifications" because of the technology it leased from Altisource Solutions. – 2012 annual report.

- "We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource [Solutions], HLSS, [Altisource Asset Management] and [Altisource] Residential, including our Executive Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities."- 2013 annual report.

- Reported income before taxes for the year ended December 31, 2013 was $335,223,000. – 2013 annual report.

- "Under the supervision of and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have conducted an evaluation of our internal control over financial reporting as of December 31, 2013, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (1992). Based on that evaluation, our management concluded that, as of December 31, 2013, internal control over financial reporting is effective based on criteria established in Internal Control – Integrated Framework issued by the COSO." – 2013 annual report.

- Ocwen is "able to increase borrower acceptance rates of loan modifications" because of the technology it leased from Altisource Solutions. – 2013 annual report.

- "[T]he financial statements, and the other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." – 2013 annual report.

- Ocwen's CEO and CFO had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." – 2013 annual report.

- Reported income before taxes for the quarter ended March 31, 20141 was $88,960,000. – 2014 first quarter report.

- The material regulatory investigations to which Ocwen is subject are: (a) a December 2012 consent order with the NYDFS; (b) an indefinite hold requested by the NYDFS of Ocwen's acquisition of a pool of MSRs from Wells Fargo; (c) the National Mortgage Settlement; and (d) a voluntary request for the production of documents from the SEC. – 2014 first quarter report.

- The material regulatory investigations to which Ocwen is subject are: (a) a December 2012 consent order with the NYDFS; (b) an indefinite hold requested by the NYDFS of Ocwen's acquisition of a pool of MSRs from Wells Fargo; (c) the National Mortgage Settlement; and (d) a June 12, 2014 subpoena from the SEC concerning the production of documents. – 2014 second quarter report.

- The material regulatory investigations to which Ocwen is subject are: (a) a December 2012 consent order with the NYDFS; (b) an indefinite hold requested by the NYDFS of Ocwen's acquisition of a pool of MSRs from Wells Fargo; (c) an inquiry from the NYDFS "about certain other aspects of [Ocwen's] business, including certain aspects of our business dealings with Altisource [Solutions], HLSS, [Altisource Asset Management] and [Altisource] Residential, the interests of [Ocwen's] directors and executive officers in these companies, an online auction business owned by Altisource [Solutions], the role of Altisource [Solutions] in certain lender-placed insurance arrangements, the provisions contained in releases we use in connection with litigation settlements and certain erroneously dated borrower correspondence that we sent"; (d) the National Mortgage Settlement; (e) a June 12, 2014 subpoena from the SEC concerning the production of documents; and (f) an additional subpoena received from the SEC in response to Ocwen's restatements of its financials. – 2014 third quarter report.

274.   In ignorance of the falsity of Defendants Ocwen's, Britti's, and Bourque's statements or of the true facts, Plaintiffs purchased Ocwen's securities in actual, eyeball reliance upon Defendants' representations.

275.   Defendants Ocwen's, Britti's, and Bourque's materially false or misleading statements artificially inflated the price of Ocwen securities.

276.     Had they known the true facts, Plaintiffs would not have purchased the Ocwen securities and/or would not have purchased them at the inflated price they paid.

277.     Upon disclosure of the true facts and/or the materialization of the concealed risks, the price of Ocwen common stock dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

278.     By reason of the foregoing, Defendants Ocwen, Britti, and Bourque are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. §78*r*.

279.     Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen and Britti in the matter *In re Ocwen Financial Corporation Securities Litigation*, 14-cv-81057-WPD (S.D.Fl.), as well as a tolling agreement between Plaintiffs and Defendant Ocwen, Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the accrual of this cause of action.

### THIRD CAUSE OF ACTION

**Violations of Section 20(a) of the Exchange Act
Against the Defendants Erbey and Faris**

280.     Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

281.     This Cause of Action is asserted against Defendants Erbey and Faris and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

282.     Each of Defendants Erbey and Faris was at the time of the wrongs alleged herein a controlling person of Ocwen within the meaning of Section 20(a) of the Exchange Act.

283.     By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge of

the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Erbey and Faris had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

284.    Defendants Erbey and Faris were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Erbey and Faris each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

285.    By reason of the conduct alleged in First Cause of Action, Ocwen is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Erbey and Faris are liable pursuant to Section 20(a) based on their control of Ocwen.

286.    By reason of the conduct alleged in Second Cause of Action, Ocwen is liable for violations of Section 18 of the Exchange Act, and Defendants Erbey and Faris are liable pursuant to Section 20(a) based on their control of Ocwen..

