**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

---

BROADWAY GATE MASTER FUND, LTD.,
PENNANT MASTER FUND LP, and
PENNANT WINDWARD MASTER FUND,
LP,

        Plaintiffs,

        v.

OCWEN FINANCIAL CORPORATION,
WILLIAM ERBEY, RONALD FARIS,
MICHAEL BOURQUE, and JOHN BRITTI,

        Defendants.

Civil Action No. 9:16-cv-80056-WPD

---

**PLAINTIFFS' MOTION TO EXCLUDE**
**THE TESTIMONY OF MARCEL A. BRYAR AND INCORPORATED**
**MEMORANDUM OF LAW AND REQUEST FOR ORAL ARGUMENT**

<table>
<tr><td>

**GENOVESE JOBLOVE & BATTISTA, P.A.**

Robert F. Elgidely
200 East Broward Boulevard, Suite 1110
Fort Lauderdale, FL 33301
Tel.  954.453.8022
Fax  954.331.2907
Florida Bar No. 111856
relgidely@gjb-law.com

</td><td>

**LOWENSTEIN SANDLER LLP**

Lawrence M. Rolnick
Marc B. Kramer
Thomas E. Redburn, Jr.
Michael J. Hampson
Richard A. Bodnar
Brandon M. Fierro
1251 Avenue of the Americas
New York, NY  10020
Tel.  212.262.6700
Fax. 212.262.7402
lrolnick@lowenstein.com
mkramer@lowenstein.com
tredburn@lowenstein.com
mhampson@lowenstein.com

</td></tr>
</table>

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND .......................................................... 3

    A.    The National Mortgage Settlement ........................................................ 3

    B.    Ocwen Misrepresents Its Purported Compliance with the NMS ................ 4

    C.    Defendants Fail To Timely Serve any Affirmative Expert Reports ............ 5

    D.    Bryar's Untimely, Irrelevant and Unreliable Opinions ............................ 6

ARGUMENT .................................................................................................................... 7

    I.    BRYAR'S AFFIRMATIVE OPINIONS SHOULD BE EXCLUDED AS UNTIMELY ............................................................................................ 8

    II.    BRYAR'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY WILL NOT ASSIST THE TRIER OF FACT ............................................ 9

        A.    "Compliance" Is Not a Scientific, Technical or Specialized Term Whose Meaning Is Beyond the Ken of the Average Juror ......................... 9

        B.    Bryar Offers an Improper Legal Opinion ................................... 11

    III.    BRYAR'S OPINIONS SHOULD ALSO BE EXCLUDED BECAUSE THEY LACK A RELIABLE FOUNDATION AND BASIS ............................. 12

CONCLUSION .............................................................................................................. 16

# **TABLE OF AUTHORITIES**

Page(s)

CASES

*City of Tuscaloosa v. Hacros Chems., Inc.*,
    158 F.3d 548 (11th Cir. 1998) ....................................................................................8

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*,
    402 F.3d 1092 (11th Cir. 2005) .........................................................................8, 11, 12

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993).....................................................................................................7

*FindWhat Inv'r Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ................................................................................10

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...................................................................................................12

*Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of the City
of Detroit*,
    50 F.3d 908 (11th Cir. 1995) ......................................................................................9

*Michigan Millers Mut. Ins. Corp. v. Benfield*,
    140 F.3d 915 (11th Cir. 1998) ..................................................................................12

*Nature's Prods., Inc. v. Natrol, Inc.*,
    No. 11-cv-62409-WPD, 2013 WL 11275370 (S.D. Fla. Oct. 8, 2013) ..........................8, 9, 11

*In re Ocwen Fin. Corp. Sec. Litig.*,
    No. 14-cv-81057-WPD (S.D. Fla.) ............................................................................11

*Owaki v. City of Miami*,
    491 F. Supp. 2d 1140 (S.D. Fla. 2007) .....................................................................15

*SEC v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968)......................................................................................10

*In re Trasylol Prods. Liab. Litig.*,
    No. 08-md-1928-DMM, 2011 WL 7109297 (S.D. Fla. Apr. 27, 2011) .....................9

*Turner v. Orr*,
    785 F.2d 1498 (11th Cir. 1986) ................................................................................12

*United States v. Everglades College, Inc.*,
    No. 12-cv-60185-WPD, 2014 WL 11531790 (S.D. Fla. May 27, 2014)...................11

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ................................................................... *passim*

*United States v. McCarthy Improvement Co.*,
   No. 14-cv-919-J-PDP, 2017 WL 443486 (M.D. Fla. Feb. 1, 2017) .........................................12

*United States v. Milton*,
   555 F.2d 1198 (5th Cir. 1977) ................................................................11, 12

**RULES**

Fed. R. Evid. 702 .................................................................................1, 7, 8, 11

**OTHER AUTHORITIES**

*Black's Law Dictionary* (6th ed. 1990) .........................................................10

*The New Oxford American Dictionary* (2d ed. 2005) ..................................................10

Plaintiffs Broadway Gate Master Fund, Ltd., Pennant Master Fund, LP, and Pennant Windward Master Fund, LP respectfully move, and submit this memorandum of law in support of their motion, pursuant to Fed. R. Evid. 702 to exclude the proposed testimony of Marcel A. Bryar.[1]

## PRELIMINARY STATEMENT

Marcel Bryar is an attorney who Defendants belatedly offered as an expert to concoct an unsupported definition of a plain English word that the jury does not need "expert" testimony to interpret. Defendants also have asked Bryar to offer a flawed legal opinion about Ocwen's contractual obligations under the National Mortgage Settlement. Bryar's proposed testimony should be excluded under Rule 702 for a number of reasons.

