UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

|  |  |
|---|---|
| BROADWAY GATE MASTER FUND, LTD., PENNANT MASTER FUND LP, and PENNANT WINDWARD MASTER FUND, LP,<br><br>                 Plaintiffs,<br><br>            v.<br><br>OCWEN FINANCIAL CORPORATION, WILLIAM ERBEY, RONALD FARIS, MICHAEL BOURQUE, and JOHN BRITTI,<br><br>               Defendants. | Civil Action No. 9:16-cv-80056-WPD |

**PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF DR. GLENN R. HUBBARD AND INCORPORATED MEMORANDUM OF LAW AND REQUEST FOR ORAL ARGUMENT**

**GENOVESE JOBLOVE & BATTISTA, P.A.**

Robert F. Elgidely
200 East Broward Boulevard, Suite 1110
Fort Lauderdale, FL 33301
Tel. 954.453.8022
Fax 954.331.2907
Florida Bar No. 111856
relgidely@gjb-law.com

**LOWENSTEIN SANDLER LLP**

Lawrence M. Rolnick
Marc B. Kramer
Thomas E. Redburn, Jr.
Michael J. Hampson
Richard A. Bodnar
Brandon M. Fierro
1251 Avenue of the Americas
New York, NY 10020
Tel. 212.262.6700
Fax. 212.262.7402
lrolnick@lowenstein.com
mkramer@lowenstein.com
tredburn@lowenstein.com
mhampson@lowenstein.com

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND AND THE OPINIONS AT ISSUE ...................................................2

     A.     Dr. Finnerty's Opinions .................................................................2

     B.     Dr. Hubbard's Opinions ................................................................4

            1.     August 12 ...........................................................................5

            2.     December 22 .......................................................................8

LEGAL STANDARD FOR ADMITTING EXPERT TESTIMONY .........................13

ARGUMENT ...............................................................................................................17

     HUBBARD'S OPINIONS AS TO THE AUGUST 12 AND DECEMBER 22,
     2014 CORRECTIVE DISCLOSURES SHOULD BE EXCLUDED BECAUSE
     THEY ARE UNRELIABLE AND WILL NOT ASSIST THE TRIER OF FACT ...........17

CONCLUSION ............................................................................................................20

REQUEST FOR HEARING ........................................................................................20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Boca Raton Cmty. Hosp., Inc. v. Tenent Health Care Corp.*,
    582 F.3d 1227 (11th Cir. 2009) ...................................................................15

*City of Tuscaloosa v. Hacros Chems., Inc.*,
    158 F.3d 548 (11th Cir. 1998) .....................................................................14

*Contreras v. Aventura Limousine & Transportation Serv., Inc.*,
    No. 12-cv-22425-WPD, 2014 WL 11880994 (S.D. Fla. July 28, 2014) ................15

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*,
    402 F.3d 1092 (11th Cir. 2005) ........................................................14, 15, 16, 19

*Coral Way, L.L.C. v. Jones*,
    No. 05–21934–CIV, 2006 WL 5249734 (S.D. Fla. Oct. 17, 2006)........................15

*Craig v. Orkin Exterminating Co.*,
    No. 99-cv-8931-WPD, 2000 WL 35593214 (S.D. Fla. Nov. 22, 2000) ................19

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993)........................................................................14, 15, 16, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) .......................................................................16

*FindWhat Inv. Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ............................................................3, 4, 12, 13

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...............................................................................16, 19

*Giraldo v. City of Hollywood Florida*,
    142 F. Supp. 3d 1292 (S.D. Fla. 2015) ...........................................................16

*Harrison v. Royal Caribbean Cruises, Ltd.*,
    No. 12-cv-24111-UU, 2013 WL 11316997 (S.D. Fla. Nov. 8, 2013) ....................19

*Hendrix v. Evenflo Co., Inc.*,
    609 F.3d 1183 (11th Cir. 2010) ....................................................................16

*Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit*,
    50 F.3d 908 (11th Cir. 1995) .......................................................................15

*Hughes v. Kia Motors Corp.*,
   766 F.3d 1317 (11th Cir. 2014) ...............................................................14, 16

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir. 2004) ...............................................................15, 16

*Medina v. 3C Const. Corp.*,
   No. 02-23090-CIV, 2005 WL 5960937 (S.D. Fla. Sept. 26, 2005).........................................15

*Mich. Millers Mut. Ins. Co. v. Benfield*,
   140 F.3d 915 (11th Cir. 1998) ...............................................................16, 19

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)....................................11

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
   111 F. Supp. 3d 1336 (S.D. Fla. 2015) ...............................................................12

*Sanchez-Knutson v. Ford Motor Co.*,
   181 F. Supp. 3d 988 (S.D. Fla. 2016) ...............................................................15

*Seamon v. Remington Arms Co., LLC*,
   813 F.3d 983 (11th Cir. 2016) ...............................................................15

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ...............................................................14, 15, 16, 19

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010)...............................................................3

## RULES

Fed. R. Evid. 702 ...............................................................*passim*

## OTHER AUTHORITIES

WEINSTEIN'S FED. EVID. § 702.03 ...............................................................15

Plaintiffs Broadway Gate Master Fund, Ltd., Pennant Master Fund LP, and Pennant Windward Master Fund, LP respectfully move, and submit this memorandum of law in support of their motion, pursuant to Fed. R. Evid. 702, to exclude the proposed testimony of Dr. Glenn R. Hubbard.[1]

## PRELIMINARY STATEMENT

Defendants' damages expert, Dr. Glenn R. Hubbard, is an economist who – with respect to matters of economics – either agrees with Plaintiffs' expert, Dr. John Finnerty, or was told by Ocwen's counsel not to offer an opinion.  What few opinions Dr. Hubbard does offer are inadmissible under Rule 702.  The reason, at bottom, is that Dr. Hubbard is not actually offering any "expert" opinions at all.  That would have required him to articulate a reliable methodology grounded in the field of economics, apply that methodology to the relevant portions of the factual record, and draw a conclusion from the results generated by applying that methodology.  But Dr. Hubbard did not do any of that here.  What he did instead was describe the assumptions Ocwen's counsel told him to make about factual and legal issues in the case that bear directly on loss causation – including about whether particular alleged corrective disclosures were truly corrective – and then state the conclusions that followed logically from those assumptions.

