EXHIBIT 2

Page 1

```
 1          UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

 3                    Case No. 9:16-CV-80056-WPD

 4   BROADWAY GATE MASTER FUND, LTD., PENNANT    :
     WINDWARD MASTER FUND,                       :
 5                                               :
            Plaintiffs,                          :
 6                                               :
                                                 :
 7          vs.                                  :
                                                 :
 8                                               :
                                                 :
 9                                               :
     OCWEN FINANCIAL CORPORATION, WILLIAM        :
10   ERBEY, RONALD FARIS, MICHAEL BOURQUE AND    :
     JOHN BRITTI,                                :
11                                               :
            Defendants.                          :
12                                               :
                                                 :
13

14       --------------------------------------
              DEPOSITION UNDER ORAL EXAMINATION OF:
15                  GLENN HUBBARD, PH.D.
                    August 18, 2017
16                    -----------
       REPORTED BY:  JENNIFER L. WIELAGE, CCR, RPR, CRR
17                    ------------

18

19

20   JOB #  210360

21

22

23

24

25
```

Page 2

```
 1            TRANSCRIPT of the deposition of the
 2   above-named witness, called for Oral Examination in
 3   the above-entitled matter, said deposition being
 4   taken pursuant to Federal Court Rules, by and before
 5   JENNIFER WIELAGE, Certified Shorthand Reporter and
 6   Notary Public of the State of New York, License No.
 7   XI01916, at the office of LOWENSTEIN SANDLER, LLP,
 8   1251 Avenue of the Americas, 17th Floor, New York,
 9   New York 10020, on Friday, August 18, 2017,
10   commencing at 11:30 in the forenoon.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                I N D E X
 2
 3
       W I T N E S S
 4
     Testimony of:
 5
 6   GLENN HUBBARD, PH.D.              PAGE NO.
 7
      EXAMINATION BY MR. BODNAR           7
 8
 9
10
              E X H I B I T S
11
12   NUMBER        DESCRIPTION         PAGE
13
     Exhibit     Expert Report of Glenn    11
14   Hubbard-1   Hubbard
     Exhibit     Exhibit 10               20
15   Hubbard-2
     Exhibit     Exhibit 29, Deposition   23
16   Hubbard-3   of Professor Hubbard
     Exhibit     Expert report of John D.  25
17   Hubbard-4   Finnerty, Ph.D.
     Exhibit     Ocwen Financial Investor  53
18   Hubbard-5   Alert
     Exhibit     Consent Order pursuant    66
19   Hubbard-6   to New York Banking Law
     Exhibit     Complaint For Violations  75
20   Hubbard-7   of the Federal
                 Securities Laws and
21               Common Law
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S:
 2
 3   LOWENSTEIN SANDLER, LLP
     1251 Avenue of the Americas
 4   New York, New York 10020
     (973) 422-6476
 5   BY:  RICHARD A. BODNAR, ESQ.
     Attorneys for Plaintiffs
 6
     LOWENSTEIN SANDLER
 7   One Lowenstein Drive
     Roseland, New Jersey 07068
 8   (973) 597-2500
     BY:  THOMAS E. REDBURN, ESQ.
 9   Attorneys for Plaintiffs
10
     KRAMER LEVIN NAFTALIS & FRANKEL, LLP
11   1177 Avenue of the Americas
     New York, New York 10036
12   (212) 715-9456
     BY:  JONATHAN WAGNER, ESQ.
13   Attorneys for Defendants
14
     ALSO PRESENT - SHA-LA HOLLIS, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            DEPOSITION SUPPORT INDEX
          DIRECTION TO WITNESS NOT TO ANSWER
 2
                   Page Line
 3
 4
          REQUEST FOR PRODUCTION OF DOCUMENTS
 5
                   Page  Line
 6
 7
                  STIPULATIONS
 8
 9             Page   Line
10
              QUESTION MARKED
11
12             Page   Line
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 22

1
2       A.    No, because it's not in the
3  January 6 -- you have alleged something that
4  previous plaintiffs' lawyers have not.
5       Q.    If I took the date February 26,
6  2014, is that something you were
7  incorporating your opinions from the January
8  6th report into the June 26th report?
9       A.    On February 26, as I state in
10  this report, I've been instructed by counsel
11  that's not a date to examine.  I do offer
12  discussion of February 26 in the previous
13  report.
14       Q.    Are you incorporating that
15  discussion into your June 26th report?
16       A.    Anything in that report you're
17  welcome to incorporate in the discussion, but
18  I have a specific instruction from counsel
19  about that date for this proceeding.