287.    Defendants Erbey and Faris are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Ocwen common stock.

288.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen, Erbey and Faris in the matter *In re Ocwen Financial Corporation Securities Litigation*, 14-cv-81057-WPD (S.D.Fl.), as well as a tolling

agreement between Plaintiffs and Defendants Ocwen, Erbey and Faris, Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

### FOURTH CAUSE OF ACTION

**Fraud**
**Against Defendants Ocwen, Erbey and Faris**

289.    Plaintiffs repeat and reallege paragraphs 19-24, 27-237, 243-49, 254-56 as if set forth herein.

290.    Defendants Ocwen, Erbey, and Faris made, authorized or caused the representations and/or omissions set forth above.

291.    Those representations and omissions were material.

292.    The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

293.    Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

294.    Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase Ocwen common stock at inflated prices.

295.    Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased Ocwen common stock at all, or at the prices they paid, had they known the true facts regarding, *inter alia*, Erbey's approval of transactions with the Related Companies, Ocwen's failure to report its financial results in accordance with GAAP,

Ocwen's lack of effective internal controls over financial reporting, Ocwen's violation of the National Mortgage Settlement, Ocwen's lack of disclosure controls and procedures, Ocwen's technology that caused Ocwen to improperly backdate loan modification letters, and the California DBO's investigation of and accusation against Ocwen.

296.    As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation
### Against Defendants Ocwen, Erbey and Faris

297.    Plaintiffs repeat and reallege paragraphs 19-24, 27-223, 243-49, 254-256 as if set forth herein.

298.    Defendants Ocwen, Erbey, and Faris authorized or caused the representations and/or omissions set forth above.

299.    These Defendants supplied false information for use by Plaintiffs in making an investment decision.

300.    Defendants Ocwen, Erbey, and Faris were aware that Plaintiffs were a large investor and actively sought to induce Plaintiffs to purchase Ocwen common stock.  Plaintiffs' purchases of large amounts of stock helped keep Ocwen's stock price high because of increased demand.  Defendants Erbey and Faris collectively held millions of shares and options to acquire Ocwen common stock at the time Plaintiffs purchased Ocwen common stock.  Thus, Defendants Erbey and Faris directly benefitted from Plaintiffs' purchases of Ocwen stock, and had a pecuniary interest in those transactions.  As a result of their pecuniary interest in the transactions, Defendants

Erbey and Faris had a duty to exercise reasonable care and competence in providing information about Ocwen to Plaintiffs.

301.   Defendants Erbey and Faris made misrepresentations that they knew, or should have known, to be false in order to induce Plaintiffs to purchase Ocwen common stock.

302.   Defendants Erbey and Faris breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

303.   Plaintiffs reasonably relied on the information Defendants Ocwen, Erbey and Faris provided and were damaged as a result of these misrepresentations.  Plaintiffs would not have purchased Ocwen common stock at all, or at the prices they paid, had they known the true facts regarding, *inter alia*, Erbey's approval of transactions with the Related Companies, Ocwen's preparation of financial statements in violation of GAAP, Ocwen's lack of effective internal controls over financial reporting, Ocwen's violation of the National Mortgage Settlement, Ocwen's lack of disclosure controls and procedures, Ocwen's technology that caused Ocwen to improperly backdate loan modification letters, and the California DBO's investigation of and accusation against Ocwen.

304.   By reason of the foregoing, Defendants Ocwen, Erbey, and Faris are liable to Plaintiffs for negligent misrepresentation.

305.   As a direct and proximate result of Ocwen's, Erbey's, and Faris's negligent misrepresentations, Plaintiffs have suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a) Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b) Awarding Plaintiffs punitive damages;

(c) Awarding Plaintiffs their attorneys' fees and costs; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: January 12, 2016                   Respectfully submitted,

                                         _/s/ Robert F. Elgidely_____
                                         Robert F. Elgidely
                                         Florida Bar No. 111856
                                         relgidely@gjb-law.com

                                         GENOVESE JOBLOVE & BATTISTA, P.A.

                                         200 East Broward Boulevard, Suite 1110
                                         Fort Lauderdale, FL 33301
                                         Tel.  954.453.8000

                                         and

                                         _Of Counsel_

                                         LOWENSTEIN SANDLER LLP

                                         Lawrence M. Rolnick, NY Bar No. 2024784
                                         lrolnick@lowenstein.com
                                         Marc B. Kramer, NY Bar No. 2167146
                                         mkramer@lowenstein.com
                                         Michael J. Hampson, NY Bar No. 4699120
                                         mhampson@lowenstein.com
                                         1251 Avenue of the Americas
                                         New York, NY  10020
                                         Tel. 212.262.6700

                                         Thomas E. Redburn, Jr., NJ Bar No. 033661995
                                         tredburn@lowenstein.com
                                         65 Livingston Avenue
                                         Roseland, NJ 07068
                                         Tel. 973.597.2500

                                           _**Attorneys for Plaintiffs**_