*First*, Defendants failed to timely disclose Bryar as an affirmative expert and to serve his affirmative report. Affirmative expert reports and disclosures were required to be served by May 25, 2017. However, Defendants did not disclose Bryar as an expert and serve his report until June 26, 2017, the deadline for serving rebuttal reports. Although parts of Bryar's report respond to Plaintiffs' mortgage servicing expert's affirmative report, Bryar's report goes much further than that. Indeed, Bryar himself admits that his opinions are not merely a rebuttal of Plaintiffs' mortgage servicing expert, but that he is also offering affirmative opinions. It is simply unfair to let one of Defendants' experts offer affirmative opinions after Defendants blew the deadline for disclosing those opinions (by an entire month) when Plaintiffs timely served their affirmative expert reports. Bryar's affirmative opinions should be excluded as untimely.

*Second*, Bryar's proffered opinion on the meaning of the word "compliance" should be excluded because the jury does not need his assistance to interpret plain English. One of the issues that the jury may be called upon to decide at trial is whether Ocwen's May 1, 2014 representation of its National Mortgage Settlement "compliance" was false. Under established Eleventh Circuit law, the test for falsity under the securities laws is whether a reasonable investor would have been misled by the statement at issue. But Bryar has conceded that he is not opining about what a reasonable investor would have understood Ocwen to mean when it represented its National Mortgage Settlement "compliance"; rather, he is purporting to offer a mortgage

---

[1] Unless otherwise defined herein, capitalized terms shall have the same meaning as set forth in the Complaint (D.E. 1). Citations to "Elgidely Decl." are to the Declaration of Robert F. Elgidely in Support of Plaintiffs' Motion to Exclude Bryar, filed herewith.

industry definition of that term (albeit without providing any actual support for that definition). The word "compliance," however, is not a scientific or technical term. Thus, the jury does not need Bryar's testimony to help it decide whether a reasonable investor would have been misled by Ocwen's representation of National Mortgage Settlement "compliance."

*Third*, Bryar is attempting to offer an improper legal opinion. Bryar examines the enforcement provisions of the National Mortgage Settlement and then offers a legal opinion about whether Ocwen ever breached those contractual provisions. However, Defendants are not permitted to use Bryar as a mouthpiece to offer legal arguments that their lawyers could make during closing arguments. Bryar's legal opinions also improperly usurp this Court's role in charging the jury with respect to the applicable law.

*Fourth*, Bryar's opinions are irrelevant. Although Bryar superficially purports to opine that Ocwen was compliant with the National Mortgage Settlement's servicing standards, once his opinion is dissected it is clear that Bryar is actually opining that Ocwen was never fined for its noncompliance with certain of the National Mortgage Settlement's servicing standards (even though it was). Thus, Bryar's opinion is about regulatory *enforcement*, not about National Mortgage Settlement *compliance*. Because Ocwen's May 1, 2014 statement referred to Ocwen's purported National Mortgage Settlement compliance, and not whether Ocwen had been subject to an enforcement action under the National Mortgage Settlement, Bryar's misplaced opinion will only serve to confuse the jury.

*Finally*, Bryar's opinions are unreliable because they are premised on factual assumptions that not only find no support in the record, but are also directly contradicted by the evidence. Specifically, Bryar asserts throughout his report that the monitor of the National Mortgage Settlement never found Ocwen to be noncompliant. That simply is not true. The monitor spoke about Ocwen's "noncompliance" with the National Mortgage Settlement on multiple occasions. With respect to the first quarter of 2014, the monitor found that Ocwen had violated various testing metrics that rendered it noncompliant. The monitor also concluded that Ocwen did not have an internal watchdog that complied with the requirements of the National Mortgage Settlement. Thus, Bryar's opinions lack a reliable foundation and basis, and should be excluded.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.      The National Mortgage Settlement**

In early 2012, the federal government, forty-nine states, and the District of Columbia entered into an agreement with the country's five largest mortgage servicers to settle claims against those servicers arising from their improper mortgage servicing practices.  (*See* Elgidely Decl. Ex. 1 at 1-2.)  As part of the National Mortgage Settlement ("NMS" or "NMS Consent Judgment"), the servicers agreed, among other things, to provide loan modifications to struggling borrowers, to make payments to borrowers who lost their homes in foreclosure, and to abide by a comprehensive set of servicing standards.  (*See id.* ¶¶ 2-5.)  The NMS contained more than three hundred servicing standards (the "NMS Servicing Standards") requiring that each servicer, among other things, assign a single point of contact to each borrower, maintain sufficient numbers of staff who are properly trained, improve borrower communication, not charge borrowers improper fees, and implement best practices for instituting foreclosure proceedings.  (*Id.* Ex. A.)  The NMS Servicing Standards are set forth in Exhibit A to the NMS, and the "Enforcement Terms" of the NMS are set forth in Exhibit E to the NMS.