In perhaps the most egregious example, Dr. Hubbard explained that Ocwen's counsel told him it is Ocwen's position that the Consent Order between Ocwen and the New York Department of Financial Services (which was revealed to the market on December 22, 2014) did not correct any of Ocwen's prior misstatements.  As a result, Hubbard expressed the "opinion" that it "follows from Defendants' position" that Plaintiffs suffered no fraud-related injury from the massive drop in Ocwen's stock price that occurred on that date.  Well, of course, it does – if one assumes there was no corrective disclosure on December 22 that affected the stock price, then it follows there was no corrective disclosure on December 22 that affected the stock price.  But that is not expert testimony.  It is a lawyer's argument dressed up as an expert's opinion.  Dr. Hubbard is doing nothing more in this case than acting as a mouthpiece for Ocwen's lawyers.  That is improper, because it is likely to mislead the jury by coating attorney arguments with the varnish of an expert's credentials.  Because they are not the product of a meaningful application

---

[1] Unless otherwise defined herein, capitalized terms used herein have the same meaning as set forth in the Complaint.  Citations to "Elgidely Decl." are to the Declaration of Robert F. Elgidely in Support of Plaintiffs' Motion to Exclude Dr. Hubbard, filed herewith.

of any recognizable expert methodology, Dr. Hubbard's proffered opinions are neither reliable nor helpful to the jury.  They cannot be admitted into evidence under Rule 702.

In addition to this fundamental flaw permeating virtually the entirety of Hubbard's expert report, several of his opinions suffer from an additional deficiency:  they are contradicted by undisputed facts in the record and supported by nothing more than Dr. Hubbard's *ipse dixit*.  Those opinions are also inadmissible for that reason.

The Court should grant Plaintiffs' motion and exclude Dr. Hubbard's testimony.

## BACKGROUND AND THE OPINIONS AT ISSUE

This is an action for securities fraud against Ocwen Financial Corporation ("Ocwen") and several of its current and former officers and directors.  As a result of the Court's ruling on Defendants' motion to dismiss, the following misrepresentations made by the Defendants remain in the case:  (1) misrepresentations concerning William Erbey's recusal from transactions with Ocwen's related companies (Compl. [D.E. 1] ¶¶ 179-91); (2) misstatements concerning Ocwen's reported financial results and the effectiveness of its internal controls over financial reporting in connection with the August 2014 restatement of Ocwen's financial statements (*Id*. ¶¶ 192-205); (3) misstatements concerning Ocwen's compliance with the National Mortgage Settlement ("NMS") (*Id*. ¶¶ 206-09); and (4) misrepresentations concerning the effectiveness of Ocwen's disclosure controls and procedures (*Id*. ¶¶ 210-13).  Plaintiffs assert five substantive causes of action.[2]  Although the legal standards governing each claim are not identical, all of Plaintiffs' claims require proof of causation and damages.

### A.    Dr. Finnerty's Opinions

On May 25, 2017, Plaintiffs proffered the Expert Report of John D. Finnerty, Ph.D. (the "Finnerty Report," Exhibit 1 to Elgiedly Decl.) on the issues of loss causation and damages.  Dr. Finnerty (1) engaged in a study of the efficiency of the market for Ocwen common stock during the period relevant to Plaintiffs' claims; (2) conducted an event study to isolate the abnormal

---

[2] Plaintiffs' five claims are:  (a) securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against Ocwen, Erbey and Faris (Count One); (b) false statements in Exchange Act filings under Section 18 of the Exchange Act against Ocwen, Britti and Bourque (Count Two); (c) control person liability under Section 20(a) of the Exchange Act against Erbey and Faris (Count Three); (d) common law fraud against Ocwen, Erbey and Faris (Count Four); and (e) negligent misrepresentation against Ocwen, Erbey and Faris (Count Five).  The Court determined at the motion to dismiss stage that scienter for certain misstatements had not been adequately pled against Faris.  (MTD Op. at 12, 16, and 19 [D.E. 35].)

returns potentially attributable to the announcement of corrective information on specific dates; and (3) analyzed, date by date, the information released to the market, the market's reaction, and the connection between that information, the misstatements alleged by Plaintiffs, and the impact of the potentially corrective information on the mix of information available to investors. (*See* Finnerty Report at 10-46 (market efficiency), 19-30 and 50-69 (event study), and 47-69 (information released to the market and correction of prior misstatements).) "An event study . . . is a statistical regression analysis that examines the effect of an event[, such as the release of information,] on a dependent variable, such as a corporation's stock price." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 (11th Cir. 2011) (quoting *United States v. Schiff*, 602 F.3d 152, 173 n. 29 (3d Cir. 2010)). Event studies are commonly used in securities litigation to prove market efficiency and loss causation, and are "used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price." *Id.* (internal quotation and citation omitted). Dr. Finnerty also calculated Plaintiffs' damages, applying the various analyses described. (*See* Finnerty Report at 70-74.) Defendants proffered no affirmative expert report regarding damages.

As discussed in his 74-page report (with multiple exhibits), Dr. Finnerty formed the following opinions to a reasonable degree of economic certainty: *First*, he concluded that during the relevant period the market for shares of Ocwen's common stock was "open, developed and efficient." (*Id.* at 5 ¶ a, 46-47.) *Second*, Dr. Finnerty's report analyzed seven potential corrective disclosure dates – *i.e.*, dates on which Plaintiffs had alleged in their complaint that information corrective of Ocwen's misstatements was released to the market. Those dates are February 26, 2014, August 4, 2014, August 12, 2014, October 21, 2014, October 22, 2014, December 16, 2014, and December 22, 2014. (*See id.* at 51-65.) Dr. Finnerty found a statistically significant abnormal return (at a confidence level of at least 95%, and for most dates at 99%) on six of those dates – with the only exception being August 4, 2014. Dr. Finnerty thus discarded August 4 as a corrective disclosure date. (*See id.* at 54.) Dr. Finnerty then searched for, reviewed, and analyzed the alleged disclosures on the remaining dates, and found that for each date there was new, corrective information of economic significance released to the market and no economically significant confounding information. Thus, in Dr. Finnerty's expert economic

opinion, the abnormal returns[3] on the six remaining dates were substantially caused by information that corrected Ocwen's earlier misstatements or constituted materialization of previously concealed risks.  (*Id.* at 5 ¶¶ c-d.)  ████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████)  (*Id.* at 5 ¶ e.)