20       Q.    And by "this proceeding", you
21  mean Broadway Gate --
22       A.    Yes, sir.
23       Q.    -- verse Ocwen?
24            Slightly different question than
25  previous.  Which opinions from the January 6

Page 23

1
2  report do you consider relevant to the June
3  report?
4            MR. WAGNER:  Objection to form.
5       A.    I think essentially the same
6  answer, insofar as they relate to the same
7  dates.  I mean, if the dates are in common
8  between the two reports.
9       Q.    Professor Hubbard, did you sit
10  for a deposition with respect to the January
11  report?
12       A.    I did.
13       Q.    And do you recall that testimony?
14       A.    I recall giving it, yes.
15       Q.    I'm going to mark as Hubbard-3.
16            (Exhibit Hubbard-3, Exhibit 29,
17  Deposition of Professor Hubbard was marked
18  for Identification by the court reporter.)
19  BY MR. BODNAR:
20       Q.    Professor Hubbard, do you
21  recognize this document?
22       A.    Yes, it's a transcript of that
23  deposition.
24       Q.    And "that deposition" being the
25  deposition referred to where you sat for a

Page 24

1
2  deposition regarding the January report?
3       A.    Yes, sir.
4       Q.    Have you reviewed this transcript
5  since your deposition?
6       A.    I have not.
7       Q.    To your recollection, did you
8  testify truthfully during that deposition?
9       A.    Yes, of course.
10       Q.    To your recollection, did you
11  make any errors during that deposition?
12       A.    Not to my knowledge, no.
13       Q.    Can you pick back up your Hubbard
14  report from June and flip back to Appendix C?
15       A.    Yes.
16       Q.    And so that we're clear on the
17  universe of what we're talking about, you are
18  not relying in your June report upon your
19  October 11, 2016 report on class
20  certification; is that correct?
21       A.    That's correct.
22       Q.    Did you review Dr. Finnerty's
23  report in preparing the June 26th report?
24       A.    I did.
25       Q.    Which -- we're going to mark this

Page 25

1
2  as Hubbard-4.
3            (Exhibit Hubbard-4, Expert
4  report of John D. Finnerty, Ph.D., was
5  marked for Identification by the court
6  reporter.)
7  BY MR. BODNAR:
8       Q.    Professor Hubbard, do you
9  recognize that document?
10       A.    Yes, this is Dr. Finnerty --
11  Finnerty's report for this proceeding.
12       Q.    In reviewing Dr. Finnerty's
13  report, did you review Dr. Finnerty's market
14  efficiency analysis?
15       A.    I did.
16       Q.    And in reviewing Dr. Finnerty's
17  report, did you review Dr. Finnerty's event
18  study?
19       A.    I did.
20       Q.    Did you review Dr. Finnerty's
21  report in anticipation of this deposition?
22       A.    Briefly, yes.
23       Q.    Opening up Hubbard-1, your June
24  26th report, to page 3 --
25       A.    Okay.

Page 42

1
2  mentioned, the issues had to do with recusal
3  or other compliance issues, not internal
4  controls, so that's why I answered yes.
5  BY MR. BODNAR:
6       Q.   And the reason you say that is
7  because counsel instructed you as such or is
8  that your independent understanding?
9            MR. WAGNER:  Objection to form.
10      A.   That would be my independent
11 understanding for those other dates.
12 BY MR. BODNAR:
13      Q.   Professor Hubbard, can you open
14 the Finnerty report marked as Hubbard-4, to
15 page 50, Paragraph 115, and give me an
16 indication once you've reviewed it.
17      A.   Yes, I'm there.
18      Q.   Isn't it the case that
19 Dr. Finnerty here is setting out that the
20 Complaint alleges misrepresentations
21 regarding effective disclosure procedures and
22 controls by Ocwen?
23           MR. WAGNER:  Objection to form.
24      A.   I believe that's correct, I list
25 that.  The question is:  What do the

Page 43

1
2  defendants instruct me?  I listed both your
3  view of the world and the defendant's view of
4  the world at the beginning of my report.
5       Q.   Professor Hubbard, I'm actually
6  going after something else, though.
7            You stated that you had a
8  independent understanding, separate from what
9  defense counsel instructed you, about the
10 internal controls issue.  And I'm trying to
11 get what that independent understanding is.
12      A.   That's not what I said.
13      Q.   Okay.
14      A.   You asked me about specific dates
15 and I said on those specific dates, I came to
16 an independent conclusion, because those
17 dates had nothing to do with internal
18 controls.
19      Q.   Let's go to your report, page 9,
20 discussing August 12, 2014.