The parties to the NMS agreed that Joseph A. Smith, Jr. (the "NMS Monitor") would monitor the servicers' compliance with the NMS Servicing Standards.  (*See id.* Ex. E § C.)  The NMS contained various "metrics" that would be used to test some of the NMS Servicing Standards.  (*Id.* Ex. E-1.)  For each metric, the NMS set forth a threshold error rate that determined the permissible number of noncompliant loans in a particular testing sample before the servicer was deemed to be failing the metric.  (*Id.*)  Each servicer was required to create a properly trained and independent "Internal Review Group," or "IRG" – completely separate from its servicing business – to test the metrics on a quarterly basis and to report its test results to the NMS Monitor.  (*Id.* Ex. E §§ C(7)-C(10).)  Persistent metric fails could result in large fines being imposed on the servicers.  (*See* Ex. E § J(3)(b).) ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

Although Ocwen was not one of the original parties subject to the NMS, in February 2013 it acquired mortgage servicing rights to 1.6 million mortgage loans from Residential Capital LLC and GMAC Mortgage, LLC (collectively, "ResCap"), which were parties to the NMS. (Elgeidy Decl. Ex. 3 at 7.)  As a result of its acquisition of those mortgages, Ocwen was required to comply with the terms of the NMS with respect to those loans, as applicable. (*Id.* Ex. 4 at F-63.)  In December 2013, Ocwen itself signed onto the NMS. (Elgeidy Decl. Ex. 5.)  As of February 26, 2014 – the date when the United States District Court for the District of Columbia entered the consent judgment between Ocwen, on the one hand, and the federal government, forty-nine states, and the District of Columbia, on the other – all loans serviced by Ocwen had to comply with the NMS.  (*Id.*)[2]

**B.      Ocwen Misrepresents Its Purported Compliance with the NMS**

On May 1, 2014, Ocwen issued a press release announcing its operating results for the first quarter of 2014.  (Elgeidy Decl. Ex. 7.)  In that press release, Ocwen falsely represented that it was in compliance with the NMS.  Specifically, Defendant Erbey was quoted in the press release as saying:

> Going forward, we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business.  We consider ***our*** solid balance sheet, ***National Mortgage Settlement compliance*** and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages.

(*Id.* (emphasis added).)

However, Ocwen was not compliant – and was not even close to being compliant – with the NMS at that time.  The record in this case is replete with examples of Ocwen's utter lack of compliance with the NMS.  *First*, Ocwen knew when it made the May 1 statement that, during the first quarter of 2014, it had failed an NMS metric governing the termination of forced-placed insurance.  Indeed, ███████████████████████████████████████
███████████████████████████████████████████████████

---

[2] The NMS Consent Judgment that Ocwen signed was substantially identical to the original NMS Consent Judgment signed in 2012, except that the Enforcement Terms were contained in Exhibit D to the Ocwen NMS Consent Judgment, not Exhibit E.  In his report, Bryar cites to the Ocwen-version, not the ResCap-version of the NMS Consent Judgment. ███████████████████
████████████

████████ The NMS Monitor has himself characterized this metric failure as Ocwen's "noncompliance" with the NMS. (Elgeidy Decl. Ex. 10 at 29.)[3] *Second*, Ocwen also failed the NMS metric governing collection of loan modification documentation – Metric 19 – during the first quarter of 2014. (*Id.* at 20.) The NMS Monitor described this metric failure as "noncompliance" by Ocwen, which Ocwen agreed to treat as "widespread" noncompliance. (*Id.* at 32.) *Third*, Ocwen's pervasive and improper backdating of thousands of borrower letters – which Ocwen's senior compliance personnel discovered in November 2013 – resulted in Ocwen being deemed to have failed an additional *seven* metrics. (*Id.* at 34-38.) *Finally*, the NMS Monitor has found that for a significant time period – including when it made the compliance statement on May 1, 2014 – Ocwen's IRG did not comply with sections C(7) and C(8) of Exhibit E to the NMS. (Elgeidy Decl. Ex. 12 at 7-13; *id.* Ex. 10 at 11-12, 39 n.33.) According to the NMS Monitor, Ocwen's IRG "lacked the critical keys to integrity mandated [by the NMS], namely, 'an internal quality control group that is independent from the line of business whose performance is being measured,' and an internal quality control group with 'the appropriate authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessments contemplated'" by the NMS. (Elgeidy Decl. Ex. 12 at 13.) The internal evidence of Ocwen's noncompliance with the NMS – contrary to its external statements to investors – is overwhelming.

### C. Defendants Fail To Timely Serve any Affirmative Expert Reports

The Pennant Plaintiffs filed this action against Ocwen and several of its present and former officers and directors in January 2016. On September 21, 2016, the parties filed their Joint Scheduling Report with the Court. (D.E. 38.) That Report sets forth the parties' agreement to certain discovery deadlines, including (i) May 25, 2017, for "[a]ffirmative expert disclosures and reports" and (ii) June 25, 2017, for "[r]ebuttal expert disclosures and reports." (*Id.* at 3.)