### B.      Dr. Hubbard's Opinions

On June 26, 2017, Defendants proffered the Expert Report of Dr. Glenn R. Hubbard (the "Hubbard Report", Exhibit 2 to the Elgidely Decl.).  Although the word "rebuttal" appears nowhere in his report, Dr. Hubbard, at deposition, testified three times that he was a "rebuttal witness."  (Deposition of Glenn R. Hubbard taken August 18, 2017 (the "Hubbard Dep.") at 51:12-15; 60:6-7; 87:19-21, Exhibit 3 to the Elgidely Decl.)  In his 11-page report (excepting appendices and exhibits), Dr. Hubbard touched on the three areas of Dr. Finnerty's analysis.  As to the efficiency of the market for Ocwen common stock during the relevant period, Dr. Hubbard ████████████████████████████████████████████████████████████████ ████████████████████  (Hubbard Report at 3 n.5.)  As to Dr. Finnerty's event study, Dr. Hubbard ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

(Hubbard Report at 6 n. 14.)  In other words, Dr. Hubbard agreed with Dr. Finnerty that the market for Ocwen common stock was efficient, that Dr. Finnerty's event study was methodologically sound, and that the abnormal returns he had calculated for each of those dates were accurate.  (*Id.* (noting that Dr. Hubbard's ██████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████).)  Indeed, at his deposition, Dr. Hubbard confirmed his acceptance of, and agreement with, Dr. Finnerty's market efficiency analysis and conclusion, as well as Dr. Finnerty's event study.  (Hubbard Dep. at 26:5-21; 33:3-34:4.)

---

[3] A ██████████████████████████████████████████████████████████ ██████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████  (Finnerty Report at 20.)  A statistically significant abnormal return thus reflects the effect on the stock price of company-specific information disclosed to the market once the economist has backed out the effects of market-wide and industry-wide factors.  *See FindWhat*, 658 F.3d at 1313 n. 31.

Furthermore, with respect to the analysis of causation in connection with the corrective disclosure dates discussed by Dr. Finnerty, Dr. Hubbard offered no opinion whatsoever as to four of those dates (February 26, October 21, October 22 and December 16, 2014).  Instead, Dr. Hubbard dropped a footnote setting forth his ██████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████ (Hubbard Report at 5 n.11.)  He thus neither formed nor offered any opinion as an expert economist to rebut Dr. Finnerty's analysis of causation and damages as to those four dates.

With respect to August 4, Dr. Hubbard accepted Dr. Finnerty's conclusion that the stock price did not experience a statistically significant abnormal return in connection with the information released to the market on that date.  (*Id.* at 6.)

The differences between Dr. Finnerty and Dr. Hubbard thus concern only two corrective disclosure dates – August 12 and December 22, 2014.  Dr. Hubbard did not perform any economic or statistical testing in formulating any of his proffered causation opinions concerning these disclosures.  (Hubbard Dep. 71:25-72:12; Hubbard Report at 7-10.)

### 1.      August 12

On August 12, 2014, Ocwen issued a press release and Form 8-K in which it announced it would restate its financial statements for the fiscal year ended December 31, 2013, and the quarter ended March 31, 2014.  (Elgidely Decl. Ex. 4 at 2.)  The restatement related to the need to correct an invalid accounting convention that it employed in connection with valuing its financing liability for Rights to Mortgage Servicing Rights ("MSRs") that it sold to Home Loan Servicing Solutions ("HLSS"), a related entity.  (*Id.*)  The adjustments involved decreasing reported pre-tax income for the first quarter of 2014 by approximately $17.3 million and increasing reported pre-tax income for fiscal year 2013 by a corresponding amount.  (*Id.*)  Ocwen also announced that it "anticipates it will determine that a material weakness existed in the relevant time periods in the adequacy of our controls relating to how we monitor and implement the impact of applicable accounting conventions."  (*Id.*)  In a separate Form 12b-25 issued the same day, Ocwen announced that, due to the need to complete the restatement, it would delay filing its Form 10-Q for the first quarter of 2014 with the Securities and Exchange Commission.  (Elgidely Decl. Ex. 5 at 2-3.)  As a plain reading of the Form 8-K and Form 12b-

25 makes clear, the restatement, delay in filing the 10-Q, and anticipated material weakness in internal controls all derived from the invalid accounting convention discussed in the Form 8-K.[4] (*See also* Plaintiffs' Motion for Partial Summary Judgment and Incorporated Memorandum of Law ("Pls. SJ Mot.") at 3-5 [D.E. 72].)

As a result of his own statistical analysis and review of the contemporaneous documents surrounding this disclosure, Dr. Finnerty found a statistically significant (at the 95% confidence level) abnormal return in Ocwen's stock price of -3.72 percent on August 12, 2014. He opined this abnormal return was caused by ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████ (Finnerty Report at 56-58.) Dr. Finnerty found no confounding news unrelated to the alleged fraud that entered the market on that day. (*Id*. at 57.)

As clarified at his deposition (because it was not discernible from the text of his report), Dr. Hubbard opined that Dr. Finnerty had failed to disaggregate the effects of confounding information released to the market on August 12. To support this opinion, Dr. Hubbard asserted (contrary to the plain text of the disclosures themselves) that Ocwen's disclosures on that date were composed of two unrelated pieces of information: ████████████████████████ ████████████████████████████████████████████████████████████████ ███████ (Hubbard Report ¶ 18.) Dr. Hubbard then found that the first piece of information confounded the second piece. (Hubbard Dep. at 45:14-49:6.)