21      A.   Yes.
22      Q.   And Professor Hubbard, did you
23 provide analysis as to this date in any prior
24 report?
25      A.   No, you had a different set of

Page 44

1
2  allegations than the previous plaintiffs'
3  lawyers.
4       Q.   Looking at Paragraph 18, it's
5  true that you accept Dr. Finnerty's
6  assessment of abnormal returns on August
7  12th, correct?
8       A.   Yes.
9       Q.   And you accept his calculation of
10 statistical significance as to August 12; is
11 that correct?
12      A.   I do.
13      Q.   And you would agree that they're
14 statistically significant -- apologies -- a
15 statistically significant abnormal return on
16 August 12; is that correct?
17      A.   I would.
18      Q.   Out of curiosity, abnormal
19 return, residual return, is there a
20 difference in your mind?
21      A.   I usually call it abnormal
22 return.  I think that's more the term of art,
23 but you could call it a residual return, if
24 you'd like.
25      Q.   We'll stick with abnormal return.

Page 45

1
2       A.   Okay.
3       Q.   Professor Hubbard, regarding
4  August 12, are you proffering any other
5  opinion as to this date?
6            MR. WAGNER:  Objection to form.
7       Q.   I'll rephrase.  Professor
8  Hubbard, are you proffering any other
9  economic opinion as of this date?
10           MR. WAGNER:  Objection to form.
11      A.   If I'm understanding your
12 question, yes.
13 BY MR. BODNAR:
14      Q.   What are you -- what economic
15 opinions are you proffering with regard to
16 August 12th?
17      A.   That Dr. Finnerty would not have
18 met his burden for establishing loss
19 causation.  So the previous agreement we had
20 was at the level of calculations and
21 statistics, not economics.
22      Q.   So that I'm clear, that
23 conclusion doesn't appear in your report; is
24 that correct?
25      A.   It most certainly does.

Page 46

```
1
2      Q.    Where does it appear?
3      A.    Well, it -- the first paragraph
4   makes it clear that there are confounding
5   issues, i.e., a change in methodology used to
6   valuing mortgage servicing rights.  I then go
7   on to say that the analyst had paid little
8   attention to Dr. Finnerty's core assumption.
9          So what I mean by his not meeting
10  his burden is he has not disentangled -- he
11  has not attempted to disentangle those.  So
12  while I can agree with them as a matter of
13  statistics and calculation, he hasn't met an
14  economist burden.
15     Q.    So that I'm clear, your opinion
16  as to August 12th is that there's confounding
17  information?
18     A.    Yes.
19     Q.    Could you state specifically what
20  that confounding information is?
21     A.    I think I just did, but I'll
22  repeat.
23     Q.    Sure.
24     A.    It's the subject of the first
25  paragraph, the change in the methodology used
```

Page 47

```
1
2   to value mortgage servicing rights.  I also
3   mentioned some lawsuits, but that's probably
4   the principle confounding information is the
5   first that I mentioned.  I, then, went on to
6   say that the analyst didn't pay much
7   attention to Dr. Finnerty's core assumption,
8   and in any event, Dr. Finnerty made no
9   attempt to disentangle them.  So he hasn't
10  met his burden for August 12th.
11     Q.    So on the first piece of
12  confounding information that you state, are
13  you suggesting that it was new information to
14  the market that there was a change in
15  methodology to value the mortgage servicing
16  rights on that date?
17     A.    I'm suggesting that Dr. Finnerty
18  has offered no analysis as to whether that
19  would be important to the market.  That would
20  be the threshold for a burden.
21     Q.    Let's take a step back.  August
22  12 concerns a restatement Ocwen's financials,
23  right?
24     A.    Yes, among other things.
25     Q.    And that restatement, Ocwen says,
```

Page 48

```
1   is a result of its changing methodology,
2   correct?
3      A.    Yes, if I'm understanding your
4   question, that's correct.
5      Q.    So do you have a different
6   understanding of what the corrective
7   disclosure is such that Ocwen's statement
8   that it's changing its methodology would be
9   confounding to the corrective disclosure?
10         MR. WAGNER:  Objection to form.
11     A.    My understanding, again, from
12  counsel, is that allegations are supposed to
13  be over internal controls.  The valuation of
14  mortgage servicing rights is something
15  separate.  Dr. Finnerty has not separated
16  those two.  He has not met his burden.
17     Q.    Professor Hubbard is it your
18  understanding from the record that using an
19  incorrect method to value NMS's mortgage
20  servicing rights is unrelated to financial
21  internal controls?