On May 25, 2017, Plaintiffs served three expert reports. One of those expert reports was the report of David Pawlowski. (Elgeidy Decl. Ex. 11.) Pawlowski has over thirty years of experience in the mortgage industry, and has expertise in, among other areas, mortgage servicing

---

[3] The threshold error rate for this metric – Metric 29 – was 5%. Ocwen's IRG reported to the NMS Monitor that Ocwen failed this Metric during the first quarter, with an error rate of 6.03%. (Elgeidy Decl. Ex. 10 at 21.) ████████████████████
████████████████████████████████████████

operations, underwriting, diligence, nonperforming loans, systems, loan administration, and risk management. (*Id.* at ¶¶ 7-14, Ex. B.)  Pawlowski was asked to assess Ocwen's compliance with the NMS, including whether the company had a routine, reliable method to ensure that Ocwen was complying with the NMS.  (*Id.* ¶ 2.)  Pawlowski reviewed voluminous amounts of documents, facts and data before forming his opinions.  (*See id.* Ex B; Elgidely Decl. Ex. 14 at 95:9-23.)  Drawing on his significant knowledge of and experience in the mortgage servicing industry, and applying that expertise and industry standards to the data he reviewed, Pawlowski concluded in his report that Ocwen's conduct did not conform to the NMS on May 1, 2014, and that it lacked the necessary risk and internal controls to make reliable and informed statements concerning its NMS compliance. (*See* Elgidely Decl. Ex. 11 ¶¶ 26-145.)[4]

> ### D.    Bryar's Untimely, Irrelevant and Unreliable Opinions

Defendants did not serve a single expert report by the deadline for serving affirmative expert reports.  However, on the day rebuttal reports were due, Defendants served two expert reports.  One of those reports was the "Expert Report of Marcel Bryar" dated June 26, 2017. (Elgidely Decl. Ex. 15.)

Bryar is an attorney who runs a mortgage consulting firm and a real estate investment firm.  (*Id.* ¶¶ 6-7, 18; Elgidely Decl. Ex. 6 at 66:24-67:14.)  In his report, Bryar states that he was asked to give three opinions.  First, he was asked to respond to Pawlowski's opinions. (Elgidely Decl. Ex. 15 ¶ 1.)  Second, ██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████  Thus, by his own admission, two of Bryar's three opinions are not in rebuttal to Pawlowski's opinions, but rather are untimely affirmative expert opinions that were not served until several weeks after the deadline for disclosing such opinions had passed. Under the Joint Scheduling Report, Plaintiffs did not have the opportunity to serve a written response to Bryar's report.

Bryar affirmatively opines that "a failure to meet a regulatory requirement in an individual instance does not translate into non-compliance [sic]" unless "the failure is material" and "[t]he regulated party does not cure the failure within a reasonable amount of time."

---

[4] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

(Elgidely Decl. Ex. 15 ¶ 27.)  In support, Bryar offers a legal opinion interpreting the NMS Consent Judgment – as a contract imposing certain obligations on Ocwen – and argues that Ocwen could be "out of compliance" with the NMS Servicing Standards only if it failed to cure one of its metric fails.  (*Id.* ¶¶ 30-43.)  Bryar concludes that Ocwen was compliant with the NMS Servicing Standards because he believes (erroneously) that the NMS Monitor has never found Ocwen to be out of compliance with the NMS Servicing Standards and has never imposed any monetary penalties on Ocwen.  (*Id.* ¶¶ 44-47.)

As explained below, the majority of Bryar's opinions are untimely, and all of his opinions are either irrelevant or unreliable (or both).  Thus, Bryar's proffered expert testimony should be excluded.

## **ARGUMENT**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The rule requires the trial court to act as a gatekeeper to ensure that opinions that are not relevant and reliable are not presented to the jury with the imprimatur of an "expert." *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993).

The Eleventh Circuit has constructed a three-part test for assessing the admissibility of expert testimony under Rule 702 and *Daubert*.  The trial court must assess whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact through the application of scientific,

> technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Hacros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).[5]

The proponent of the expert opinion bears the onus of demonstrating that the expert is qualified, that her methodology is reliable, and that her testimony will assist the jury. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1109 (11th Cir. 2005) ("The proponent of the expert testimony carries a substantial burden under Rule 702."). Even if the proponent of the testimony meets its burden, the trial court still should exclude the expert's opinion if its "probative value is substantially outweighed by its potential to confuse or mislead the jury, . . . or if the expert testimony is cumulative or needlessly time consuming." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (internal citation omitted). "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id.*

## I.   BRYAR'S AFFIRMATIVE OPINIONS SHOULD BE EXCLUDED AS UNTIMELY

If Defendants wanted Bryar to offer any affirmative opinions – as opposed to merely offering rebuttal opinions in response to Plaintiffs' experts' opinions – they were required to disclose Bryar as an expert and serve an affirmative report by May 25, 2017. (*See* D.E. 38 at 3 (setting May 25, 2017 deadline for "[a]ffirmative expert disclosures and reports").) However, Defendants did not serve Bryar's report until June 25, 2017, the deadline for serving rebuttal reports. (*See id.*) Thus, Bryar's attempts to offer new opinions that are not a rebuttal of Pawlowski's opinions are affirmative opinions that were not timely served. Specifically, this includes his newly-minted opinions concerning (i) the meaning of the plain English word "compliance" and (ii) his legal interpretation of Ocwen's legal obligations under the NMS Consent Judgment. Both of these opinions should be excluded because they are untimely.