However, Dr. Hubbard did not conduct his own expert analysis to determine whether Ocwen's internal control weaknesses were unrelated to the incorrect methodology for valuing MSRs. Instead, for this conclusion he relied entirely on an instruction from Ocwen's counsel – specifically, that Plaintiffs' allegations in connection with the August 12 disclosure concerned only internal controls and that the MSRs valuation methodology was "something separate." (Hubbard Dep. 57:19-22 ██████ ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[4] On August 18, 2014, Ocwen issued restated financial statements and confirmed the material weakness in its internal controls over financial reporting. (Elgeldy Decl. Ex.6.)



[redacted] Ocwen's counsel further instructed Dr. Hubbard to assume that only the information disclosed concerning the weakness in Ocwen's internal controls was corrective, while the disclosed error in valuing MSRs (which underlay the restatement) was not. (Hubbard Dep. at 57:24-58:6 [redacted]

Indeed, Dr. Hubbard was emphatic during his testimony that he had not formed his own opinion about whether the weakness in Ocwen's internal controls and its invalid accounting convention for valuing MSRs were related.

> [redacted]



(Hubbard Dep. at 59:11-60:7 (emphasis added).)   Having effectively been told by counsel to assume the truth of what he should have been trying to prove, Dr. Hubbard assumed that the internal control weaknesses were unrelated to the erroneous valuation methodology and concluded based on that assumption that collectively they constituted confounding information that Dr. Finnerty was obligated to disaggregate but did not.

Dr. Hubbard also noted in his report that ███████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

(Hubbard Report ¶ 21.)  Dr. Hubbard intimated (but never actually stated) in his report that these law firm press releases, which on their face were released in response to Ocwen's restatement, somehow constituted confounding information on August 12 that was unrelated to the restatement itself or the announced weakness in Ocwen's internal controls.   Dr. Hubbard downplayed this portion of his opinion during his deposition, stating that the law firm press releases were not "particularly important."  (Hubbard Dep. at 54:4-55:19.)  But, even as to this opinion, it is clear from Dr. Hubbard's deposition testimony that his opinion was the ineluctable result of what counsel told him to assume, not the product of independent expert analysis.   (*See* Hubbard Dep. at 53:10-14 (admitting that his view that the press releases are confounding is tied to the fact that he ██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████).)   Dr. Hubbard simply has not formed an independent view grounded in any recognizable economics methodology that the press releases constitute confounding information that Dr. Finnerty was required to disaggregate when opining on loss causation.

### 2.    December 22

On December 22, 2014 the market became aware that Ocwen had entered into a Consent Order with the New York State Department of Financial Services ("NYDFS").   The NYDFS Consent Order disclosed that Ocwen had widespread conflicts of interest with related parties. Specifically, contrary to its representations in its 2013 and 2014 annual reports, Ocwen stipulated and agreed in the NYDFS Consent Order that it did "not have a written policy that explicitly require[d] potentially conflicted employees, officers, or directors to recuse themselves from involvement from transactions with [the Related Companies]" and that Erbey did not recuse himself "from approvals of several transactions" with the Related Companies. (Consent Order as

between Ocwen and the New York Department of Financial Services ("Consent Order") Elgidely Decl. Ex. 7 at ¶¶ 20-21.)  The NYDFS Consent Order also revealed that Ocwen had failed to comply with the servicing standards of the National Mortgage Settlement.  Specifically, Ocwen stipulated and agreed that Ocwen had:  (a) "fail[ed] to confirm that it had the right to foreclose before initiating foreclosure proceedings"; (b) fail[ed] to ensure that its statements to the court in foreclosure proceedings were correct"; (c) pursu[ed] foreclosure even while modification applications were pending"; (d) fail[ed] to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty"; and (e) fail[ed] to assign a designated customer care representative."  (*Id.* ¶ 12.)   Ocwen also admitted that the letter backdating problem occurred, that it engaged in improper letter-dating as far back as 2012, that borrowers were harmed as a result and that it improperly ignored the issue after it was raised internally.  (*Id.* ¶¶ 15-16.)

With respect to remedies, among other sanctions, Ocwen agreed that: (a) it would no longer share any common officers or employees with any related party; (b) it would not share risk, internal audit, or vendor-oversight functions with any related party; (c) it would appoint two additional board members who would not own any equity in any related party; and (d) Erbey would resign from his positions as Chairman of Ocwen and the Related Companies.  (*Id.* ¶¶ 50-51, 55, 57.) Ocwen also agreed to pay a $150 million civil penalty and to accept limits on its ability to purchase additional MSRs and supervision from an Operations Monitor and a Compliance Monitor.  (*Id.* ¶¶ 24, 31- 49.)  A plain reading of the Consent Order indicates these sanctions – all of which were included in the section of the Order entitled "Settlement Provisions" – were imposed collectively for all of the misconduct that Ocwen acknowledged it had committed.

Based on his analysis, Dr. Finnerty found a statistically significant (at the 99% confidence level) abnormal return in Ocwen's stock price of -26.26 percent on December 22, 2014.  He opined this abnormal return was caused by the revelation of the information discussed above, all of which demonstrated the lack of internal controls at Ocwen ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ (Finnerty Report at 69.)

Dr. Finnerty did not find any confounding news unrelated to the alleged fraud that entered the market on December 22, 2014.  (*Id*. at 68-69.)

Rather than analyze the December 22 disclosure holistically, Dr. Hubbard analyzed it twice – once solely as a purported corrective disclosure of misstatements concerning Erbey's recusal, and then again solely as a purported corrective disclosure of misstatements concerning Ocwen's compliance with the NMS and internal controls failures.  (Hubbard Dep. at 62:10-25; Hubbard Report ¶¶ 13-17, 22.)  By analyzing the Consent Order as if it constituted two separate disclosures, Dr. Hubbard once again assumed the existence of confounding information he was supposed to be trying to prove.