22         MR. WAGNER:  Objection to form.
23     A.    I'm not sure I could necessarily
24  accept the beginning of what you said, but my
25
```

Page 49

```
1   instruction from counsel is that this is to
2   be limited to internal controls and
3   therefore, the valuation change is separate.
4   If you have a different view, that's more
5   between the two of you.
6   BY MR. BODNAR:
7      Q.    So if a company uses an incorrect
8   methodology and fails to correct that at some
9   point -- strike that.
10         Looking at Paragraph 20,
11  Professor Hubbard, you write, quoting from
12  text:  Some of these articles also suggested
13  that it markets's reaction to Ocwen's
14  announcement was tempered.
15         Do you see that?
16     A.    I see it, yeah.
17     Q.    Is the word "tempered" from a
18  news source or is that your own word?
19     A.    That's my own word, inferring
20  from the fact that analysts had put little
21  weight on the news emphasized by
22  Dr. Finnerty.
23     Q.    And is that an economic term?
24     A.    "Tempered" is a colloquial term.
25
```

Page 58

1
2    aspect could be considered as part of the
3    corrective disclosure; is that accurate?
4         A.   Yes, that's what I said at the
5    beginning of the report when we went over the
6    three categories.
7         Q.   So outside of your counsel's
8    instruction, do you have any other reason to
9    believe that internal controls and the
10   changing of an incorrect valuation of
11   mortgage servicing rights are unrelated?
12        A.   They're not the same thing.  I
13   understand you have a more expansive
14   definition on which they might be, but
15   they're certainly not if the definition is
16   internal control.
17        Q.   I appreciate your answer, but
18   listen to my question.  It's not about the
19   same thing.  I'm asking:  Do you have a
20   reason, aside from your counsel's
21   instruction, to think they're unrelated?
22        MR. WAGNER:  Objection to form.
23        A.   Well, they're not the same thing.
24   I think it's what I just said.  You can
25   change a valuation methodology for reasons

Page 59

1
2    having nothing to do with an internal
3    control.
4         Q.   So to be clear, to you the term
5    "related" and "the same thing" are, in fact,
6    the same?
7         MR. WAGNER:  Objection to form.
8         A.   That's certainly true.  Not
9    the answer I just gave you.  I understand you
10   don't like the answer but it is what it is.
11        Q.   So then -- it would be fair to
12   say that the change of the incorrect
13   valuation of MSRs and the financial
14   accounting internal controls are related?
15        MR. WAGNER:  Hold on.
16        A.   I don't know whether they are or
17   not.  That would be something your expert
18   would have to parse.  They certainly need not
19   be.  There are many changes in valuation
20   methodologies that have nothing to do with
21   internal controls.
22        Q.   And it's your view that this is
23   one of them?
24        A.   My view is your expert didn't
25   establish that one way or the other and it

Page 60

1
2    was his burden to do so.
3         Q.   So you don't have an independent
4    review outside of Dr. Finnerty's work?
5         MR. WAGNER:  Objection to form.
6         A.   I'm here as a rebuttal expert for
7    him.
8    BY MR. BODNAR:
9         Q.   Could you open up Hubbard-1,
10   which is your June 26 report to page 7.
11        A.   Okay.
12        Q.   Now, talking about the December
13   22nd corrective disclosure.  Is it fair to
14   say that you examined the December 22nd
15   disclosure through two completely separate
16   misrepresentation frameworks?
17        MR. WAGNER:  Objection to form.
18        A.   I'm not sure what you mean by
19   "framework".
20   BY MR. BODNAR:
21        Q.   Sure.  Let's look at page 7.
22        A.   Okay.
23        Q.   On page 7 through
24   approximately -- through page 8, you examined
25   the December 22, 2014 disclosure through the

Page 61

1
2    framework of whether it relates to
3    Mr. Erbey's recusal; is that accurate?
4         A.   Yes.  Now I see what you mean by
5    "framework" because I also separately
6    consider it, yes.
7         Q.   And we can also go to page 10.
8         A.   Correct.
9         Q.   Let me get the question out, but
10   appreciate where you're going.
11        If we can go to page 10 where you
12   say, again, talking about the December 22,
13   2014 disclosure, you now analyze it through a
14   framework of NMS service and compliance; is
15   that accurate?
16        A.   Yes.
17        Q.   And that's page 10, basically,
18   through the end of the report, excepting --
19        A.   No.
20        Q.   -- basically through the end of
21   the report; is that fair?
22        A.   Yes, sir.
23        Q.   And would you agree with me that
24   those two frameworks are separate in that you
25   don't commingle them in any way?