This Court's decision in *Nature's Products, Inc. v. Natrol, Inc.*, No. 11-cv-62409-WPD, 2013 WL 11275370 (S.D. Fla. Oct. 8, 2013), is directly on point. There, the plaintiff proffered Dr. Kantha Schelke to testify about its compliance with FDA Good Manufacturing Practices. *Id.* at *3. In response, the defendant proffered Luis Chavaria to testify not only in response to Dr.

---

[5] Plaintiffs do not challenge Bryar's qualifications as an expert in the field of mortgage servicing at this time, but reserve the right to explore that issue at trial.

Schelke's opinions, but also to offer an opinion about an FDA Establishment Inspection Report and about the plaintiff's record/batch production for a third party. *Id.* at \*6. This Court excluded Chavaria from testifying about the FDA Establishment Inspection Report and the plaintiff's record/batch production because those opinions were not a rebuttal to Dr. Schelke's opinions. *Id.*; *see also In re Trasylol Prods. Liab. Litig.*, No. 08-md-1928-DMM, 2011 WL 7109297, at \*8 (S.D. Fla. Apr. 27, 2011) (finding that opinions that do not "directly address[] an assertion raised by" affirmative expert are not rebuttal opinions).

Similar to the "rebuttal" report in *Nature's Products*, entire sections of Bryar's report are "separate and apart" from his review of Pawlowski's report. *Id.* Indeed, Bryar himself ***admits*** in his own report that it is not simply a rebuttal report. (Elgeidy Decl. Ex. 15 ¶ 1 (describing the scope of his engagement as not only (1) to respond to Pawlowski's opinions, but (2) "also . . . to provide [his] opinion regarding Ocwen's compliance with the servicing standards set forth in" the NMS, and (3) "to provide [his] opinion regarding the compliance standard applicable to compliance with the NMS Servicing Standards.").)  Accordingly, Bryar should be prohibited from testifying about the affirmative opinions set forth in Sections V.A.1, V.A.2, and V.A.3 of his report.

## II.   BRYAR'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY WILL NOT ASSIST THE TRIER OF FACT

### A.   "Compliance" Is Not a Scientific, Technical or Specialized Term Whose Meaning Is Beyond the Ken of the Average Juror

In addition to being an untimely affirmative opinion, Bryar's opinion about what he thinks "compliance" means should be excluded because the jury does not need an expert's help to decide the meaning of plain English.  Expert testimony is only admissible "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. An expert is not permitted to unduly influence the jury by endorsing lay evidence with the expert's seal of approval.  Thus, "[e]xpert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of the City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995).

One of the issues the jury may be asked to decide at trial is whether Ocwen's representation to investors of "NMS compliance" was false and misleading.[6]   The test for whether a statement is false and misleading is as follows:  "A statement is misleading if in light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it."  *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir. 1968)) (alterations and ellipsis omitted).  Thus, the issue is not what a *lawyer and mortgage professional* might argue is "NMS compliance," but rather what a *reasonable investor* would have understood Ocwen to mean when it told its investors it was in compliance.

"Compliance" is not a technical or scientific term that requires expert testimony.  It is a word that people use in their day-to-day interactions, and a term for which there is a common understanding.  The plain meaning of "compliance with" is "the state or fact of according with or meeting rules or standards." *Compliance*, *The New Oxford American Dictionary* (2d ed. 2005). Significantly, the leading legal dictionary similarly defines "compliance" as "[s]ubmission; obedience; conformance." *Complianc*e, *Black's Law Dictionary* 285 (6th ed. 1990); *see also id.* at 286 (defining "comply" as, among other things, "[t]o act in accordance with").  The fact that the definitions in *Black's* track the definition found in a common English dictionary strongly implies that a reasonable investor would not have to consult with a legally-trained mortgage servicing expert to understand what Ocwen was representing to investors.  "Compliance" with the NMS was never intended to convey some unknown "term of art" to the market.

The jurors do not need Bryar to tell them what he thinks "compliance" means when attempting to determine what a reasonable investor would have understood Ocwen to mean when it represented its NMS compliance on May 1, 2014.  Indeed, ███████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████   ██████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████  ██  ████████████████████████████████

Accordingly, Bryar's opinion about the meaning of "compliance" – for which, as explained in more detail in Point III *supra*, Bryar cannot actually provide any support – is more likely to

---

[6] Both parties have moved for summary judgment on the issue of whether the May 1, 2014 statement was false and misleading.  (D.E. 69; D.E. 72.)

confuse and mislead the jurors than help them. *See Frazier*, 387 F.3d at 1263 (instructing district courts to "take care to weigh the value of [expert testimony] against its potential to mislead or confuse"). As such, it should be excluded.

**B.      Bryar Offers an Improper Legal Opinion**

Bryar's legal opinions concerning Ocwen's contractual obligations under the NMS are not admissible expert testimony. Testifying experts may not offer legal opinions to the jury. *Cook*, 402 F.3d at 1112 n.8. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63. "[C]ourts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law." *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977).