Moreover, Dr. Hubbard's separate analyses contradicted undisputed facts of record and reached conclusions that, as was the case with his analysis of August 12, were not the product of applying his expertise but simply followed ineluctably from the assumptions Ocwen's counsel told him to make.  In opining that the -26.26 percent abnormal return in Ocwen's stock price on December 22 was caused by something other than the release of information correcting the misstatement that Erbey recused himself from transactions with the related entities, Dr. Hubbard reasoned that some of the penalties imposed by the Consent Order – the $150 million fine, appointment of the Monitors, and restrictions on Ocwen's future purchases of MSRs – were "unrelated" to Mr. Erbey's recusal.  (Hubbard Report at 7.)  His sole basis for this view was that because the Consent Order did not specifically *say* that these sanctions were imposed *because of* Erbey's recusal failures, the two were not related "per se."  (Hubbard Dep. at 69:3-5 █████████ ████████████████████████████████████████████ )

But that, of course, is pure *ipse dixit*.  The Consent Order does not say that the $150 million penalty was imposed *because of* any particular aspect of Ocwen's misconduct.  What it says is that Ocwen committed many different types of bad acts – including Erbey's failure to recuse, the letter backdating, and violations of servicing standards – and that "to resolve this matter, the Parties agree to the following:" – including the $150 million penalty and numerous other sanctions imposed under the "Settlement Provisions" of the Order.  (Consent Order at 2-18.)  Under Dr. Hubbard's reasoning, the sanctions imposed by the Order are "unrelated" to *any* of the misconduct in which Ocwen admitted it engaged, merely because it does not explicitly link the sanctions to particular bad acts.  That is a preposterous way to read the Order, as reasonable market actors would understand (and common sense would dictate) that the NYDFS

was imposing sanctions *because of* Ocwen's bad acts.  Thus, on these facts, the sanctions cannot possibly be confounding information, as they are the direct consequence of Ocwen's violations – including Erbey's failure to recuse himself from transactions with the related entities – that Ocwen admitted it committed but previously concealed from Plaintiffs and its other investors. Even Dr. Hubbard, apparently realizing it made no sense, ultimately backed away from the implications of his own position.  (Hubbard Dep. at 70:15-25.)  Yet, that did not cause him to alter his conclusion.

   In addition, Dr. Hubbard opined that █████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████ (Hubbard Report ¶ 15.)  But this opinion has no foundation in the undisputed facts – indeed, facts that Hubbard himself admitted.  The August 4 disclosure consisted of a letter from NYDFS to Ocwen that ***accused*** Erbey of not recusing himself from transactions with the Related Companies.  (Elgeldy Decl. Ex. 8 at 5-6; Hubbard Dep. at 73:11-15 (admitting that August 4 letter was merely an accusation, not an admission of misconduct by Ocwen).)  What is more, Ocwen denied that accusation, thereby leading the market to believe that NYDFS's accusations were untrue.  (Hubbard Dep. at 74:12-19 (admitting that Ocwen denied the NYDFS's accusation); Elgeldy Decl. Ex. 6 at 18 (representing, following the NYDFS's August 4 letter, that Erbey recuses himself for negotiations and approvals of transactions with the Related Companies).)  Then, in the December 19 Consent Order, Ocwen ***reversed itself and "agreed" and admitted*** that "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties."  (Consent Order at 2, 9.)  That was new, economically significant, information that one would expect to generate a price reaction. Indeed, Hubbard conceded that "of course" an accusation of misconduct is different from a finding or admission by the regulated entity that the misconduct actually occurred.  (Hubbard Dep. at 73:16-74:3, 74:20-75:2.)  There is absolutely no reason to expect investors to treat the two the same way, especially when the company has continued to mislead the market in the interim by denying the accusation.  *See Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, at *9 (S.D.N.Y. Oct. 5, 2016) (finding consent orders entered into by defendant with regulator were corrective disclosure even though defendant had issued prior press release as to same category of issue because consent orders were settlements involving

admissions of widespread violations, payment of large funds, and agreements to appoint independent monitor); *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1382 (S.D. Fla. 2015) (finding that later disclosure of extent of relief sought by regulator was corrective disclosure even when the existence of the investigation was previously known, as the disclosure revealed that regulator was in fact seeking extensive relief including civil penalties and injunctions); *cf. FindWhat*, 658 F.3d at 1314 ("The securities laws do not immunize defendants who knowingly disseminate materially false or misleading information simply because their fraud concerns false information already believed by the market."). And, beyond his own say so, Dr. Hubbard offered no reason grounded in economics for expecting the market to shrug off Ocwen's admission that Erbey engaged in misconduct merely because it shrugged off NYDFS's earlier accusation of such misconduct that Ocwen misleadingly denied. Thus, Dr. Hubbard's "point" that "the surprise on August 4th generated no commentary and generated no stock price effect" says nothing about what caused the statistically significant abnormal return in Ocwen's stock price on December 22.

Analyzing the Consent Order as solely a purported corrective disclosure concerning Ocwen's compliance with the NMS and internal controls failures, Dr. Hubbard again relies for his conclusion solely on an instruction from Ocwen's counsel.