Both parties have proffered testimony from mortgage servicing experts concerning Ocwen's compliance (or lack thereof) with the NMS. However, only Plaintiffs' expert's opinions are the proper subject of expert testimony. Pawlowski drew on his significant knowledge of, and experience in, the mortgage servicing industry to review the facts and data concerning Ocwen's mortgage servicing practices, risk controls and internal controls, and concluded that Ocwen's conduct did not conform to the NMS Servicing Standards and that Ocwen did not have an IRG that comported with the NMS's requirements. (*See* Elgidely Decl. Ex. 11 ¶¶ 26-145.) That is a proper use of expert testimony. *See In re Ocwen Fin. Corp. Sec. Litig.*, No. 14-cv-81057-WPD, D.E. 285 at 14-15 (denying motion to exclude class plaintiffs' expert on regulatory compliance); *Nature's Products*, 2013 WL 11275370, at *3 (finding expert opinion reliable where expert relied on relevant standards, examined the plaintiff's conduct based on record evidence, and drew on her "education, experience and overall expertise" to reach her opinion that plaintiff complied with FDA requirements).

Bryar, on the other hand, uses his legal training to interpret the Enforcement Terms of the NMS Consent Judgment and concludes that Ocwen never breached the NMS Consent Judgment because the NMS Monitor never fined Ocwen. (*See* Elgidely Decl. Ex. 15 ¶¶ 30-47.) Bryar's testimony does not help the jury understand if Ocwen was complying with the NMS, but is instead the kind of advice a lawyer would give Ocwen about its legal exposure under the consent judgment. That sort of "expert testimony" is not admissible under Rule 702. *See United States v. Everglades College, Inc.*, No. 12-cv-60185-WPD, 2014 WL 11531790, at *4-5 (S.D. Fla. May

27, 2014) (excluding expert testimony where the proffered expert sought to opine about, among other things, "the legal issue of whether the FCA requires proof of a link between specific students' loan defaults and particular incentives provided to the admissions counselors who enrolled those specific students").   "Though expert testimony might be helpful to define technical terms in a contract or the standard of care in the industry, . . . the interpretation of a written contract is a matter of law." *United States v. McCarthy Improvement Co.*, No. 14-cv-919-J-PDP, 2017 WL 443486, at \*15 (M.D. Fla. Feb. 1, 2017).   Thus, in *McCarthy*, the court prohibited an expert in the construction industry from testifying about a subcontractor's legal obligations under the subcontract that was at issue in the litigation.   *Id.*.   Like the subcontract in *McCarthy*, the NMS Consent Judgment is a legally binding agreement, and Bryar may not opine about Ocwen's legal obligations under that contract.   *See Turner v. Orr*, 785 F.2d 1498, 1503 (11th Cir. 1986) ("The consent judgment is deemed a contract.").   Yet that is precisely what Bryar is attempting to do.   Bryar's opinion is not relevant and will simply confuse the jury.

In essence, Defendants are attempting to use "expert" testimony to make legal arguments to the jury by designating a lawyer with mortgage industry experience as an expert on mortgage servicing and then having that lawyer interpret Ocwen's obligations under a contract.   Bryar's opinions offer "nothing more than what Defendants' lawyers . . . can argue in closing arguments."   *Frazier*, 387 F.3d at 1262-63.   They also attempt to "substitute for the court in charging the jury regarding the applicable law."   *Milton*, 555 F.2d at 1203.   Bryar's legal opinions should therefore be excluded.

## III.   BRYAR'S OPINIONS SHOULD ALSO BE EXCLUDED BECAUSE THEY LACK A RELIABLE FOUNDATION AND BASIS

In addition to the litany of problems identified above, Bryar's opinions are inadmissible because they are based purely on Bryar's *ipse dixit*, are flatly contradicted by the record evidence, and/or fail to account for important facts that undermine them.   Expert testimony should be excluded where it "is connected to existing data only by the *ipse dixit* of the expert." *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").   Moreover, "a trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained."   *Cook*, 402 F.3d at 1111.

Bryar attempts to proffer ██████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ )  However,
Bryar has failed to provide any foundation or basis for that opinion.  The only purported support
that Bryar cites in his written report is an industry bulletin from the Consumer Financial
Protection Bureau ("CFPB") titled "Responsible Business Conduct: Self-Policing, Self-
Reporting, Remediation, and Cooperation."  (*Id.* ¶ 27 n.21, ¶ 29 n.22.)  However, that document
in no way suggests some specialized industry definition of the word "compliance," but instead
simply provides guidance to the industry about actions regulated parties may take to "favorably
affect the ultimate resolution of a [CFPB] investigation."  (*See id.* Ex. 16 at 1.)  Lawyers provide
this kind of guidance and advice to their clients all the time.  When pressed in deposition about
where in the CFPB bulletin Bryar's definition of compliance could be found, Bryar ████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████   ████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████   ██████████
██████████████   This Court is not required to accept Bryar's unsupported conclusions about what
the industry purportedly believes "compliance" means.  *See Frazier*, 387 F.3d at 1265 (finding
that expert's inability to provide specific examples to support his opinion, "even after repeated
prompting," rendered his conclusion unreliable).