(Hubbard Report ¶ 22 (emphasis added); *see also* Hubbard Dep. at 80:3-13 (admitting that, with respect to December 22, he ███████████████████████ (emphasis added)).) Because his opinion is limited to merely stating the conclusion that logically follows from Defendants' position that the Consent Order contained no corrective disclosures, Dr. Hubbard is ███████████████████████ ███████████████████████ ███████████████████ (Hubbard Report at 10.) He thus brought no economics expertise whatsoever to bear on this aspect of his opinion.[5]

---

[5] Dr. Hubbard did observe that the Consent Order does not specifically mention ████████ ███████████████████████ (Hubbard Report at 10.) But he never analyzed whether the facts that Ocwen admitted in the Consent Order demonstrated lack of

Finally, Dr. Hubbard opined that any information regarding recusal in the Consent Order would confound any information regarding NMS compliance. (Hubbard Report at 11; Hubbard Dep. at 82:8-13.) Not only was that opinion logically inconsistent with his earlier-expressed opinion that the Consent Order's disclosure of Erbey's recusal failures did not impact the stock price, but he based it on nothing more than his own unsupported decision to analyze the Consent Order as if it were two separate disclosures rather than the unitary corrective disclosure it actually was. Indeed, Dr. Hubbard ultimately conceded his opinion about the existence of supposedly confounding information was not based in economics expertise. Rather, it derived from instructions Dr. Hubbard received from counsel – *i.e.*, ██████████████████████ ██████████████████ (Hubbard Dep. at 82:15-83:9 (emphasis added).) Thus, the issue, for him, was ████████████████████████████████████████ ██████ (*Id.* at 83:7-9.)

## LEGAL STANDARD FOR ADMITTING EXPERT TESTIMONY

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

---

compliance with the NMS, regardless of whether the Consent Order mentioned the NMS specifically or not. Of course, as a matter of law, a corrective disclosure need not be a mirror image of a prior misstatement so long as the two "share the same subject matter." *See FindWhat*, 658 F.3d at 1312 n. 28. And, Dr. Hubbard admitted that, from an economic perspective, the use of the same, specific words is unnecessary for a statement to be corrective of a prior statement, stating ██████████████████████████████████████████ ██████ (Hubbard Dep. at 76:22-77:7.) Given his own understanding of what makes a corrective disclosure corrective, Dr. Hubbard's failure to analyze whether the Consent Order's disclosures share the same subject matter and economic substance as Ocwen's representation that it was in compliance with the NMS renders whatever opinion he may have on that issue pure *ipse dixit*. Moreover, Dr. Hubbard's assertion that Dr. Finnerty never identified a public disclosure that Ocwen was not in compliance with the NMS is flatly untrue. (*Id.*) The NMS Monitor Report released on December 16, 2014, said exactly that. (*See* Finnerty Report at 63-65; Pls. SJ Mot. at 6-9.) In any event, neither of these assertions is relevant, as Dr. Hubbard's opinion relied on Ocwen's position that December 22 is not a corrective disclosure.

-13-

> (c)  the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The rule requires the trial court to act as a gatekeeper to ensure that opinions that are not relevant and reliable are not presented to the jury with the imprimatur of an "expert." *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993).

The Eleventh Circuit has constructed a three-part test for assessing the admissibility of expert testimony under Rule 702 and *Daubert*.  Before admitting expert testimony, the trial court must determine that:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Hacros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).  "The proponent of the expert opinion must carry the burden of establishing qualification, reliability, and helpfulness."  *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)); *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005) ("The proponent of the expert testimony carries a substantial burden under Rule 702.").

As explained further below, Dr. Hubbard's opinions fail the reliability and helpfulness prongs.[6]  Reliability concerns whether the expert's "reasoning or methodology is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592-93.  To determine whether an expert's opinion is reliable, a court should consider (among other factors):  (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the

---

[6] With respect to the first prong – qualifications – experts may be qualified in various ways, including by training, education, and experience.  *Frazier*, 387 F.3d at 1260-61.  Plaintiffs at this time do not challenge Dr. Hubbard's qualifications as an expert in the field of economics, but reserve the right to explore that issue at trial.

technique has been generally accepted in the proper scientific community.  *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).  This list is not exhaustive; the Court may take other factors into account.  *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016).

By contrast, helpfulness or fit "goes primarily to relevance."  *Id.* (citing *Daubert*, 509 U.S. at 591).  Though the basic standard of relevance is a liberal one, "if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'"  *Id.* (citing *Boca Raton Cmty. Hosp., Inc. v. Tenent Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009)).  To assist the trier of fact, "[e]xpert testimony must be relevant to the task at hand, . . . i.e., that it logically advances a material aspect of the case." *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 993 (S.D. Fla. 2016) (Dimitrouleas, J.) (quoting *Coral Way, L.L.C. v. Jones*, No. 05–21934–CIV, 2006 WL 5249734, at *2 (S.D. Fla. Oct. 17, 2006)); *see Medina v. 3C Const. Corp.*, No. 02-23090-CIV, 2005 WL 5960937, at *2 (S.D. Fla. Sept. 26, 2005) (stating that issues "well within the ambit of reasonable factual determinations for the jury" are not appropriate for expert testimony, even where the testimony may be "helpful" in the abstract).  Expert testimony that does not assist the jury in comprehending the evidence actually submitted at trial or to determine facts that are actually at issue in the case – or which is relevant only to factual matters or theories that will not be before the jury – is not "helpful" expert testimony.  *Contreras v. Aventura Limousine & Transp. Serv., Inc.*, No. 12-cv-22425-WPD, 2014 WL 11880994, at *2 (S.D. Fla. July 28, 2014) ("[W]here an expert opinion has a tendency to confuse the trier of fact, it may not satisfy the helpfulness prong.")  The expert's opinion must fit the case.

Furthermore, to be helpful, the expert's opinion must address matters that are beyond the understanding of the average lay person.  *Frazier*, 387 F.3d at 1262; *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995) ("Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves.").  And, it must consist of something more than a regurgitation of counsel's arguments to be uttered from the witness stand by the expert.  "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63 (citing WEINSTEIN'S FED. EVID. § 702.03); *see, e.g.*, *Cook*, 402 F.3d at 1110-14 (expert's opinion properly excluded where he did not possess any specialized

knowledge not within the general understanding of the jury and his opinions could be argued to the jury by plaintiff's lawyers); *Giraldo v. City of Hollywood Florida*, 142 F. Supp. 3d 1292, 1302–04 (S.D. Fla. 2015) (Dimitrouleas, J), *appeal dismissed* (11th Cir. 15-15218) (Dec. 22, 2015) (same).   Expert testimony must reflect actual application of the witness's professional expertise.  *See Frazier*, 387 F.3d at 1261.