Indeed, it is clear from his reliance on the CFPB bulletin that Bryar is confusing the
concept of *regulatory compliance* and the concept of *regulatory enforcement* in response to a
regulated entity's noncompliance.  However, compliance and enforcement are two separate and
distinct concepts.  Indeed, when taken to its logical conclusion, Bryar's attempt to substitute the
standards for regulatory enforcement with the definition of "compliance" leads to absurd results.
Bryar opines that a servicer can never be out of compliance with a mortgage servicing regulation
unless and until it has been given the opportunity (and in fact has failed) to cure.  (Elgidely Decl.
Ex. 15 ¶ 27.)  But if the servicer has been given an opportunity to cure, then by definition it
could not have been in compliance in the first place.  A servicer who is in compliance with a
regulation *has nothing to cure*.  Conversely, an opportunity to cure can only arise if one is out of

compliance in the first place.  This fatal flaw in Bryar's logic illustrates that Bryar is really giving legal advice about regulatory enforcement, not expert testimony about what the word "compliance" means.  Thus, even if Bryar had provided a basis or foundation for his opinion, which he has not, his opinion concerning *enforcement* is irrelevant to the issue of whether Ocwen misrepresented to its investors that it was in *compliance* with the NMS.  Ocwen did not represent to its investors on May 1, 2014 that it had not been the subject of any NMS enforcement action; it instead misrepresented that it was in "compliance" with the NMS.

This point is further underscored by the very document on which Bryar relies to support his opinion – the NMS Consent Judgment.  Bryar opines that Ocwen's violation of an NMS metric does not render it noncompliant with the applicable NMS Servicing Standard.  (Elgidely Decl. Ex. 15 ¶ 35.)  However, the Enforcement Terms of the NMS expressly provide that in the event of a metric failure, the NMS Monitor must determine if the servicer's "noncompliance" was "widespread."  (*Id.* Ex. 1 at E-12 ¶ 5.)  Thus, the NMS itself identifies a metric failure as "noncompliance," which completely undermines Bryar's contrary interpretation of that contract.

Indeed, Ocwen *itself* has stated that a metric failure is noncompliance.  In July 2017, Ocwen sent a revised quarterly report to the NMS Monitor in which it reported that the IRG's testing had resulted in Metric 29 exceeding the threshold error rate for the first quarter of 2017. (Elgidely Decl. Ex. 17 at 10.)  According to the NMS Monitor, Ocwen reported "that it was ***not in compliance*** with Metric 29" at that time.  (*Id.* at 15 (emphasis added).)  Thus, Ocwen has taken a non-litigation position vis-à-vis the NMS Monitor that is diametrically opposed to Bryar's legal interpretation of the NMS in this case (as well as Ocwen's own litigation position).

Another fundamental flaw warranting exclusion is that Bryar's opinion is limited in scope to Ocwen's compliance with the NMS Servicing Standards that were tested by metrics, whereas the May 1, 2014 statement misrepresented Ocwen's compliance *with the entire NMS*.  Bryar conceded during deposition that ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████  And while Bryar purports to opine on Ocwen's metric and non-metric Servicing Standards in his report (*id.* Ex. 15 ¶¶ 36-43), he conceded in deposition that ████████████████████████████████████████████████ ███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████

There is also undisputed evidence that Ocwen failed to comply with other parts of the NMS besides the servicing standards as of that date.  Specifically, Ocwen's IRG did not comply with sections C(7) and C(8) of Exhibit E to the NMS because the NMS Monitor found that the IRG "lacked the critical keys to integrity mandated [by the NMS], namely, 'an internal quality control group that is independent from the line of business whose performance is being measured,' and an internal quality control group with 'the appropriate authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessments contemplated'" by the NMS.  (Elgidely Decl. Ex. 12 at 13.)  Thus, even if Bryar were right in his opinion that Ocwen was compliant with the metric NMS Servicing Standards – which he is not – that conclusion would still not render true Ocwen's May 1, 2014 misrepresentation that it was compliant with all aspects of the NMS.  As such, Bryar's opinion is unreliable and likely to mislead the jury.

Finally, Bryar's opinion that Ocwen was compliant with the NMS Servicing Standards should also be excluded because it is based solely on Bryar's erroneous belief that the NMS Monitor never found Ocwen out of compliance with the NMS.  (*See* Elgidely Decl. Ex. 15 ¶¶ 44-46).  Bryar's assertion that the NMS Monitor never found Ocwen out of compliance with the NMS is flatly contradicted by the NMS Monitor's public statements about Ocwen's noncompliance with the NMS.  Expert opinions that are "directly contradicted by the record" are properly excluded.  *See Owaki v. City of Miami*, 491 F. Supp. 2d 1140, 1161 (S.D. Fla. 2007).  Here, the NMS Monitor made the following public statements about Ocwen's noncompliance with the NMS:

- In his final report on Ocwen's NMS compliance for the first two quarters of 2014, the NMS Monitor described Ocwen's Metric 29 failure as "***noncompliance***."  (Elgidely Decl. Ex. 10 at 29 (emphasis added).)