Certain kinds of defects in expert testimony implicate both the reliability and helpfulness prongs.  For an expert's opinion to be "reliable" and "helpful" to the trier of fact, it must have a justified scientific relationship to the pertinent facts.  *McDowell*, 392 F.3d at 1298 (citing *Daubert*, 509 U.S. at 591).  "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive." *Id.* at 1299 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995)); *see also Frazier*, 387 F.3d at 1261 ("[O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." (internal quotation and citation omitted)).   Though experts commonly extrapolate from existing data, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *accord Hughes*, 766 F.3d at 1331; *Mich. Millers Mut. Ins. Co. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998); *see also* Fed. R. Evid. 702 Advisory Committee's Note, 2000 Amendment ("The trial court's gatekeeping function requires more than simply taking the expert's word for it."); *McDowell*, 392 F.3d at 1300 ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions[.]").   "Rather, the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *Joiner*, 522 U.S. at 146).  Because admissible expert testimony must possess an adequate foundation in the facts of the case, "a trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Cook*, 402 F.3d at 1111.

Here, Defendants cannot satisfy their burden of showing an adequate foundation for the admissibility of Hubbard's proffered expert opinions.

<u>**ARGUMENT**</u>

**HUBBARD'S OPINIONS AS TO THE AUGUST 12 AND DECEMBER 22, 2014 CORRECTIVE DISCLOSURES SHOULD BE EXCLUDED BECAUSE THEY ARE UNRELIABLE AND WILL NOT ASSIST THE TRIER OF FACT**

Based on his report and deposition testimony, Dr. Hubbard's anticipated testimony at trial reflects only two areas of purported disagreement between himself and Dr. Finnerty – specifically, how to assess loss causation for the August 12 and December 22 corrective disclosures.  As to the bulk of Dr. Finnerty's opinions, Dr. Hubbard either did not analyze them or expressly agrees with Dr. Finnerty's conclusions.  Dr. Hubbard agrees with Dr. Finnerty that the market for Ocwen common stock during the relevant time period was efficient, that Dr. Finnerty correctly conducted his event study for assessing market efficiency and damages, that the statistically significant abnormal returns calculated by Dr. Finnerty for all tested corrective disclosure dates are accurate, and that there was no statistically significant abnormal return in Ocwen's common stock on August 4, 2014.  Further, Dr. Hubbard was instructed by counsel not to review four corrective disclosure dates that Dr. Finnerty analyzed – February 26, October 21, October 22, and December 16, 2014.  Dr. Hubbard proffers no opinion of any kind as to these dates, leaving Dr. Finnerty's opinions as to them unrebutted.

As to the two areas where the experts purportedly disagree, Dr. Hubbard's proffered opinions concerning the August 12 and December 22 corrective disclosures are inadmissible because they are both unreliable and unhelpful to the jury.  Dr. Hubbard's testimony should be excluded under Rule 702.

*First*, fundamental elements of Dr. Hubbard's opinions concerning the August 12 and December 22 corrective disclosures are unreliable because they are based on no discernible analysis or methodology grounded in the economics discipline.  Instead, these opinions consist of nothing more than Dr. Hubbard's stating a conclusion that follows directly from an assumption that Ocwen's counsel told him to make.  As to August 12, Dr. Hubbard opined that Ocwen's disclosures about its invalid accounting convention for valuing MSRs-related liabilities and its material weakness in internal controls confounded each other not because he derived that conclusion from an application of economics principles, but because Ocwen's counsel directed him to assume those two categories of information were unrelated and, hence, confounding.

(Hubbard Dep. at 82:8-83:9.) He also concluded that the contemporaneous press releases about restatement-inspired shareholder litigation constituted confounding information not because the laws of economics justified that conclusion, but rather because of his counsel's "view of the world." (*Id.* at 53:10-14.) Similarly, Dr. Hubbard opines that Plaintiffs suffered no injury from the information disclosed in the NYDFS Consent Order on December 22, 2014, not because he independently analyzed those disclosures as an expert economist, but because his opinion ██████████████████████████████████████████████████████████████████ ████████████████████ (Hubbard Report at 10-11.) Even if those disclosures were in some sense corrective, Ocwen told Dr. Hubbard to assume a state of affairs in which disclosures about Erbey's recusal failures are unrelated to, and thereby confound, disclosures about Ocwen's lack of NMS compliance and internal controls weaknesses – despite the fact that all of these disclosures reveal information about Ocwen's defrauding of its investors. (*Id.* at 11.)

As these examples illustrate beyond cavil, Dr. Hubbard has not meaningfully applied his expertise in the economics field in formulating the opinions he is proffering in this case. In fact, Dr. Hubbard is not actually offering any expert opinions at all. Instead, he is simply serving as a mouthpiece for arguments formulated by Ocwen's attorneys, who are not bound by any of the methodological conventions or protocols of professional economics. In each instance discussed above, Ocwen's counsel instructed Dr. Hubbard to simply assume exactly what it was he was supposedly trying to prove. That does not even remotely approach the level of analytical rigor required in the field of economics or any other academic discipline. Dr. Hubbard's opinions thus do not constitute reliable expert testimony. And, trying to hide behind being a rebuttal expert does not help him. Ocwen has the burden under Rule 702 of showing the experts it proffers – whether designated as rebuttal experts or not – will offer testimony that is the product of reliably applying a valid scientific methodology to the facts of the case. It cannot do so here.