- In that same report, the NMS Monitor described Ocwen's Metric 19 failure as "***noncompliance***."  (*Id.* at 32 (emphasis added).)

- In a May 7, 2015 press release addressing Ocwen's compliance for the first two quarters of 2014,  the NMS Monitor stated: "Although there is still work to be done to ensure Ocwen's compliance, I felt that it was important to report to the Court and to the public as the results of our retesting became available.  I will

continue to do so *until I am satisfied that Ocwen has addressed its noncompliance* and independence issues." (Elgidely Decl. Ex. 18 (emphasis added).)

- In a September 8, 2016 update, the NMS Monitor stated: "Ocwen has made demonstrable progress in its efforts to improve its compliance with the [NMS]. However, as evidenced by the two fails reported in the final quarter 2015, *there is still work to be done for Ocwen to fully comply*." (Elgidely Decl. Ex. 19 at 12 (emphasis added).)

Thus, Bryar's belief that the NMS Monitor never found Ocwen out of compliance with the NMS is unsupported by the incontrovertible factual record. Because an erroneous factual assumption is the foundation of Bryar's entire opinion about Ocwen's purported compliance with the NMS Servicing Standards, Bryar's opinion crumbles without that foundation, and should be excluded.[7]

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion to exclude the proposed testimony of Marcel A. Bryar.

---

[7] Bryar's conclusion that "the NMS Monitor has never subjected Ocwen to any penalties under the settlement" – although irrelevant because it again conflates the concepts of enforcement with the concept of compliance – is also demonstrably false. On September 6, 2017, the Monitoring Committee of the NMS submitted an unopposed motion to the United States District Court for the District of Columbia seeking to have Ocwen pay a fine of $1 million for its continued noncompliance with Metric 29. (Elgidely Decl. Ex. 20 at 2-3.)

## **REQUEST FOR HEARING**

Because the disposition of this motion may have a significant impact on the scope of the trial of this matter, which is presently scheduled to begin on or about November 27, 2017, Plaintiffs respectfully request a hearing on this motion.

## **LOCAL RULE 7.1(a)(3) CERTIFICATION OF PRE-FILING CONFERENCE**

Counsel for Plaintiffs conferred via phone with Defendants' counsel on September 20, 2017, in a good faith effort to resolve the issues raised in the above motion, and Defendants' counsel has stated that Defendants do not consent to the relief sought therein.

Dated: September 25, 2017                    Respectfully submitted,

                    _____/s/ *Robert F. Elgidely*_____
                    Robert F. Elgidely
                    Florida Bar No. 111856
                    Email:  relgidely@gjb-law.com
                    GENOVESE JOBLOVE & BATTISTA, P.A.
                    200 East Broward Boulevard, Suite 1110
                    Fort Lauderdale, FL 33301
                    Tel.  954.453.8022
                    Fax. 954.331.2907

                    and

                    LOWENSTEIN SANDLER LLP
                    Lawrence M. Rolnick
                    Marc B. Kramer
                    Thomas E. Redburn, Jr.
                    Michael J. Hampson
                    Richard A. Bodnar
                    Brandon M. Fierro
                    1251 Avenue of the Americas
                    New York, NY  10020
                    Tel. 212.262.6700

                    *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of September, 2017, I served the foregoing on

all counsel of record identified on the attached Service List **<u>via CM/ECF</u>**.

/s/ *Robert F. Elgidely*
ROBERT F. ELGIDELY

## SERVICE LIST

BROADWAY GATE MASTER FUND, LTD., PENNANT MASTER FUND LP, and
PENNANT WINDWARD MASTER FUND, LP v. OCWEN FINANCIAL CORPORATION,
WILLIAM ERBEY, RONALD FARIS, MICHAEL BOURQUE, and JOHN BRITTI
**CASE NO.** 16-cv-80056-WPD

---

### *Counsel for Plaintiffs*

Robert F. Elgidely
**GENOVESE JOBLOVE & BATTISTA, P.A.**
200 East Broward Boulevard, Suite 1110
Fort Lauderdale, FL 33301
Tel.  954.453.8022
Fax. 954.331.2907
Email:  relgidely@gjb-law.com


Lawrence M. Rolnick
Marc B. Kramer
Thomas E. Redburn, Jr.
Michael J. Hampson
Richard A. Bodnar
Brandon M. Fierro
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY  10020
Tel. 212.262.6700
Fax. 212.262.7402
Email:  lrolnick@lowenstein.com
Email:  mkramer@lowenstein.com
Email:  tredburn@lowenstein.com
Email:  mhampson@lowenstein.com
Email:  rbodnar@lowenstein.com
Email:  bfierro@lowenstein.com

### *Counsel for Defendants*

Jeffrey Allan Hirsch
**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
Tel. 954.765.0500
Fax. 954.765.1477
Email:  hirschj@GTLAW.com


John P. Coffey
Jonathan M. Wagner
Jason M. Moff
Jared I. Heller
Sara Lefkowitz
**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
Tel. 212.715.9100
Fax. 212.715.8456
Email:  scoffey@kramerlevin.com
Email:  jwagner@kramerlevin.com
Email:  jmoff@kramerlevin.com
Email:  jheller@kramerlevin.com
Email:  slefkowitz@kramerlevin.com