*Second*, and for the same reason, Dr. Hubbard's testimony is not helpful to the trier of fact. The assumptions that Ocwen's counsel told Dr. Hubbard to make about which corrective disclosures are truly "corrective" and what they actually disclose, and the conclusions he reached based on those assumptions, are nothing more than lawyers' arguments that Ocwen's attorneys are free to make to the jury at trial. Dr. Hubbard's purported expertise adds nothing of substance to those arguments. Having Dr. Hubbard present them from the witness stand is likely to mislead the jury by lending these arguments the veneer of an expert's endorsement when they

-18-

are not the product of meaningful application of expertise, but rather the thoughts of Ocwen's lawyers.  *See Frazier*, 387 F.3d at 1262-63; *Cook*, 402 F.3d at 1110-14 (expert's opinion properly excluded where he did not possess any specialized knowledge not within the general understanding of the jury and his opinions could be argued to the jury by plaintiff's lawyers); *Harrison v. Royal Caribbean Cruises, Ltd.*, No. 12-cv-24111-UU, 2013 WL 11316997, at *3 (S.D. Fla. Nov. 8, 2013) (excluding expert where purported expert's "testimony serves only to stamp the imprimatur of 'expert testimony' on the conclusions defense counsel would like the jury to draw in considering the factual evidence at trial").

     *Third*, Dr. Hubbard's remaining opinions lack any foundation in the factual record and are supported by nothing other than his own say so.  For example, he simply declares – in defiance of any common sense reading of the document's plain text – that the $150 million civil penalty imposed by the NYDFS Consent Order was "unrelated" to Ocwen's admission that Erbey did not recuse himself from transactions with the Related Companies, as Erbey had represented.  In the same vein, Dr. Hubbard proclaims – again contrary to the undisputed facts of record and common sense – that the December 22 announcement of Ocwen's admission to Erbey's recusal failures could not have affected the stock price because the market did not react when NYDFS accused Erbey of similar misconduct four months earlier but could not actually prove it had occurred in the face of Ocwen's denials.  Remarkably, Hubbard stuck to this bald assertion even after he admitted that "of course" there was a difference between a mere accusation and an admission of wrongdoing, and despite his failure to offer any rationale grounded in economic principles for why the market would be expected to treat the two the same way and simply overlook the fact that, as of December 22, 2014, Ocwen was now admitting to engaging in serious misconduct that it had previously denied and concealed from its investors.  Such unsupported "opinions" by an expert witness are not admissible, as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Michigan Millers*, 140 F.3d at 921 (quoting *Joiner*, 522 U.S. at 146); *cf. Craig v. Orkin Exterminating Co.*, No. 99-cv-8931-WPD, 2000 WL 35593214, at *6 (S.D. Fla. Nov. 22, 2000) (excluding expert where expert testimony was conclusory).  There is simply "too great an analytical gap between the data and the opinion proffered" by Dr. Hubbard.  *Joiner*, 522 U.S. at 146.  His opinions in this matter are inadmissible.

-19-

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion to exclude the proposed testimony of Dr. Glenn R. Hubbard.

## REQUEST FOR HEARING

Because the disposition of this motion could have a significant impact on the scope of trial, scheduled to begin on or about November 27, 2017, Plaintiffs respectfully request a hearing on this motion.

## LOCAL RULE 7.1(a)(3) CERTIFICATION OF PRE-FILING CONFERENCE

Counsel for Plaintiffs conferred via phone with Defendants' counsel on September 20, 2017, in a good faith effort to resolve the issues raised in the above motion, and Defendants' counsel has stated that Defendants do not consent to the relief sought therein.


Dated: September 25, 2017                    Respectfully submitted,

                                             _____/s/ *Robert F. Elgidely*_____
                                             Robert F. Elgidely
                                             Florida Bar No. 111856
                                             Email:  relgidely@gjb-law.com
                                             GENOVESE JOBLOVE & BATTISTA, P.A.
                                             200 East Broward Boulevard, Suite 1110
                                             Fort Lauderdale, FL 33301
                                             Tel.  954.453.8022
                                             Fax. 954.331.2907

                                             and

                                             LOWENSTEIN SANDLER LLP
                                             Lawrence M. Rolnick
                                             Marc B. Kramer
                                             Thomas E. Redburn, Jr.
                                             Michael J. Hampson
                                             Richard A. Bodnar
                                             Brandon M. Fierro
                                             1251 Avenue of the Americas
                                             New York, NY  10020
                                             Tel. 212.262.6700

                                             *Attorneys for Plaintiffs*

-20-

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of September, 2017, I served the foregoing on

all counsel of record identified on the attached Service List **<u>via CM/ECF</u>**.

                                               _____/s/ *Robert F. Elgidely*_____
                                               ROBERT F. ELGIDELY

## SERVICE LIST

BROADWAY GATE MASTER FUND, LTD., PENNANT MASTER FUND LP, and
PENNANT WINDWARD MASTER FUND, LP v. OCWEN FINANCIAL CORPORATION,
WILLIAM ERBEY, RONALD FARIS, MICHAEL BOURQUE, and JOHN BRITTI
**CASE NO.** 16-cv-80056-WPD

---

### _Counsel for Plaintiffs_

Robert F. Elgidely
**GENOVESE JOBLOVE & BATTISTA,
P.A.**
200 East Broward Boulevard, Suite 1110
Fort Lauderdale, FL 33301
Tel.  954.453.8022
Fax. 954.331.2907
Email:  relgidely@gjb-law.com


Lawrence M. Rolnick
Marc B. Kramer
Thomas E. Redburn, Jr.
Michael J. Hampson
Richard A. Bodnar
Brandon M. Fierro
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY  10020
Tel. 212.262.6700
Fax. 212.262.7402
Email:  lrolnick@lowenstein.com
Email:  mkramer@lowenstein.com
Email:  tredburn@lowenstein.com
Email:  mhampson@lowenstein.com
Email:  rbodnar@lowenstein.com
Email:  bfierro@lowenstein.com

### _Counsel for Defendants_

Jeffrey Allan Hirsch
**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
Tel. 954.765.0500
Fax. 954.765.1477
Email:  hirschj@GTLAW.com


John P. Coffey
Jonathan M. Wagner
Jason M. Moff
Jared I. Heller
Sarah Lefkowitz
**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
Tel. 212.715.9100
Fax. 212.715.8456
Email:  scoffey@kramerlevin.com
Email:  jwagner@kramerlevin.com
Email:  jmoff@kramerlevin.com
Email:  jheller@kramerlevin.com
Email:  slefkowitz@kramerlevin.com